*Hearing Date: August 9, 2017, 9:30 a.m. (Prevailing Eastern Time)*
*Proposed Objection Deadline: August 2, 2017, 4:00 p.m.  (Prevailing Eastern Time)*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>The Financial Oversight and Management Board for Puerto Rico,<br><br>    as representative of<br><br>The Puerto Rico Electric Power Authority, *et al.*<br><br>               Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 04780-LTS |

## MOTION OF AD HOC GROUP OF PREPA BONDHOLDERS, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., AND SYNCORA GUARANTEE INC. FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW MOVANTS TO ENFORCE THEIR <u>STATUTORY RIGHT TO HAVE A RECEIVER APPOINTED</u>

# Table of Contents

                                                                                                          **Page**

TABLE OF AUTHORITIES...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 4

I.      Overview of the PREPA Bonds ............................................................................. 4

II.     Crisis at PREPA ....................................................................................................... 8

III.    Negotiation and the RSA ...................................................................................... 11

        A.      The RSA: Three Years of Work to Restructure PREPA's Finances ....................11

        B.      The RSA Addressed Mismanagement at PREPA....................................14

        C.      The Puerto Rico Energy Commission Ratified the RSA and Its Rates ................15

IV.     Governor Rosselló and the Oversight Board Throw Away Three Years of Work,
        Damaging PREPA and Its Bondholders ............................................................. 16

        A.      Governor Rosselló's Reversals of PREPA's Operational and Governance
                Reforms.............................................................................................16

        B.      The Oversight Board and Governor Rosselló Discard the RSA............................19

JURISDICTION..................................................................................................................... 21

RELIEF REQUESTED ............................................................................................................ 22

ARGUMENT ........................................................................................................................ 22

THE COURT SHOULD LIFT THE STAY FOR "CAUSE" UNDER SECTION 362(D)(1),
        INCLUDING FOR LACK OF ADEQUATE PROTECTION ........................................ 22

        A.      PREPA's Failure to Abide by the Rate Covenant Constitutes Cause to Lift
                the Stay...............................................................................................23

        B.      PREPA's Ongoing Mismanagement Constitutes Cause to Lift the Stay...............27

        C.      Bondholders Face a Decline in the Value of Their Collateral Without
                Adequate Protection............................................................................29

        D.      The Balance of Harms Favors Bondholders ..................................................29

        E.      The PROMESA Stay Cases Are Distinguishable.................................................32

CONCLUSION.................................................................................................................................. 35

# Table of Authorities

**Page(s)**

**Cases**

*In re A Partners, LLC,*
    344 B.R. 114, 127 (Bankr. E.D. Cal. 2006)................................................................22

*Brigade Leveraged Capital Structures Fund Ltd. v. García-Padilla,*
    217 F. Supp. 3d 508 (D.P.R. 2016)....................................................29, 30, 33, 35

*In re Inwood Heights Housing Development Funding Corp.,*
    2011 WL 3793324 (Bankr. S.D.N.Y. Aug. 25, 2011) ..............................................23

*In re Jefferson Cnty., Ala.,*
    474 B.R. 228 (Bankr. N.D. Ala. 2012) ....................................................4, 25, 26, 27

*In re Jefferson Cnty., Ala.,*
    Case No. 11-05736 Dkt. No. 2248 (Bankr. N.D. Ala. Nov. 22, 2013)....................26

*In re Jefferson Cnty., Ala.,*
    Case. No. 14-0213 Dkt. No. 35 (N.D. Ala. Sep. 30, 2014) ....................................26

*In re Lakeshore Apartments of Ft. Oglethorpe, II, Ltd.,*
    109 B.R. 278 (Bankr. S.D. Ohio 1989)...................................................................23

*Le Sannom Bldg. Corp. v. Nathanson,*
    1993 U.S. Dist. LEXIS 11677 (S.D.N.Y. Aug. 17, 1993) ......................................23

*Marder v. Turner (In re Turner),*
    161 B.R. 1 (Bankr. D. Me. 1993).............................................................................31

*Marrero Rolón, et al. v. PREPA, et al.,*
    No. 15-01167, Dkt. No. 1 (D.P.R. 2015).......................................................1, 9, 10, 12

*In re Monroe Park,*
    17 B.R. 934 (D. Del. 1982)......................................................................................29

*Peaje Investments LLC v. García-Padilla,*
    2017 WL 104826 (1st Cir. Jan. 11, 2017)..........................................................33, 34

*Peaje Investments LLC v. García-Padilla,*
    NO. 16-2365 (FAB), D.P.R. (Nov. 2, 2016)............................................................24

*Peerless Ins. Co. v. Rivera,*
    208 B.R. 313 (D.R.I. 1997)......................................................................................30

*In re S. Side House, LLC,*
    474 B.R. 391 (Bankr. E.D.N.Y. 2012)....................................................................29

*In re Shefa, LLC,*
    524 B.R. 717 (Bankr. E.D. Mich. 2015)..............................................................27

**Statutes, Rules, & Other Authorities**

11 U.S.C. § 105(b) ............................................................................................24, 29

11 U.S.C. § 362 .........................................................................................1, 22, 34

11 U.S.C. § 1129(a)(6) .............................................................................................24

48 U.S.C. § 2195(a) ..................................................................................................35

48 U.S.C. § 2124(i)(3) ........................................................................................19, 35

48 U.S.C. § 2161 ..........................................................................................1, 22, 24, 34

48 U.S.C. § 2164(f) ...................................................................................................35

48 U.S.C. § 2174(b)(6) .............................................................................................24

P.R. Laws Ann. Tit. 22 ................................................................................... *passim*

U.S. Const. amend V ................................................................................................24

Act 2-2017 ..............................................................................................................17

Act 3-2017 .........................................................................................................17, 27

Act 37-2017 ...........................................................................................................19

S. Rep. 100-506 (1988).............................................................................................5

H.R. 5278 (2016) ....................................................................................................19

Movants, who are holders and/or insurers of bonds issued by the Puerto Rico Electric Power Authority ("**PREPA**" or the "**Authority**") representing approximately 65% of the approximately $8.3 billion in outstanding bond debt, respectfully submit this combined motion and memorandum of law in support thereof (the "**Motion**"), pursuant to 11 U.S.C. § 362(d) (made applicable to this proceeding pursuant to 48 U.S.C. § 2161) to lift the automatic stay to commence an action in a court of competent jurisdiction against PREPA for the appointment of a receiver.

## PRELIMINARY STATEMENT

Movants seek to lift the stay to enforce their unequivocal right under Puerto Rico law and the Trust Agreement pursuant to which the Bonds (as further defined below) were issued to install a receiver for PREPA following an event of default.

Puerto Rico law and the Trust Agreement require PREPA to set its rates and charges at amounts sufficient to enable PREPA to pay its debts. The purpose of these provisions is to compensate PREPA's bondholders for the limited recourse nature of the Bonds and the inability of PREPA to grant a mortgage or other lien on its physical assets. To provide creditors with the equivalent of a full recourse obligation that is secured by a mortgage on its physical assets, PREPA pledged its revenues, and covenanted that it would maintain rates at levels sufficient to cover certain operating expenses and debt service on the Bonds. Further giving effect to this pledge, the Authority Act provides for the *automatic* appointment of a receiver in the event that PREPA fails to meet its obligations.

PREPA had not sought an increase in its base rates from the 1980's through 2015, and its current rate is inadequate to generate sufficient revenues to pay debt. As a result, it defaulted on its payment of principal and interest on the Bonds that was due on July 3, 2017. For

- 1 -

decades, PREPA has been crippled by politicized mismanagement and outright corruption. As a result of such mismanagement, PREPA has been unable to generate adequate cash flow to service PREPA's debt obligations on the Bonds as required by the Trust Agreement and the Authority Act. Pursuant to the Authority Act and under the bond documents, Movants are therefore entitled to the appointment of a receiver. The entitlement to a receiver is unequivocal and unconditional. Every day that a receiver is not appointed and the rate covenant in favor of Movants is not enforced, Movants' collateral package is at risk of being diminished. Lifting the stay is thus required, not only to prevent undue and irreparable harm to Movants, but also to foster operational reform by, among other things, depoliticizing PREPA's key decision-making.

Movants had hoped that this day would never come. For over three years they worked tirelessly with two different governors to address PREPA's defaults and cash flow issues and establish a pathway for long-term reform. As the negotiations slowly progressed, Movants advanced hundreds of millions of dollars of new liquidity to PREPA to avoid payment defaults. In addition, PREPA agreed to appoint non-political, independent leadership, including a Chief Restructuring Officer ("**CRO**") and independent board members, who began to implement various necessary interim reforms, resulting in hundreds of millions of dollars of savings for PREPA.

Movants' negotiations with PREPA ultimately culminated in the execution of a restructuring support agreement among PREPA, Movants and certain other parties (the "**RSA**") that was authorized by statute enacted by Puerto Rico's legislature, and certain key components of which were approved by the Puerto Rico Energy Commission. The transactions contemplated in the RSA would have provided PREPA with long-term rate and operational stability and would have enabled PREPA to continue to implement operational reforms. Unfortunately, following

- 2 -

the election of Governor Rosselló, three of the six independent board members were dismissed and replaced with political appointees, and Governor Rosselló did not renew the CRO's contract, leading to her departure in February 2017.

On June 28, 2017, the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") established under the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("**PROMESA**") formally notified PREPA that it refused to certify the RSA for implementation under Title VI of PROMESA.  On June 29, 2017, AAFAF and PREPA's board chose to terminate the RSA, triggering an avoidable payment default and forcing this Title III proceeding.   With the failure of the RSA, the return of PREPA's politicization, and rates inadequate to fund PREPA's obligations, Movants no longer are prepared to accept the injury they have suffered and continue to suffer.  A receiver is needed to give undivided focus to the needs of PREPA, including pursuing revenue enhancements, in order to improve PREPA's operations and return PREPA to financial stability.  By contrast, given the conflicts of interest that permeate much of the decision-making by the Rosselló Administration, PREPA's interests cannot be adequately served or protected if they are subjected to the whims of the Governor's agenda.

Movants therefore seek relief from the stay, for cause, in order to exercise their statutory right to seek relief before a court of competent jurisdiction to appoint a receiver for PREPA.  The receiver would ensure that the lien granted to bondholders and insurers as part of their collateral package produces net revenues in amounts sufficient to timely pay debt service on the Bonds and have such other powers provided for under the Authority Act or the Trust Agreement and that the court appointing the receiver may deem appropriate.

- 3 -

<u>**STATEMENT OF FACTS**</u>

**I.  Overview of the PREPA Bonds**

PREPA was established as a public corporation under the Puerto Rico Electric Power Authority Act, Act No. 83 of May 2, 1941, P.R. Laws Ann. Tit. 22 §§ 191, *et seq.* (as amended, reenacted and supplemented, the "<u>**Authority Act**</u>"), to own and operate production and transmission assets providing electricity to 1.5 million customers.  Section 16 of the Authority Act authorized PREPA to issue bonds to the public.  *See* P.R. Laws Ann. Tit. 22 § 206.

Pursuant to its statutory authority, PREPA has issued approximately $8.3 billion in revenue and revenue refunding bonds (the "<u>**Bonds**</u>") under a Trust Agreement by and between PREPA and U.S. Bank National Association, as successor trustee (the "<u>**Trustee**</u>"), dated as of January 1, 1974 (as amended and supplemented, the "<u>**Trust Agreement**</u>").[1]  Movants hold and/or insure approximately $5.3 billion – approximately 65% – in principal amount of Bonds outstanding.

Unlike financings for privately-owned utilities, holders of revenue bonds in public utility financings generally have no recourse to general funds of the sponsoring state, territory or municipality, have no recourse to or mortgage or other lien on physical assets, and are secured solely by a pledge of revenues of the utility after payment of current operating expenses.  This is because the laws of most U.S. states and territories (including Puerto Rico) restrict public

---

[1] *See* Dkt. No. 2 (Statement of Oversight Board Regarding PREPA's Title III Case) (hereinafter "<u>Oversight Board Statement</u>") at 6-7.  All references to Dkt. are to the docket of this Title III proceeding, unless otherwise noted.  A true and correct copy of the Trust Agreement is attached as Exhibit B to the Declaration of Steven Spencer (the "<u>**Spencer Declaration**</u>").  *See also* Spencer Decl. ¶ 4 n.4. (describing all supplemental agreements amending the version of the Trust Agreement attached as Exhibit B).

utilities from pledging physical assets as collateral for financial obligations.  P.R. Laws Ann. Tit. 22 § 206.[2]

        To compensate holders of revenue bonds for these restrictions on recourse to and mortgage or other lien on physical assets, such bonds are generally also secured by a covenant to maintain rates at a level sufficient to cover debt service, which ensures that bondholders will not be adversely impacted by increases in the amount of operating expenses due to inflation or otherwise.  The rate covenant gives bondholders the unimpaired right to the revenues pledged to them and is therefore a necessary part of the collateral package.  Without the rate covenant, bondholder collateral would be diminished each year solely by an increase in operating expenses.  Thus, revenue bonds of public utilities (including the Bonds) are typically secured by (i) a lien on revenues generated by the utility system, (ii) a covenant that the utility will maintain rates at a level sufficient to cover debt service, and (iii) the right to require a court of competent jurisdiction to appoint a receiver if the utility is in default.

        These statutory and contractual provisions operate together to give creditors a collateral package that is the equivalent of a full recourse obligation that is secured by a mortgage or other lien on the physical assets.  Indeed, in enacting amendments to chapter 9 in 1988, Congress specifically sought to provide limited recourse revenue bondholders "a recognition of a hypothetical mortgage from which revenues are derived where a real mortgage cannot be created either for legal reasons or because of compelling consideration of public policy."  S. Rep. 100-506, at 13 (1988).

---

[2] *See, e.g.*, *In re Jefferson County*, 474 B.R. 228, 238-39 (Bankr. N.D. Ala. 2012) ("[M]any states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties.").

As part of the collateral package for the Bonds, PREPA entered into a binding commitment, set forth under the Trust Agreement and supported by the Authority Act, to "fix, charge and collect reasonable rates and charges" and "adjust such rates and charges so that Revenues will at all times be sufficient" to pay the "Current Expenses of the System" and cover 120% of "the aggregate Principal and Interest Requirements for the next fiscal year" on account of the Bonds (the "**Rate Covenant**").  Trust Agreement (Spencer Decl., Exh. B) at § 502.

This portion of the collateral package is supported through power expressly granted to PREPA under Section 6(*l*) of the Authority Act, which grants PREPA "all rights and powers necessary and convenient to," among other things,

> determine, fix, alter, charge, and collect reasonable and just rates, fees, rents, and other charges subject to the [Energy] Commission's approval, . . . for electric power services . . . that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of such agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors.

P.R. Laws Ann. Tit. 22 § 196(*l*), *amended by* Act 4-2016 at § 8.

In 2014, the Authority Act was amended to create the Puerto Rico Energy Commission (the "**Energy Commission**"), which is charged with reviewing and approving electric rates.  *See generally* Act 57-2014, codified at P.R. Laws Ann. Tit. 22 § 1054(b). However, the Authority Act carefully ensures that the Energy Commission does not undermine PREPA's obligation to charge adequate rates; it requires that the Energy Commission approve a rate that "(i) is sufficient to guarantee the payment of principal, interest, reserves, and all other requirements of bonds . . . [and] (ii) complies with the terms and provisions of the agreements entered into with or in benefit of buyers or holders of any bonds . . . ."  Authority Act at § 6A(c), *amended by* Act 4-2016 at § 9; Authority Act at § 6.25A(b), *amended by* Act 4-2016 at § 18.

- 6 -

PREPA bondholders' collateral thus includes the pledge of current and future revenues and the right to have rates and charges set at levels sufficient to guarantee payment of debt service on the Bonds, payments into reserves under the Trust Agreement, and payment of all other financial obligations of PREPA.  As described below, PREPA is in breach of the Rate Covenant and in violation of these related statutory provisions, and has been for many years due to, among other things, its lengthy history of mismanagement.

To enforce their rights, bondholders holding at least twenty-five percent of the principal amount of Bonds outstanding have the statutory right to require the appointment of a receiver following an event of default.[3]  Section 17(a) of the Authority Act provides:

> [I]n the event that [PREPA] shall default in any agreement made with the holders of the bonds, any holder or holders of the bonds . . . *shall have the right* to apply in an appropriate judicial proceeding to any court of competent jurisdiction in Puerto Rico for the appointment of a receiver of the undertakings, or parts thereof, the income or revenues of which are pledged to the payments of the bonds so in default . . . . Upon such application the court may appoint, and if the application is made by the holders of twenty-five (25%) per centum in principal amount of such bonds then outstanding, or by any Trustee for holders of bonds in such principal amount*, **shall** appoint a receiver of such undertakings*.

P.R. Laws Ann. Tit. 22 § 207(a) (emphasis added).  As the language of the Authority Act shows, this relief is mandated:  The court is required to appoint a receiver upon application by holders of more than 25% in principal amount of Bonds outstanding.  Movants hold and/or insure (which for purposes of directing remedies qualifies as the sole holder of the Bonds) approximately 65% of the Bonds, well above this threshold.

---

[3] Under the Trust Agreement, bondholders originally had the right to compel enforcement of the Rate Covenant themselves.  Following the passage of Act 57-2014, all rate increases must be approved by the Energy Commission.  The vast majority of Bonds were issued and insured prior to the enactment of Act 57-2014, when PREPA had the unilateral right to increase rates.

## II.     Crisis at PREPA

PREPA has a long and undisputed history of mismanagement, corruption, and poor performance.  In April 2015, Lisa Donahue, PREPA's former CRO, testified before the Puerto Rico Senate that a "fundamental issue that PREPA has that must change" is the politicization permeating PREPA's operations.[4]  She stated that "[s]taffing decisions are made often without regard for prior experience or expertise given the nature of PREPA's role in the political process"; that the top 200 people at PREPA switch every four years with the change of political administrations; and that it is "an impossible task" to "efficiently manage a business where you know your tenure is short-term and you are going to have political pressure to do things that may or may not be in the best interest to the long-term results of the organization." *Id.* at 12, 84, 77-78.

Long-term capital planning at PREPA was "nearly impossible as leadership and priorities changed.  Too often, decisions were made out of political priorities, rather than sound business judgment."[5]  PREPA often started and then abandoned expensive projects due to political pressure or changing administrations.[6]  For example, in 2012, after investing $50 million in a natural gas pipeline, Puerto Rico withdrew its plans for the pipeline amid a storm of controversy and political opposition.[7]

---

[4] Donahue April 2015 Testimony (HasBrouck Decl., Exh. K-2) at 77.

[5] *Puerto Rico Elec. Power Auth. Operational Transformation: Hearing Before the Puerto Rico S. Comm. on Energy Affairs and Water Resources*, 17th Legis. Assemb., 3 (Oct. 4, 2016) (testimony of Lisa Donahue, Chief Restructuring Officer of PREPA) (hereinafter "Donahue October 2016 Testimony"), attached as Exhibit E to HasBrouck Declaration.

[6] *See* In re: Puerto Rico Electric Power Authority Rate Review. CEPR-AP-2015-0001, Final Resolution and Order at 22 (Jan. 10, 2017) (hereinafter "Energy Commission Order"), attached as Exhibit A to HasBrouck Declaration.

[7] *See, e.g., Puerto Rico abandons plans to build gas pipeline*, Associated Press, Oct. 12, 2012, http://www.cnbc.com/id/100165617; *see also* Congressman Gutiérrez, Press Release, Oct. 11, 2012, https://gutierrez.house.gov/press-release/gasoducto-puerto-ricos-pipeline-project-dead.

PREPA's management has been repeatedly accused of corruption. In a special television program entitled "*¿Por qué pagamos tanto? En su totalidad*," which aired in Puerto Rico on or about May 12, 2014, then-Senate President Eduardo Bhatia suggested that the PREPA kickbacks amounted to nearly $300 million in just one year.[8]

A class action lawsuit filed on February 24, 2015 alleged that the heads of PREPA's fuel procurement office and other PREPA employees violated the Racketeer Influenced and Corrupt Organization Act and engaged in a kickback scheme with oil suppliers and testing labs to defraud PREPA ratepayers of millions of dollars by coordinating with oil testing labs to fraudulently certify "dirty," low-cost fuel oil as higher-cost, cleaner, compliant fuel oil from 2002 to 2014 and keep the profits. *See Marrero Rolón, et al. v. PREPA, et al.*, No. 15-01167, Dkt. No. 1 (D.P.R. 2015).

PREPA also suffered from years of inefficient or nonexistent collection efforts and poor monitoring and metering standards. By 2014, PREPA's collections record was abysmal. A report issued by FTI Capital Advisors, LLC ("**FTI**"), PREPA's consultant, in late 2014 detailed parts of PREPA's dysfunction. Of $950 million in outstanding accounts receivables for general (non-governmental or municipal) customers, more than half were over 120 days old. FTI Report (HasBrouck Decl., Exh. I) at 11, 16. FTI reported $400 million in inactive accounts "for which there is no collection activity or strategy." *Id.* at 29. At the time of the report, over 3,000 meters were showing power consumption not linked to any account. *Id.*

This habit of non-collection extended to PREPA's governmental and municipal customers. Pervasive non-payment by Puerto Rico's public corporations "result[ed] in a de-facto

---

[8] *Por qué pagamos tanto? En su totalidad.*, Univision (2014), http://www.univision.com/puerto-rico/wlii/por-que-pagamos-tanto-en-su-totalidad-video.

subsidy to these corporations," made worse by PREPA's "inability to take enforcement actions against non-payers." *Id.* at 17.  This practice of providing free power to governmental agencies can be seen in the Title III petition for the Puerto Rico Highway and Transportation Authority ("**HTA**"), which lists PREPA as the largest unsecured creditor of HTA, holding a $46 million claim against HTA.  *See* Case No. 17-03567, Dkt. No. 1 (May 22, 2017).  PREPA was required by law to offer subsidies to municipalities, and the municipalities took advantage of that, operating businesses that earned income for the municipality without having to pay for power.  FTI Report (HasBrouck Decl., Exh. I) at 20.  With several other governmental entities (including HTA) in Title III proceedings, the continued politicization of the PREPA board is fraught with conflicts of interest that cannot be resolved.

Compounding these issues is a history of inadequate rates.  Indeed, the Fiscal Plan that PREPA put together on April 28, 2017 (the "**Fiscal Plan**") – which has been provisionally approved by the Oversight Board subject to requested modifications – states that PREPA's current financial situation is the result of "years of rate deficits, during which operating expenses incurred were not recovered in rate revenues."  Dkt. No. 2, Exh. 1 at 15.

Notwithstanding its contractual and statutory obligations, for 26 years (from 1989 through 2015), PREPA failed to increase its base rate (a fixed rate for non-fuel expenses like general administration, capital investment, and debt service), resulting in years of collections that were inadequate to cover PREPA's costs.[9]  PREPA has acknowledged that, "[h]istorically, there has been political pressure to not increase PREPA's rates in response to cost and investment needs . . . ."  Energy Commission Order (HasBrouck Decl., Exh. A) at 4.

---

[9] *Exploring Energy Challenges and Opportunities Facing Puerto Rico*, Hearing Before the Subcomm. on Energy and Natural Resources, 114th Cong. 2 (2016) (statement of Lisa Donahue, PREPA's Chief Restructuring Officer) (hereinafter "Donahue U.S. Senate Testimony"), attached as Exhibit G to HasBrouck Testimony.

Stated simply, PREPA's management over decades has been unwilling to adjust the base rate, not only causing it to breach its contracts and financial obligations but also setting the utility onto an unsustainable path that must be corrected.

## III.    Negotiation and the RSA

### A.    The RSA: Three Years of Work to Restructure PREPA's Finances

In the summer of 2014, PREPA faced a liquidity crisis, and PREPA and its creditors started urgent negotiations that culminated in a group of forbearance agreements between PREPA, the Government Development Bank ("**GDB**") (PREPA's fiscal advisor), and its major financial creditors, including certain members of the Ad Hoc Group, insurers of Bonds, and certain fuel line of credit lenders.[10]  Under the Forbearance Agreement, bondholders made various agreements, including to forbear from exercising certain remedies against PREPA and to amend the Trust Agreement to, among other things, temporarily suspend PREPA's requirement to refill bondholder reserves dedicated to pay the bondholders to required levels.

For its part, PREPA agreed to appoint a chief restructuring officer who would work to renegotiate PREPA's debt, address PREPA's operational problems, and try to restore PREPA's financial health.  Energy Commission Order (HasBrouck Decl., Exh. A) at 14.  On September 11, 2014, PREPA hired Lisa Donahue of AlixPartners as PREPA's CRO and retained AlixPartners as outside consultant.  Donahue and AlixPartners set to work identifying and realizing savings for PREPA, correcting many of PREPA's administrative issues and putting together a comprehensive plan for PREPA's revitalization.  According to the former President of

---

[10] The original agreement executed on August 14, 2014 between PREPA, the Ad Hoc Group, and the insurers of bonds (the "**Forbearance Agreement**") is annexed as Exhibit A to the Spencer Declaration.  The Forbearance Agreement was amended a number of times.  Those amendments – as well as the other forbearance agreements PREPA entered into at the time and the amendments to those agreements – are available at the Government Development Bank's website, http://www.gdb-pur.com/investors_resources/prepa.html.

PREPA's board, their work achieved $267 million in one-time savings and $212 million in recurring annual operating expense savings.[11]

Months of further negotiation with certain creditors culminated in agreement on a holistic, consensual restructuring of PREPA's financial debt, memorialized in the RSA executed in late 2015. *See* Dkt. No. 2, at 8. Despite statutory and contractual protections designed to ensure payment in full through adequate rates, Movants agreed to voluntary concessions. These concessions included the voluntary exchange of uninsured Bonds at a discount into securitization bonds issued by a newly created public corporation (the "**SPV**") secured by the SPV's right to assess a charge on electrical use (the "**Transition Charge**") and providing that the new securitization bonds would pay only interest for the first five years after issuance. Donahue U.S. Senate Testimony (HasBrouck Decl., Exh. G) at 6-7. Certain of the insurers agreed to provide first loss protection on the securitization bonds (and thereby increase their overall exposure to PREPA) through the issuance of over $400 million of surety bonds that would fund the debt service reserve fund for the new securitization bonds. *Id.* To support this settlement, the legislature quickly passed, and on February 16, 2016, the Governor signed, Act 4-2016, the Electric Power Authority Revitalization Act (the "**Revitalization Act**"), authorizing the creation of the SPV with powers necessary to implement the deal.

As part of the RSA, certain Movants also agreed to help PREPA with its liquidity position and avoid a default on its Bonds. Spencer Decl. at ¶ 9. Certain Movants agreed to fund scheduled debt service through the purchase of newly issued Bonds – essentially deferring payments owed to them (or on Bonds insured by them) to avoid a payment default. Spencer

---

[11] *The Status of the Puerto Rico Electric Power Authority (PREPA) Restructuring Support Agreement*, Hearing Before the Subcomm. on Indian, Insular and Alaska Native Affairs, 115th Cong. 3 (2017) (statement of Luis Benítez, Chairman of PREPA's Board) (hereinafter "Benítez Testimony"), attached as Exhibit B to HasBrouck Declaration.

Decl. at ¶ 10.  This dramatically reduced the amount of money that PREPA was required to pay to bondholders over the past three years by approximately $374 million.  *See* Oversight Board Statement, Dkt. No. 2, at 4.

After Governor Rosselló took office, he demanded further concessions from creditors to improve PREPA's financial position over the next ten years (the "**RSA Enhancements**").  The RSA Enhancements were agreed to in principle on April 6, 2017, and formally incorporated into the RSA on April 27, 2017.[12]  The RSA Enhancements reflected PREPA's new ability under Title VI of PROMESA to impose the exchange of uninsured Bonds for new securitization bonds issued by the SPV at a discount onto the uninsured bondholders that were not parties to the RSA, thus eliminating the ability for holders of uninsured Bonds to refuse to exchange their Bonds.[13]  In addition, the insurers agreed in the RSA Enhancements to defer approximately $340 million of principal through forward purchase commitments that otherwise would be due within six years of the closing date, thereby providing PREPA with further liquidity relief.[14]  Movants also agreed to another relending transaction (the "**2017 Relending**"), namely a purchase of newly issued Bonds that would reduce the amount of money that PREPA would need to pay to bondholders on July 3, 2017 by the amount of bonds purchased.[15]  PREPA

---

[12] *See generally PREPA Public Disclosure Dated April 6, 2017*, Electronic Municipal Market Access, Municipal Securities Rulemaking Board (Apr. 6, 2017), https://emma.msrb.org/ER1046043-ER819555-ER1220619.pdf (hereinafter, the "April 6, 2017 EMMA Filing"); *see also PREPA Public Disclosure Dated April 28, 2017*, Electronic Municipal Market Access, Municipal Securities Rulemaking Board (April 28, 2017), https://emma.msrb.org/ER1046043-ER819555-ER1220619.pdf.

[13] *See* April 6, 2017 EMMA Filing at 24 (stating that treatment of "Non-RSA Bondholders" will be "implementation through Title VI" of PROMESA).  The pre-RSA Enhancements version of the RSA capped the number of uninsured Bonds that could remain at PREPA after the voluntary exchange (the "**Holdout Bonds**") at $700 million.  *See* Energy Commission Order (HasBrouck Decl., Exh. A) at 92.

[14] April 6, 2017 EMMA Filing, Annex B at 3.

[15] *Id.* at 2-3.

indicated that, absent the 2017 Relending, it would not have sufficient liquidity to pay the full amount of debt service due on the Bonds.[16]

## B.  The RSA Addressed Mismanagement at PREPA

The RSA – as incorporated into the Revitalization Act – also sought to correct some of the worst of PREPA's mismanagement.  It required the appointment of a board of directors made up of consumer representatives and a majority of professional, independent members chosen by the Governor from a list compiled by a recognized search firm and confirmed by the Senate.  Section 5, Act 4-2016.  Governor García-Padilla submitted his nominees on October 27, 2016, and the Senate confirmed them on December 2, 2016.[17]  In order to prevent the "quadrennial turnover of managers with each new political administration" (Energy Commission Order (HasBrouck Decl., Exh. A) at 23), the Revitalization Act provided that board members' terms would be staggered, removal of board members would only be permitted for a specified list of causes, and any replacement would be selected using the same criteria as the selection of the original members.  P.R. Laws Ann. Tit. 22 § 1074.

Finally, the RSA required that PREPA submit a rate case to the Energy Commission asking for a change in PREPA's rate structure premised on the creditor concessions in the RSA.  PREPA sought a rate that would be sufficient to cover debt service on $700 million in Holdout Bonds only, on the assumption that the separate "Transition Charge" issued by the new SPV would be collected to cover debt service on the new securitization bonds.  Energy

---

[16] *PREPA Public Disclosure Dated March 21, 2017*, Electronic Municipal Market Access, Municipal Securities Rulemaking Board (March 21, 2017), https://emma.msrb.org/EP986991-EP765363-EP1167129.pdf  (hereinafter "EMMA Disclosure"), attached as Exhibit E to Spencer Declaration.

[17] *See Governor Appoints PREPA Board Members*, La Fortaleza (October 27, 2016), http://new.reorg-research.com/data/documents/20161027/5812607a36688.pdf; *see also Senate Confirms PREPA Board Members but Milestones Still Loom,* Reorg Research (Dec. 2, 2016), https://platform.reorg-research.com/print/article/28240.

- 14 -

Commission Order (HasBrouck Decl., Exh. A) at 15-16, 29.  PREPA's debt service revenue requirement for fiscal year 2017 took into account debt service on Holdout Bonds only (as well as debt service on certain insured Bonds not then part of the RSA and on PREPA's expired fuel lines) and was $314,319,000, even though PREPA owed $611 million in debt service on its Bonds in fiscal year 2017.  Energy Commission Order (HasBrouck Decl., Exh. A) at 92.

### C.  The Puerto Rico Energy Commission Ratified the RSA and Its Rates

PREPA submitted its rate petition on May 27, 2016.  Energy Commission Order (HasBrouck Decl., Exh. A) at 190.  After months of hearings involving extensive testimony from PREPA, independent experts, and RSA opponents, the Energy Commission approved the proposed rate on January 10, 2017.  The approved rate included a charge per kilowatt hour sufficient to cover PREPA's revenue requirement.  However, that revenue requirement for 2017 "assume[d] that the payment for the debt included in the RSA is not an expected expense for 2017."  Energy Commission Order (HasBrouck Decl., Exh. A) at 216 n.351.

For all the emphasis placed on the importance of bondholder concessions, debt service is only a small component of PREPA's rates.  To satisfy bondholder claims in full, current rates would only need to increase by approximately 3.5 cents per kilowatt hour.[18] HasBrouck Decl. at ¶ 27.  For comparison, PREPA's all-in electricity charge in April 2017 was 20.1 cents per kilowatt hour.[19]  The Energy Commission's expert estimated that the current charge for PREPA's debt service is only approximately 1.9 cents.[20]  Rates under the RSA – and

---

[18] Expert Report of Stephen G. Hill, In re: Puerto Rico Electric Power Authority Rate Review, No. CEPR-AP-2015-0001, at 24-27 (Nov. 2, 2016), http://energia.pr.gov/wp-content/uploads/2016/11/Hill-Report-Final-11-21.pdf (hereinafter "Hill Report").

[19]  Operations Report – April 2017 Puerto Rico Electric Power Authority at 5 (May 31, 2017), https://www2.aeepr.com/INVESTORS/DOCS/Financial%20Information/Monthly%20Reports/2017/April%202017.pdf.  The April 2017 monthly report is the most recent publicly available monthly report.

[20] Hill Report, at 25-27.

rates required to cover all of PREPA's debt service obligations – are, in fact, lower than the 28

cents per kilowatt hour paid by Puerto Ricans as recently as 2014.[21]

## IV.    Governor Rosselló and the Oversight Board Throw Away Three Years of Work, Damaging PREPA and Its Bondholders

### A.  Governor Rosselló's Reversals of PREPA's Operational and Governance Reforms

Despite the progress that was made, there are still operational problems at the

utility, including numerous power outages.  PREPA suffers from: (1) poor system reliability and

availability driven by poor maintenance and operation procedures, (2) poor levels of customer

service, (3) poor level of collections and high levels of energy theft, (4) poor worker safety, (5)

insufficient budgeting and capital planning rigor, and (6) inefficient procurement processes.

HasBrouck Decl. at ¶ 9.

Far from moving to fix these problems, the new Puerto Rico administration is

making them worse by destroying PREPA's hard-won political independence.  Shortly after he

took office, Governor Rosselló signed into law an act that granted the Puerto Rico Fiscal Agency

and Financial Advisory Authority ("AAFAF") sole authority to negotiate with public

corporations' creditors.  Act 2-2017 at § 5(c).[22]  Notably, the Governor appoints the majority of

the AAFAF board members, and there are no restrictions on his ability to remove those

members.  Former President of the PREPA board Luis Benítez testified that "in late 2016,

PREPA and its creditors reached an agreement in principle to modify certain terms of the RSA,

subject to approval by [AAFAF]. . . . The agreement in principle, however, was not executed

because AAFAF assumed responsibility for creditor negotiations on January 27, 2017."  Benítez

---

[21] *See* Dkt. No. 2, Exh. 1 at 45; *see also* Donahue Senate Testimony (HasBrouck Decl., Exh. G) at 2.

[22] Movants respectfully request from the Court leave to file section 5 of Act 2-2017 in Spanish as Exhibit C and also request an extension of 10 days to file a certified translation.

Testimony (HasBrouck Decl., Exh. B) at 6.  AAFAF sent out a press release the same day saying

that AAFAF "is the only entity of the government of Puerto Rico authorized to negotiate and

reach agreement with creditors . . . .  Therefore, AAFAF . . . has informed [PREPA] that AAFAF

and its financial advisor, Rothschild, will now lead the negotiations with PREPA creditors."[23]

Governor Rosselló next signed a law that would allow him to remove any board

member from any public corporation, including PREPA, "that [the Governor] understands that is

not performing the public policy established by him or that does not have his confidence to

formulate and implement the fiscal plan required by the federal legislation known as

PROMESA."  Act 3-2017 at § 29.[24]

When asked about his proposed changes to the PREPA board, Governor Rosselló

said he wanted political loyalty as the "first criteria" for the PREPA board: "That the members

are not partisan political figures, that is not the first criteria of this administration . . . .  The

criteria is if they well effectuate the public policy of this administration."[25]  The Governor

pointed to rates as one of the differences between his goals and the professional board's goals:

"If I don't trust… It has already been shown that the steps they [board members] have taken go

against that, for example raising rates […] That goes totally against what we want to do."[26]

---

[23] AAFAF January Press Release (Spencer Decl., Exh. C) at 1.

[24] Movants respectfully request from the Court leave to file section 29 of Act 3-2017 in Spanish as Exhibit D and
also request an extension of 10 days to file a certified translation.

[25] *Rosselló Nevares Says Energy Reform Will Bring Down Costs, Defends PREPA Board Shakeup*, Reorg Research,
Feb. 14, 2017, https://platform.reorg-research.com/print/article/30713.

[26] *Governor Recommends New PREPA Chairman*, Caribbean Business, March 3, 2017,
http://caribbeanbusiness.com/governor-recommends-new-prepa-chairman/.

In early February 2017, PREPA also announced that the engagement of AlixPartners and Lisa Donahue would be terminated.[27]  The engagement ended on February 15, 2017.  Moody's Investor Services said of the shakeup, "[w]e view these developments as credit negative for PREPA.   The absence of a restructuring firm focused on PREPA creates a leadership vacuum following two years of negotiations that enabled the utility to reach a broad agreement with bondholders on a restructuring plan and make operational changes that improved the utility's efficiency and lowered its costs."[28]

A month later, Governor Rosselló announced his nomination of a new Executive Director for PREPA to replace PREPA's sitting Executive Director, who had held the post since 2015 – prior to Governor Rosselló's election.[29]

On June 26, 2017, Governor Rosselló signed into law a bill specifically aimed at overhauling PREPA's board, allowing him to appoint three political appointees and three independent, professional board members, all subject to his unfettered right to remove them if they disagree with his public policy.  *See* Act 37-2017, § 1.[30]  Governor Rosselló quickly took advantage of the new law.  According to one of the consumer representatives on the PREPA board, "PREPA no longer has a board.  On Monday we met but that meeting was not valid

---

[27] *See* Cynthia López Cabán, *The Departure of AlixPartners is Near*, El Nuevo Día (Feb. 2, 2017), https://www.elnuevodia.com/english/english/nota/thedepartureofalixpartnersisnear-2287053/; *see also Rosselló Pledges to Protect 'Most Vulnerable' in Pension Reform,* Reorg Research (Feb. 15, 2017), https://platform.reorg-research.com/print/article/30778.

[28] *Puerto Rico Electric Power Authority: Recent Developments Raise Uncertainty, But a Consensual Restructuring Is Still Possible,* Moody's, Feb. 24, 2017, https://www.moodys.com/research/Puerto-Rico-Electric-Power-Authority-Recent-Developments-Raise-Uncertainty-But-Issuer-Comment--PBM_1061081.

[29] *See* Ramos Press Release (Spencer Decl. Exh. I-1).  Governor Rosselló's pick, Ricardo Ramos, served as an advisor to Excelerate Energy, the company that will build and operate the Aguirre Offshore Gasport, a major new energy project for PREPA.  *Id.*

[30] Movants respectfully request from the Court leave to file section 1 of Act 37-2017 in Spanish as Exhibit E and also request an extension of 10 days to file a certified translation.

because they dismissed us retroactive to June 26."[31]   On June 28, 2017, the Governor announced

three of PREPA's new board members: Omar Marrero, who already held a position in the

Governor's Administration as Executive Director of the Public Private Partnerships Authority;

Edwin Alexis Irizarry Lugo; and Ernesto Sgroi.[32]

### B.   The Oversight Board and Governor Rosselló Discard the RSA

On June 30, 2016, Congress passed PROMESA, which created the Oversight

Board, although the members of the Oversight Board were not appointed until August 31, 2016 –

months after the RSA was executed.  Dkt. No. 2 at 14.

PROMESA is designed to promote consensual deals with creditors, particularly

deals struck prior to passage of PROMESA.[33]   Indeed, PROMESA § 104(i)(3), entitled

"PREEXISTING VOLUNTARY AGREEMENTS," provides that any settlement reached with a

majority of affected creditors before May 18, 2016 shall be deemed to conform to certain

statutory requirements for certification by the Oversight Board.   PROMESA affords the

Oversight Board no discretion to assess the underlying terms of such agreements.

---

[31] Eva Lloréns Vélez, *Puerto Rico Electric Power Authority Board Fired*, Caribbean Business (June 29, 2017), https://caribbeanbusiness.com/puerto-rico-electric-power-authority-board-fired/.

[32] *Governor Names New PREPA Board Members; Includes P3 Authority Chief, 2 Others*, Reorg Research, June 28, 2017, https://platform.reorg-research.com/print/article/37868.   Of the three new board members, Mr. Marrero is already a member of the Rosselló administration, Mr. Irizarry is an environmental engineer and attorney, and Mr. Sgroi is a real estate agent who served as treasurer in Governor Rosselló's gubernatorial campaign.  *Governor Designates 3 Members to Board of Directors of PREPA,* La Fortaleza (June 28, 2017) (Spencer Decl. Ex. H). Governor Rosselló has yet to pick the three independent, professional members.

[33] *See, e.g.*, PROMESA at §§ 405 (PROMESA stay is designed to "ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment"), 206(a) (prior to authorizing a Title III filing, the Oversight Board must find that "the entity has made good-faith efforts to reach a consensual restructuring with creditors"), 104(i)(3) (providing that a "voluntary agreement" reached prior May18, 2016 is deemed in conformance with certain requirements under PROMESA), 601(g)(2) (providing a special process for Oversight Board authorization to implement voluntary agreements with creditors under Title VI).  *See also* Congressional Research Service, *Summary: H.R. 5278 - 114th Congress (2015-2016)*, http://www.congress.gov/bill/114th-congress/house-bill/5278 (citing powers of the board as protecting certain preexisting voluntary agreements); *see also* D. Andrew Austin, Cong. Research Serv., R44532, The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA; H.R. 5278, S. 2328) 9 ("The act would grandfather in voluntary agreements executed before its enactment.").

In fact, the RSA is the only restructuring support agreement that fits this description, and the Revitalization Act was enacted prior to the enactment of PROMESA specifically to implement the RSA. This was confirmed by Representative Bishop, Chair of the House Committee on Natural Resources which has jurisdiction over Puerto Rico and produced PROMESA, in a letter to the Oversight Board describing Congress' legislative intent and criticizing its failure to certify the RSA.[34]

Despite this clear Congressional intent that PROMESA did not authorize the Oversight Board to re-trade the RSA, the Oversight Board promoted such retrading as early as December 20, 2016 in a letter to outgoing Governor García-Padilla and Governor-Elect Rosselló – before the Oversight Board had even appointed an executive director or (upon information and belief) conducted a full professional analysis of the PREPA deal.[35] However, certain members of the Oversight Board indicated in congressional testimony that they would approve a supplemented deal that bondholders reached with Governor Rosselló.[36]

Regrettably, even after Movants acceded to demands and agreed to the RSA Enhancements outlined above, the Oversight Board continued to block consummation of the RSA. In late April 2017, PREPA sent a letter to the Oversight Board asking that the Oversight

---

[34] Letter from Chairman Bishop to José B. Carrión III 1 (June 15, 2017) ("[T]he decision to implement the RSA had already been made by Congress with the passage of PROMESA."). *But see* Letter from Representatives Velázquez and Grijalva to Chairman Bishop (June 16, 2017), https://velazquez.house.gov/sites/velazquez.house.gov/files/06162017%20FINAL%20Letter%20to%20OB%20on% 20PREPA%20RSA.pdf (letter from two minority party members responding to Bishop letter).

[35] Letter from Oversight Board to Governor García-Padilla and Governor-Elect Rosselló (Dec. 20, 2017) ("We believe that a process should be established for interested stakeholders to weigh in on the pros and cons of the current proposed PREPA restructuring and more generally on the options for energy reform. The Board will work with the Government and with PREPA on an expedited basis to assess the PREPA restructuring in light of the goals of delivering lower cost, reliable power to Puerto Rico as soon as possible."), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58598734087c1.pdf.

[36] *Testimony of Ana J. Matosantos, Member of Financial Oversight & Management Board for Puerto Rico* (Mar. 22, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58d3e084e91d4.pdf at 3 ("The Board has already advised the Governor that it would approve an RSA amended to reflect improved economic terms, including lower transition costs, as the Governor is requesting in negotiations.").

- 20 -

Board authorize PREPA to use Title VI of PROMESA to implement the transactions in the
RSA.[37] The Oversight Board failed to act on that request for two months.[38] Finally, on June 28,
2017, in a blatant overstep of its authority under PROMESA, it formally notified PREPA that it
had determined not to certify the RSA to allow PREPA to use Title VI to restructure its debt.[39]

   That same week, the creditors offered to extend certain deadlines in the RSA to
allow time for continued discussions, but PREPA refused to consent to the extension of those
deadlines. Spencer Decl. at ¶ 15. The RSA has terminated, and PREPA's creditors therefore are
no longer bound by the terms of the RSA, including the concessions they agreed to, and are no
longer required to forbear from exercising remedies. PREPA defaulted on the payment of debt
service due on the Bonds on July 3, 2017.[40]

## JURISDICTION

   The Court has jurisdiction to grant the relief sought in this Motion pursuant to
section 362(d) of title 11 of the United States Code, which applies to this proceeding pursuant to
section 301 of PROMESA, 48 U.S.C. § 2161. This Motion is filed pursuant to the Case
Management Order, Dkt. No. 11, and Rule 4001-1 of the Local Bankruptcy Rules of the
Bankruptcy Court for the District of Puerto Rico.

---

[37] *See* Letter from Oversight Board to Mohammad Yassim, Chief Legal & Regulatory Officer, AAFAF (June 28,
2017) at 1, https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59558f7c56536.pdf (hereinafter "Oversight
Board Letter") (stating that PREPA sent letter to Oversight Board on April 28, 2017).

[38] On June 26, 2017, National and Assured filed a complaint against the Oversight Board seeking, among other
things, to compel the Oversight Board to fulfill its obligations under PROMESA to certify the RSA. They filed an
amended complaint on July 17, 2017, to address the action of the Oversight Board in refusing to certify the RSA.
The amended complaint seeks, among other things, a declaratory judgment that the Oversight Board failed to
comply with its duty to certify the RSA as required by PROMESA. *See* Case 3:17-cv-01882 (D.P.R.).

[39] *See* Oversight Board Letter at 1.

[40] *Public Disclosure Notice Dated July 3, 2017*, Electronic Municipal Market Access, Municipal Securities
Rulemaking Board (July 3, 2017),
https://emma.msrb.org/ContinuingDisclosureView/ContinuingDisclosureDetails.aspx?submissionId=EP791340.

### RELIEF REQUESTED

Movants request an order, in the form of the proposed order, attached as **Exhibit A**, lifting the automatic stay to allow Movants to exercise their statutory right to seek relief before a court of competent jurisdiction, by filing a complaint substantially in the form attached as **Exhibit B**, to appoint a receiver for PREPA.  The receiver would ensure that the lien granted to bondholders and insurers as part of their collateral package produces net revenues in amounts sufficient to timely pay debt service on the Bonds and have such other powers provided for under the Authority Act or the Trust Agreement and that the court appointing the receiver may deem appropriate.

### ARGUMENT

### THE COURT SHOULD LIFT THE STAY FOR "CAUSE" UNDER SECTION 362(D)(1), INCLUDING FOR LACK OF ADEQUATE PROTECTION

"On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause."  11 U.S.C. § 362(d)(1); PROMESA at § 301(a) (incorporating Section 362).  The term "cause" as used in § 362(d)(1) "is a broad and flexible concept which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations." *In re A Partners, LLC*, 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006) (citations omitted).

Municipal bankruptcies grant few rights to creditors, making relief from the stay a particularly important remedy for creditors.  For example, in a Chapter 11 case, creditors can attempt to maximize their recovery by terminating exclusivity and filing a competing plan.  That right is unavailable here: in a Title III case, the Oversight Board retains exclusive right to file a plan of adjustment. *See* PROMESA at 312(a), 48 U.S.C. § 2172(a)

- 22 -

A.      **PREPA's Failure to Abide by the Rate Covenant Constitutes Cause to Lift the Stay**

Bondholders have a right to payment of principal and interest when due, and they are secured by a lien that includes a right to rates that are sufficient to enable that payment. Since PREPA failed to respect these rights, bondholders have the right under Puerto Rican law, upon application by holders of more than 25% of the principal amount of Bonds outstanding, to the *automatic* appointment of a receiver.  *See* P.R. Laws Ann. Tit. 22 § 207(a).[41]

PREPA's behavior is analogous to a mortgagor's refusal to raise the rents charged to tenants in the mortgaged building.  Courts have routinely lifted the automatic stay to allow creditors to enforce their contractual rights in the face of debtor mismanagement.  For example, in *Le Sannom Bldg. Corp. v. Nathanson*, the District Court upheld the bankruptcy court's decision to lift the stay and allow continuance of a receiver on the grounds that "the Debtor had mismanaged the Building to such an extent that the interest of creditors were being jeopardized." No. 92 Civ. 8716, 1993 U.S. Dist. LEXIS 11677 (S.D.N.Y. Aug. 17, 1993).  Similarly, in *In re Inwood Heights Housing Development Funding Corp.*, the court found cause for relief from the stay or dismissal of the case based on the debtor's failure to collect rents.  2011 WL 3793324 at *6 (Bankr. S.D.N.Y. Aug. 25, 2011); *c.f. In re Lakeshore Apartments of Ft. Oglethorpe, II, Ltd.*, 109 B.R. 278, 281 (Bankr. S.D. Ohio 1989) (denying relief from the stay because mortgagee did not show failure to collect amounts due or actions tending to decrease revenues).

This case is stronger than those cited above, because the Court does not need to determine that there has been mismanagement at PREPA (even though ample evidence exists).

---

[41] Section 804 of the Trust Agreement grants the Trustee the right to apply for appointment of a receiver, and Section 808 allows holders of more than 20% of the Bonds to institute suits, actions or proceedings on the Bonds under their own names.  *See* Trust Agreement (Spencer Decl., Exh. B) §§ 804, 808.

Bondholders are simply seeking to bring suit in a non-Title III court to vindicate an unequivocal Commonwealth law right to a receiver to seek a rate increase – a right uniquely recognized in Section 314(b)(6) of PROMESA, which requires the Court "to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors" before it can confirm a plan for PREPA.[42]   The Title III Court cannot itself appoint a receiver, 11 U.S.C. § 105(b), incorporated into PROMESA § 301(a), 48 U.S.C. § 2161(a).   Nor can the Title III Court determine electrical rates – only the Energy Commission can do so.   11 U.S.C. § 1129(a)(6), incorporated into PROMESA § 301(a), 48 U.S.C. § 2161(a).

Finally, as the District of Puerto Rico has already recognized in connection with a pre-Title III stay, adequate protection reflects not merely a statutory command but a constitutional one under the Fifth Amendment.  *See* Memorandum and Order, *Peaje Investments LLC v. García-Padilla*, NO. 16-2365 (FAB), D.P.R. (Nov. 2, 2016). ("[T]he concept of 'adequate protection' has constitutional roots, not just statutory ones.") (citations omitted). Movants' property includes not only the revenues generated by current rates but the statutory and contractual right to increase rates and appoint a receiver with the power to seek rate adjustments, and PREPA's use of the stay to prevent required rate increases and maintain inadequate current rates is a taking of property without just compensation.

This is not the normal case where debtholders ask a court to overturn state law limits on rates that they claim are confiscatory.   In this case, Commonwealth law itself – and the decisions of the Energy Commission – entitle PREPA to higher rates.   It is the Oversight Board and Governor Rosselló's administration that would use PROMESA, which specifically abjures

---

[42]   PROMESA § 314(b)(6), 48 U.S.C. § 2174(b)(6).  Section 314(b)(6) has no analog in Chapter 9 of the Bankruptcy Code.

interference in rate-making, to confiscate Movants' right to seek the imposition of higher rates mandated by Commonwealth law.

While denying relief from the automatic stay, the opinion in *In re Jefferson County, Alabama*, 474 B.R. 228 (Bankr. N.D. Ala. 2012), actually supports lifting the stay here.

In *Jefferson County*, as here, the municipality had mismanaged a utility (the sewer system) to the point where a receiver had been appointed.  In *Jefferson County*, as here, the municipality had refused to raise rates for an extended period.  But in *Jefferson County*, the Court denied relief from the stay (to reinstate the prepetition receiver) because the mismanagement and rate freeze were failures attributable to the old county board of commissioners, and Jefferson County now had a new board of commissioners that had committed to raise rates and (the Court found) would continue the operational improvements implemented by the receiver prior to the petition date:

> "There is evidence that the new commissioners are willing to take unpopular stances . . ." *id.* at 244, including "the manifested agreement by the new county commissioners to take the politically dangerous step of agreeing to significant rate increases . . . ." *Id.* at 285.

Judge Bennett found that there was not sufficient cause to alter the stay at that point, but clearly warned that such relief could be available if the debtor failed to follow through on its promises:

> Subsequent stay modification requests are available to parties should the County not take the necessary actions to maintain the improvements wrought during the Receiver's tenure and go forward to *address the various other matters that need further action, including appropriate revenue enhancements, be it by a rate increase or by some other manner.*"

- 25 -

*Id.* at 286 (emphasis added). Meaningful rate increases were ultimately implemented as part of the confirmed plan.[43]

Here, Puerto Rico's previous administration had depoliticized PREPA's board and professionalized its management. The previous administration – and legislature and Energy Commission – had committed to raise rates. Puerto Rico's new administration is re-politicizing the PREPA board to avoid raising rates. In the words of Governor Rosselló, "That the members are not partisan political figures, that is not the first criteria of this administration . . . . The criteria is if they will effectuate the public policy of this administration."[44] He also said: "If I don't trust… It has already been shown that the steps they [board members] have taken go against that, for example raising rates […] That goes totally against what we want to do."[45] As opposed to the emphasis the *Jefferson County* Court placed on "appropriate revenue enhancements," PREPA's current budget (the assumptions in which Movants dispute) projects a 30% decrease in operating revenues alone during the next fiscal year.[46] PREPA's operational issues – including widespread blackouts – are also getting worse, and the independent CRO that implemented many of the reforms at PREPA is long gone. The *Jefferson County* decision actually supports the imposition of a receiver in light of PREPA's circumstances. A receiver

---

[43] *See, e.g.*, Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9 Plan of Adjustment for Jefferson Cnty., Ala., *In re Jefferson Cnty., Ala.*, Case No. 11-05736, Dkt. No. 2248 (Bankr. N.D. Ala. Nov. 22, 2013), at 57 ("From and after the Effective Date, the County Commission shall adopt and maintain the Approved Rate Structure . . . , including increases in sewer rates to the extent necessary to allow the timely satisfaction of the County's obligations . . . ."); Memorandum Opinion, *In re Jefferson Cnty., Ala.*, Case. No. 14-0213, Dkt.. No. 35 (N.D. Ala. Sep. 30, 2014), at 14-15 ("The Approved Rate Structure is a schedule that, unless a specified alternative method is employed, requires the County Commission to increase sewer rates by [set amounts] for 'each remaining fiscal year that the New Sewer Warrants remain outstanding . . . .'").

[44] *Rosselló Nevares Says Energy Reform Will Bring Down Costs, Defends PREPA Board Shakeup*, Reorg Research, Feb. 14, 2017, https://platform.reorg-research.com/print/article/30713.

[45] *Governor Recommends New PREPA Chairman*, Caribbean Business, March 3, 2017, http://caribbeanbusiness.com/governor-recommends-new-prepa-chairman/.

[46] *See* PREPA's FY 2018 Budget (HasBrouck Decl., Exh. J-1) at 3 (showing revenues from operations declining from $4.02 billion in 2017 to $2.8 billion in 2018).

- 26 -

could take steps necessary to correct PREPA's operational issues and avoid the Fiscal Plan's projections regarding declining revenues.

### B.      PREPA's Ongoing Mismanagement Constitutes Cause to Lift the Stay

The dismissal of professional managers and directors in favor of political operatives constitutes mismanagement that is itself a denial of adequate protection. Courts have held that ongoing mismanagement or danger of abuse of collateral is relevant in determining whether or not to lift the stay. *See, e.g.*, *In re Shefa, LLC*, 524 B.R. 717 (Bankr. E.D. Mich. 2015) (finding cause to lift the stay where, among other things, debtor was not operating or paying property taxes on hotel and hotel's physical condition continued to decline).

The relief bondholders seek is urgent in light of the specter of the reoccurrence of the mismanagement that PREPA suffered in the past as a result of the politicization of the utility. The politicization of PREPA has only grown worse under the current administration. Governor Rosselló signed into law Act 3-2017, which subjects PREPA to extreme governmental oversight by requiring the Governor or his representative to sign off on any purchases over $10,000 made by public corporations, including PREPA. *See* Act 3-2017 § 18. This effectively paralyzes PREPA's ability to operate efficiently on a daily basis. Further, the Governor dismissed independent and professional board members, and instead chose to appoint his political allies and supporters to the PREPA board to ensure that his political agenda is adhered to in any decision-making by the PREPA board. This has resulted in a giant step backwards for PREPA. This is particularly alarming in light of the myriad conflicts of interest inherent in the various Title III cases. It is clear that the PREPA board will be acting in accordance with the Governor's agenda, which may include prioritizing other governmental entities and constituents whose interests

conflict with PREPA's own interests.  As long as the PREPA board is effectively controlled by the Governor, these conflicts are insurmountable.[47]

The Energy Commission warned against precisely this type of politicization of PREPA, stating:

> The transformation of PREPA will require deep commitment not only from bondholders and customers, but also from PREPA's Board, executives, managers, employees and unions.  The quadrennial turnover of managers with each new political administration, the political pressures from elected officials to avoid necessary rate increases, the failure of government agencies to pay their electricity bills on time, the irresponsible initiation and termination of expensive capital projects, the high levels of electricity theft, the work rules that prevent efficient use of well-paid employees, the poor recordkeeping and antiquated administrative procedures, the compensation schemes that prevent PREPA from recruiting and retaining qualified and experienced personnel – all this must come to a halt, to be replaced by a universal commitment to the good of the Commonwealth.

Energy Commission Order Order (HasBrouck Decl., Exh. A) at 23.  PREPA's current non-professional board appointees and management, and the Rosselló administration that imposed those appointees, have demonstrated that they cannot meet these standards.  PROMESA authorizes the Oversight Board to represent PREPA in Title III, but it nowhere authorizes the Oversight Board to manage or take control of PREPA's operations, and (as noted) 11 U.S.C. § 105(b) specifically precludes this Court from appointing a receiver to do so.  The Court should

---

[47] As only one example, PREPA has deposits at GDB, its former fiscal agent, and GDB has outstanding loans to PREPA.  GDB has entered into a restructuring supporting agreement (the "**GDB RSA**") with its bondholders that was conditionally certified by the Oversight Board and will be implemented in a Title VI proceeding under PROMESA.  The GDB RSA provides that GDB bondholders will receive a recovery between 55-75% of their claims; PREPA's deposits will be offset against its line of credit, and it is unclear what recovery, if any, PREPA will receive on its remaining $114 million deposit claim.  PREPA board members carrying out the Governor's agenda may not direct PREPA to enforce its rights if doing so would conflict with the interests of the Commonwealth in consummating the GDB RSA or otherwise protecting or prioritizing other classes of depositors or debtholders.  *See, generally* Government Development Bank Restructuring Support Agreement, May 15, 2017, https://new.reorg-research.com/data/documents/20170515/5919b06aa9a34.pdf.

- 28 -

therefore lift the stay in order to allow bondholders to seek relief before a court that can appoint a receiver who can take the necessary and appropriate steps to correct PREPA's course.

### C.   Bondholders Face a Decline in the Value of Their Collateral Without Adequate Protection

Stay relief is also warranted where a secured party, "faced with a decrease in the value of its collateral while the stay is in effect, is not supplied by the debtor with an alternative form of relief that will safeguard its interest in that collateral." *Brigade Leveraged Capital Structures Fund Ltd. v. García-Padilla*, 217 F. Supp. 3d 508, 519 (D.P.R. 2016); *In re Monroe Park*, 17 B.R. 934, 937 (D. Del. 1982) ("[A]dequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in the collateral, pending the outcome of bankruptcy proceedings.").   A movant bears the burden of showing a threat to collateral, but the debtor bears the burden of proof on adequate protection. *In re S. Side House, LLC*, 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012) ("It is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected.").

PREPA and the Oversight Board cannot carry that burden of proof.   The Governor is opposed to increasing the rates, which now barely cover operating expenses, and the Fiscal Plan approved by the Oversight Board assumes that PREPA's revenues will decrease in the future.  Fiscal Plan (Dkt. No. 2, Exh. 1), at 25.  While Movants do not agree with the Fiscal Plan's assumptions, those assumptions reflect the views of the PREPA board as recently as last month.

### D.   The Balance of Harms Favors Bondholders

Deciding whether to lift the stay "requires the court to engage in an equitable, case-by-case balancing of the various harms at stake." *Brigade*, 217 F. Supp. 3d at 518.  Courts will find that cause exists "when the harm that would result from a continuation of the stay

- 29 -

would outweigh any harm that might be suffered by the debtor . . . if the stay is lifted." *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D.R.I. 1997). This does not require the Court to find that there will be no harm to the debtor: "Cause may exist for lifting the stay whenever the stay harms the creditor and lifting the stay will not *unduly* harm the debtor." *See Marder v. Turner (In re Turner)*, 161 B.R. 1, 3 (Bankr. D. Me. 1993) (emphasis added).

PREPA's bondholders face a profound threat to the value of their collateral. The rate approved by the Energy Commission assumed that the RSA would be implemented and that the Transition Charge (not PREPA's revenues) would cover debt service. The Transition Charge never went into effect, and therefore PREPA's rates are insufficient to cover debt service. Further, the Fiscal Plan's projections show bondholders' collateral declining in value as a result of declining demand, and thus their projections (although disputed by Movants) suggest that further delay in collecting pledged revenues jeopardizes their ultimate collection.

PREPA itself faces little actual harm (and should benefit) from the relief bondholders are seeking. Any harm to PREPA stems from requiring PREPA to act responsibly through appointment of a receiver, who will comply with PREPA's statutory and contractual obligations. A receiver is required to "maintain, restore, insure, and keep insured [the PREPA system] and from time to time shall make all such necessary or proper repairs as such receiver may deem expedient . . . ." P.R. Laws Ann. Tit. 22 § 207(b). Thus, a receiver acts in the best interests of PREPA, its customers, and its creditors.

Furthermore, compelling PREPA to charge an appropriate rate sufficient to cover expenses and service debt obligations, does not harm PREPA. To the contrary, it benefits PREPA, which for the first time in years would stop incurring more debt to fund operations, and would be able to start reducing its debt burden in a responsible fashion. As the Energy

Commission found in its decision raising PREPA's rates for the first time in decades, "Just as
paying for our children's education imposes costs today but benefits for a lifetime, so will paying
electricity rates today promise improvements for the future."   Energy Commission Order
(HasBrouck Decl., Exh. A) at 23.  And imposing the relatively modest increase that would be
required now would avoid the need to impose a far more dramatic increase in the future.

Lifting the stay would not impair other creditors' rights.  A rate increase does not
take money away from other creditors, but merely ensures that there will be sufficient money to
pay one particular set of creditors while leaving other creditors largely unaffected.

PREPA and the Oversight Board are likely to make the same arguments that the
Oversight Board members made at the Oversight Board's April 28 hearing – that the public will
be harmed by higher rates because lower rates are necessary for economic growth.[48]  These
arguments – essentially, "the public is benefitted by seizing bondholders' collateral for the
benefit of the public" – ignore both legal protections of collateral and the recent history of the
Commonwealth, when (as the Energy Commission found) Puerto Rico generated ___less___ Gross
Domestic Product while paying ___lower___ electrical rates.  The fact is, PREPA ___has___ charged higher
rates, and the Energy Commission found that PREPA ___can___ charge higher rates – indeed, that it
___must___ charge higher rates.  Whether Puerto Rico would benefit from lower rates may be within
the purview of the Energy Commission in considering a rate application from the receiver.
Indeed, the last time the Energy Commission was asked to approve a rate increase, it determined
that failure to increase rates would have consequences "more negative for Puerto Rico than the
consequences of a rate increase," in light of PREPA's need to finance operations and provide

---

[48] *See, e.g.*, Oversight Board, Resolution #5 Adopted at Seventh Public Meeting of the Financial Oversight and
Management Board for Puerto Rico Held on April 28, 2017 in New York, NY at 2 (May 2, 2017),
https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/590926a5960ce.pdf  ("PREPA's  Fiscal  Plan  must
provide for lower cost, reliable power that can support the economic growth of Puerto Rico.").

reliable energy.  Energy Commission Order (HasBrouck Decl., Exh. A) at 28.  The question of the benefits of lower rates is not before this Court.

In fact, Puerto Rico residents already enjoy rates significantly below that of other island residents (Fiscal Plan (Dkt. No. 2, Exh. 1), at 17), and have for years been receiving a windfall in the form of rates that were artificially so low that they did not cover PREPA's costs. *Id.* at 15.  PREPA estimates that its rates from fiscal year 2011 to fiscal year 2015 were between 13% to 25% lower than it should have been.  *Id.*

E.      **The PROMESA Stay Cases Are Distinguishable**

In the fall of 2016, the District of Puerto Rico heard a number of requests to lift the automatic stay imposed by PROMESA for a limited time period.  It denied those requests in two written decisions: *Brigade Leveraged Capital Structures Fund Ltd. v. García-Padilla*, 217 F. Supp. 3d 508 (D.P.R. 2016), and a Memorandum and Order in *Peaje Investments LLC v. García-Padilla*, NO. 16-2365 (FAB), D.P.R. (Nov. 2, 2016).   Certain parties appealed to the First Circuit, which upheld parts of that denial in *Peaje Investments LLC v. García-Padilla*, 2017 WL 104826 (1st Cir. Jan. 11, 2017).  The District Court decisions are readily distinguishable from the PREPA situation, and the Court of Appeal's opinion supports relief from the stay.

**First**, an entirely different burden of proof applies to this case.  The First Circuit held that creditors seeking relief from the PROMESA stay prior to the filing of a Title III bear the burden of proof in showing that their interests will not be protected unless the court lifts the stay.  The Court of Appeals contrasted this with a lift-stay motion under the Bankruptcy Code (as incorporated into a Title III proceeding), in which the **_debtor_** bears the burden of showing that creditors' interests are adequately protected.  11 U.S.C. § 362(g)(2), incorporated into Title III by PROMESA  § 301(a), 48 U.S.C. § 2161(a); *Peaje*, 2017 WL 104826, at *3.  Here, PREPA and

- 32 -

the Oversight Board – and not creditors – will be required to satisfy that standard, which will be difficult in the face of their own projections and statements.[49]

**Second**, the District Court and Court of Appeals found that movants in those cases had not established they would experience meaningful harm from continuation of the temporary PROMESA stay. *See, e.g.*, Memorandum at *13. Few of those cases involved actual payment defaults. Moreover, in some, the courts found that there would not be further payment defaults until the expiration of the temporary stay because amounts in the bondholder reserve funds – at that time in 2016 – would be sufficient to cover payments due on the applicable bonds while the stay was in place. *Id*. In the present case, by contrast, there has already been a payment default, the Trustee has run through bondholder reserves, Movants have repeatedly agreed to forbear enforcement of their rights, and PREPA continues to charge a rate that does not cover its obligations in full. According to the Fiscal Plan's projections, PREPA may not be able to recoup the revenue it loses today from refusing to raise rates as it is required to do. PREPA is thus comparable to the Employee Retirement System, whose efforts to maintain the stay and reduce its bondholders to unsecured creditors, were rebuffed by the First Circuit. *Peaje*, 2017 WL 104826, at *4 ("Movants face the prospect of being left with a mere unsecured claim. ERS provides no authority for the proposition that such a claim may constitute adequate protection.").

**Third**, this case does not involve PROMESA's temporary stay, which by statute lasted only ten months. As the First Circuit noted, the initial PROMESA stay was "of limited duration and is designed to protect unique interests" and "these differences may bear on whether the stay should be lifted . . . ." *Peaje*, 2017 WL 104826, at *2 n.2. When the District Court

---

[49] Movants do not endorse the Fiscal Plan's projections and reserve the right to challenge them at an appropriate time; in the context of this Motion, however, it is incumbent on the Oversight Board and the Commonwealth to show how Movants are adequately protected in light of their own projections showing a deterioration in pledged revenues. 11 U.S.C. § 362(g)(2).

rendered its decision, the final termination of the PROMESA stay was less than seven months away.  A PREPA Title III proceeding, by contrast, could take years to resolve – particularly if PREPA and the Oversight Board insist on attempting to impair the property rights of secured creditors.  PREPA bondholders could be subject to the automatic stay for much longer than other creditors were under the PROMESA stay.

        **Finally,** unlike the PROMESA stay cases, here there is little risk of a "wave of litigation" or of undermining PROMESA's goal of a full, consensual restructuring.  *Brigade*, 217 F. Supp. 3d at 528-29.  In contrast to the numerous lift-stay motions filed against the Commonwealth and its instrumentalities in the months after PROMESA was enacted, this is the first creditor lawsuit that directly involves PREPA.  There is also little risk of additional bondholder suits.  PREPA has only one type of bond debt, and this action is brought on behalf of all PREPA's bondholders.  Lifting the stay would actually promote PROMESA's goal of a full, consensual restructuring of PREPA.  Unlike in the prior cases, Movants are not looking to divert revenues from other creditors or governmental units; instead, they are looking to obtain an appropriate rate in the best interests of PREPA and its stakeholders.  It is no answer to say – as the Oversight Board's members have suggested – that PREPA's restructuring must await and be subsumed in the Commonwealth's own Title III case.  That argument flies in the face of the statute.  Congress explicitly separated PREPA's restructuring from the Commonwealth by *exempting* PREPA's RSA from the requirement of a Fiscal Plan, PROMESA § 104(i)(3), 48 U.S.C. § 2124(i)(3), Congress specifically precluded substantive consolidation of Title III cases, PROMESA § 304(f), 48 U.S.C. § 2164(f), and Congress specifically condemned transfers from one debtor to another, PROMESA § 407(a), 48 U.S.C. § 2195(a).

<u>**CONCLUSION**</u>

Movants request an order, in the form of the proposed order, attached as **Exhibit A**, lifting the automatic stay to allow Movants to exercise their statutory right to seek relief before a court of competent jurisdiction, by filing a complaint substantially in the form attached as **Exhibit B**, to appoint a receiver for PREPA.

I hereby certify that, on this same date, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system, which will notify the attorneys of record.

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, today July 18, 2017.

**TORO, COLÓN, MULLET, RIVERA & SIFRE, P.S.C.**

*s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcmrslaw.com

*s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

*s/ Nayda Pérez-Román*
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
E-mail: nperez@tcmrslaw.com

P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

*Counsel to the Ad Hoc Group of PREPA Bondholders*

**CASELLAS ALCOVER & BURGOS P.S.C.**

*s/ Heriberto Burgos Pérez*
HERIBERTO BURGOS PÉREZ
USDC-PR No. 204,809
E-mail: hburgos@cabprlaw.com

*s/ Ricardo F. Casellas-Sánchez*
RICARDO F. CASELLAS-SÁNCHEZ
USDC-PR No. 203,114
E-mail: rcasellas@cabprlaw.com

*s/ Diana Pérez-Seda*
DIANA PÉREZ-SEDA
USDC–PR No. 232,014
E-mail: dperez@cabprlaw.com

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

*s/ Gregory A. Horowitz*
AMY CATON*
THOMAS MOERS MAYER*
GREGORY A. HOROWITZ*
NATAN HAMERMAN**
ALICE J. BYOWITZ**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
        acaton@kramerlevin.com
        ghorowitz@kramerlevin.com
        nhamerman@kramerlevin.com
        abyowitz@kramerlevin.com

*admitted *pro hac vice* in No. 17-03283-LTS
** *Pro hac vice* applications pending

*Counsel to the Ad Hoc Group of PREPA Bondholders*

**CADWALADER, WICKERSHAM & TAFT LLP**

*s/ Howard R. Hawkins, Jr.*
HOWARD R. HAWKINS, JR.*
MARK C. ELLENBERG*
NATHAN BULL (*pro hac vice* admission forthcoming)
ELLEN HALSTEAD*
THOMAS J. CURTIN*
CASEY J. SERVAIS*
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
Fax: (212) 406-6666
Email: howard.hawkins@cwt.com

- 36 -

P.O. Box 364924
San Juan, PR 00936-4924
Tel.: (787) 756-1400
Fax: (787) 756-1401

*Counsel for Assured Guaranty Corp. and  Assured
Guaranty Municipal Corp.*

mark.ellenberg@cwt.com
nathan.bull@cwt.com
ellen.halstead@cwt.com
thomas.curtin@cwt.com
casey.servais@cwt.com

\* admitted *pro hac vice* in No. 17-03283-LTS
*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

**WEIL, GOTSHAL & MANGES LLP**

*s/ Marcia Goldstein*
MARCIA GOLDSTEIN*
JONATHAN POLKES*
SALVATORE A. ROMANELLO*
GREGORY SILBERT*
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007
STEPHEN A. YOUNGMAN
200 Crescent Court, Suite 300
Dallas, Texas  75201-6950
Tel.: (214) 746-7700
Fax: (214) 746-7777
Email: marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        salvatore.romanello@weil.com
        gregory.silbert@weil.com
        stephen.youngman@weil.com

\*admitted *pro hac vice* in No. 17-03283-LTS

*Counsel for National Public Finance
Guarantee Corp.*

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

*s/ Eric Pérez-Ochoa*
ERIC PÉREZ-OCHOA
USDC-PR No. 206,314
E-mail: epo@amgprlaw.com

*s/ Luis A. Oliver-Fraticelli*
LUIS A. OLIVER-FRATICELLI
USDC-PR NO. 209,204
E-mail: loliver@amgprlaw.com

208 Ponce de Leon Ave., Suite 1600
San Juan, PR 00936
Tel.: (787) 756-9000
Fax: (787) 756-9010

*Counsel for National Public Finance Guarantee
Corp.*

**DEBEVOISE & PLIMPTON LLP**

*s/ My Chi To*
MY CHI TO*
CRAIG A. BRUENS*
ELIE J. WORENKLEIN*

**GOLDMAN ANTONETTI & CORDOVA, LLC**

*s/ Carlos A. Rodríguez-Vidal*
CARLOS A. RODRÍGUEZ-VIDAL
USDC-PR No. 201213
E-mail: crodriguez-vidal@gaclaw.com

*s/ Solymar Castillo-Morales*
SOLYMAR CASTILLO-MORALES
USDC-PR NO. 218310
E-mail: scastillo@gaclaw.com

P.O. Box 70364
San Juan, PR 00936-8364
Tel.: (787) 759-4117
Fax: (787) 767-9177

*Counsel for Syncora Guarantee Inc.*

919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email: mcto@debevoise.com
        cabruens@debevoise.com
        eworenklein@debevoise.com

*admitted *pro hac vice* in No. 17-03283-LTS

*Counsel for Syncora Guarantee Inc.*