# **Exhibit B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------X
CERTAIN FUNDS AND ACCOUNTS[1] MANAGED :
OR ADVISED BY ANGELO, GORDON & CO., L.P. :
BLUEMOUNTAIN CAPITAL MANAGEMENT, : Civil Action No. _____
LLC, FRANKLIN ADVISERS, INC., KNIGHTHEAD :
CAPITAL MANAGEMENT, LLC, MARATHON :
ASSET MANAGEMENT, LP, :
OPPENHEIMERFUNDS, INC., ASSURED :
GUARANTY CORP., ASSURED GUARANTY : **COMPLAINT**
MUNICIPAL CORP., NATIONAL PUBLIC :
FINANCE GUARANTEE CORPORATION, AND :
SYNCORA GUARANTEE INC., :
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Plaintiffs, :
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　v. :
　　　　　　　　　　　　　　　　　　　　　　:
THE PUERTO RICO ELECTRIC POWER :
AUTHORITY :
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-and- :
　　　　　　　　　　　　　　　　　　　　　　:
FINANCIAL OVERSIGHT AND MANAGEMENT :
BOARD FOR PUERTO RICO, :
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendants. :
---------------------------------------------------------------------X

**[DRAFT] COMPLAINT FOR APPOINTMENT OF A RECEIVER**

　　　　Plaintiffs, by and through their undersigned counsel, for their Complaint for Appointment of a Receiver against Defendants the Puerto Rico Electric Power Authority ("**PREPA**" or the "**Authority**") and the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), upon information and belief as to all matters, hereby allege as follows:

**NATURE OF THIS ACTION**

　　　　1.　　Plaintiffs are mutual funds, insurers and other investors that hold or insure over [$5.3] billion in bonds issued by PREPA (the "**Bonds**") under a trust agreement between PREPA and U.S.

---
[1] The specific funds are identified on Exhibit A.

Bank National Association, as successor trustee (the "**Trustee**"), dated January 1, 1974, as amended and supplemented (the "**Trust Agreement**"). The Bonds are secured by, among other things, a pledge of all or substantially all of the present and future revenues of PREPA.

2. On July 3, 2017, PREPA defaulted on the payment of principal and interest on the Bonds that was due on that date.

3. As a result of this default, Plaintiffs seek appointment of a receiver for PREPA under Section 804 of the Trust Agreement and under Section 17 of the Puerto Rico Electric Power Authority Act, Act No. 83 of May 12, 1941, P.R. Laws Ann. Tit. 22 §§ 191, *et seq.* (the "**Authority Act**") at § 207.

## THE PARTIES, JURISDICTION AND VENUE

4. Plaintiffs include members of an ad hoc group of PREPA bondholders (the "**Ad Hoc Group**")[2] who collectively hold over [$3] billion of uninsured Bonds (exclusive of accrued and accreted interest).

5. Exhibit A hereto sets forth the specific funds and accounts and the place of incorporation/organization and the principal place of business of each fund or account.

6. Plaintiff Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "**Assured**") are, respectively, Maryland and New York insurance companies that guaranteed payment of principal and interest when due on certain of the Bonds. Assured insures approximately $[805] million of Bonds and owns approximately [$42] million (exclusive of accrued and accreted interest) of uninsured Bonds. In addition, on July 3, 2017, Assured paid approximately [$19.9] million on account of Bonds and interest rate swaps that it insured, and is therefore subrogated to the rights of PREPA bondholders and the swap counterparty.

---

[2] Those members consist of certain funds and accounts managed or advised by Angelo, Gordon & Co., L.P.; BlueMountain Capital Management, LLC; Franklin Advisers, Inc.; Knighthead Capital Management, LLC; Marathon Asset Management, LP; and OppenheimerFunds, Inc.

2

7. Plaintiff National Public Finance Guarantee Corporation ("**National**") is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds. National insures approximately [$1.15] billion of Bonds and also owns approximately [$139] million (exclusive of accrued and accreted interest) of uninsured Bonds. In addition, National owns approximately [$95] million of Bonds and rights to receive thereunder on account of claims paid to holders of such Bonds under National's insurance policies.

8. Plaintiff Syncora Guarantee Inc. ("**Syncora**") is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds. Syncora insures approximately [$126.2] million of Bonds and also owns approximately [$38.5] million (exclusive of accrued and accreted interest) of uninsured Bonds. In addition, Syncora owns approximately [$42.1] million of Bonds and rights to receive payment thereunder on account of claims paid to holders of such Bonds under Syncora's insurance policies.

9. Puerto Rico is neither the principal place of business nor the place of incorporation/organization of any Plaintiff.

10. Defendant PREPA is a public corporation organized under the laws of the Commonwealth of Puerto Rico that provides electrical power to residents and businesses located in the Commonwealth.

11. Defendant Oversight Board is as an entity within the Puerto Rico government established under federal law. According to its statutory authority, the Oversight Board acts as PREPA's representative in PREPA's Title III proceeding. The Oversight Board is also simultaneously acting as representative for other governmental entities, such as the Commonwealth of Puerto Rico. The Oversight Board filed PREPA's petition for Title III relief and has sole ability to file any plan of adjustment for PREPA. The Oversight Board also certified a Fiscal Plan and budget for PREPA, and has ongoing responsibility for the review and approval of any budgets proposed by PREPA and laws or regulations concerning PREPA.

3

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds the sum or value of $75,000.

13. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391 because all or substantially part of the events giving rise to these claims occurred in this District.

## BACKGROUND

A. <u>The PREPA Bonds</u>.

14. In 1941, the passage of the Authority Act established PREPA as a public corporation.

15. Section 16 of the Authority Act authorized PREPA to issue bonds to the public. *See* P.R. Laws Ann. Tit. 22 § 206.

16. Pursuant to its statutory authority, PREPA has issued approximately $8.3 billion in Bonds that remain currently outstanding.

17. The Bonds issued by PREPA are secured by and payable solely from PREPA's Revenues (as defined in the Trust Agreement) from its electric generation and distribution System (as defined in the Trust Agreement) after the payment of certain Current Expenses as defined by and subject to the restrictions in the Trust Agreement.[3]

18. The Bonds were issued pursuant to the Trust Agreement, in which PREPA agreed to certain covenants and granted the holders of the Bonds certain rights and remedies.

19. Section 17 of the Authority Act grants holders of the Bonds the right to appointment of a receiver for PREPA upon an event of default under the Trust Agreement.[4]  P.R. Laws Ann. Tit. 22 § 207.

---

[3] Capitalized terms that are used but not defined herein shall have the meanings given to them in the Trust Agreement.

[4] Section 804 of the Trust Agreement grants the Trustee the right to apply for appointment of a receiver, and Section 808 allows holders of more than 20% of the Bonds to institute suits, actions or proceedings on the Bonds under their own names.

4

B.      <u>PREPA's Obligation to Charge Sufficient Rates to Cover Debt Service</u>.

20.     PREPA entered into a binding commitment under the Trust Agreement to set electric rates at a level sufficient to cover its obligations in the Trust Agreement, including to pay Current Expenses and debt service on the Bonds.

21.     The Trust Agreement defines Revenues as "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System, including the income derived by the Authority from the sale of electricity generated or distributed by the System . . . ." Trust Agreement § 101.

22.     Unlike financings for privately-owned utilities, holders of revenue bonds in public utility financings generally are secured solely by a pledge of revenues of the utility after payment of current operating expenses and have no recourse to or mortgage or other lien on physical assets of the utility. This is because the laws of most U.S. states and territories (including Puerto Rico) restrict public utilities from pledging their physical assets as collateral for their financial obligations. P.R. Laws Ann. Tit. 22 § 206.

23.     As is typical for public utility financings, PREPA's Bonds are limited recourse bonds that are secured solely by the Revenues. However, as with other public utilities, PREPA provided its creditors with the equivalent of a mortgage or other lien on physical assets of PREPA by providing a collateral package consisting of: (i) a lien on revenues generated by PREPA, (ii) a covenant that PREPA will maintain rates at levels sufficient to cover debt service, and (iii) the right to require a court of competent jurisdiction to appoint a receiver if PREPA is in default.

24.     In pertinent part, Section 502 of the Trust Agreement provides that:

> [t]he Authority further covenants that it will at all times fix, charge and collect reasonable rates and charges for the use of the services and facilities furnished by the System . . . .

25.     Section 502 of the Trust Agreement further provides that "from time to time, and as often as shall appear necessary, [PREPA] will adjust such rates and charges so that Revenues will at

5

all times be sufficient" to pay Current Expenses and provide an "amount at least equal to one hundred and twenty per centum (120%) of the aggregate Principal and Interest Requirements for the next fiscal year on account of [the Bonds]" (the "**Rate Covenant**").

26. Puerto Rico law also requires that rates be set at a level that will cover Principal and Interest Requirements (as defined in the Trust Agreement). Specifically, Section 6 of the Authority Act provides in relevant part that PREPA is authorized to:

> determine, fix, alter, charge, and collect reasonable and just rates, fees, rents, and other charges subject to the [Energy] Commission's approval, . . . for electric power services . . . that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of such agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors.

P.R. Laws Ann. Tit. 22 § 196(*l*), *amended by* Act 4-2016 at § 8.

27. In 2014, the Authority Act was amended to create the Puerto Rico Energy Commission (the "**Energy Commission**"), which is charged with reviewing and approving electric rates. However, the Authority Act carefully ensures that the Energy Commission does not undermine PREPA's obligation to charge adequate rates; the Authority Act requires that the Energy Commission approve a rate that:

> (i) is sufficient to guarantee the payment of principal, interest, reserves, and all other requirements of bonds and other financial obligations . . . [and] (ii) complies with the terms and provisions of the agreements entered into with or in benefit of buyers or holders of any bonds or other financial obligations of the Authority . . . ."

Authority Act at § 6A(c), *amended by* Act 4-2016 at § 9; § 6.25A(b), *amended by* Act 4-2016 at § 18.

28. Under the Trust Agreement, bondholders originally had the right to compel enforcement of the Rate Covenant themselves. Following the passage of Act 57-2014, all rate increases must be approved by the Energy Commission. The vast majority of Bonds were issued

6

and insured prior to the enactment of Act 57-2014, when PREPA had the unilateral right to increase rates.

29. As discussed in more detail below, the Authority Act also provides for the appointment of a receiver upon the application of holders of more than twenty-five percent of Bonds then outstanding.

30. PREPA bondholders' collateral thus includes the pledge of current and future Revenues, the right to have rates and charges set at levels sufficient to guarantee payment of debt service on the Bonds, payments into bondholder reserves under the Trust Agreement, and payment of all other financial obligations of PREPA, and the ability to enforce that right.

C.     Restructuring Support Agreement.

31. In the summer of 2014, PREPA faced a liquidity crisis. PREPA and its creditors started urgent negotiations that culminated in a group of agreements between PREPA, the Government Development Bank (PREPA's fiscal advisor), the Ad Hoc Group, insurers of Bonds, and certain fuel line credit lenders (the agreement between PREPA, GDB, the Ad Hoc Group, and the insurers, the "Forbearance Agreement"). Under the Forbearance Agreement, certain bondholders and insurers agreed to, among other things, forbear from exercising certain remedies against PREPA and to amend the Trust Agreement to suspend PREPA's requirement to deposit money in bondholder reserve accounts on a monthly basis.

32. The parties engaged in months of further intensive negotiating that resulted in a holistic, consensual restructuring of PREPA's debt, memorialized in a Restructuring Support Agreement in December 2015 (as amended and restated in March 2016 and as supplemented from and after that date, the "**RSA**").

33. Despite their statutory and contractual protections designed to ensure payment in full through adequate rates, Plaintiffs agreed to voluntary concessions, including the exchange of

7

uninsured Bonds at a discount into securitization bonds issued by a newly created public corporation (the "**SPV**") secured by the SPV's right to assess a charge on electrical use (the "**Transition Charge**") and providing that the new securitization bonds would pay only interest for the first five years after such bonds were issued. To facilitate the implementation under the RSA, Plaintiffs Assured and National agreed to provide first loss protection on the SPV bonds (and thereby increase their overall exposure) through the issuance of approximately $435.6 million of surety bonds that would fund the debt service reserve fund for the new SPV bonds.

34. The creditor concessions in the RSA were also designed to allow PREPA to invest in the System in order to create a modern, cost-efficient utility.

35. To support this settlement, the legislature quickly passed, and on February 16, 2016, Governor García-Padilla signed Act 4-2016, the Electric Power Authority Revitalization Act ("**Act 4**"), authorizing the creation of the SPV with powers necessary to implement the deal.

36. Act 4 also provided for various governance reforms. The majority of PREPA's board would be an independent, professional body made up of qualified individuals who were recommended by a recognized search firm, selected by the Governor, and confirmed by the Senate. These board members would be salaried, serve staggered terms, and could only be removed for a specified list of causes. Any replacement would be selected using the same criteria as the selection of the original members.

37. After Governor Rosselló took office, he demanded further concessions from creditors to improve PREPA's financial position over the next ten years. The RSA was also supplemented to reflect PREPA's new ability under Title VI of PROMESA to impose the exchange of Bonds for new securitization bonds at a discount onto the uninsured bondholders that were not parties to the RSA, thus eliminating the ability for holders of uninsured Bonds to refuse to exchange their Bonds.[5] In

---

[5] The original version of the RSA capped the number of uninsured Bonds that could remain at PREPA (the "**Holdout Bonds**") at $700 million.

addition, the insurers agreed to defer approximately $340 million of principal through forward purchase commitments that otherwise would be due within six years of the closing date, thereby providing PREPA with further liquidity relief. Plaintiffs also agreed to another relending transaction (the "**2017 Relending**"), namely a purchase of newly issued Bonds that would reduce the amount of money that PREPA would need to pay to bondholders on July 3, 2017 by the amount of bonds purchased. PREPA indicated that, absent the 2017 Relending, it would not have sufficient liquidity to pay the full amount of debt service due on the Bonds.

38. The RSA terminated on June 29, 2017. As a result of that termination, PREPA's creditors are no longer bound by the terms of the RSA, including the concessions they agreed to, or required to forbear from exercising remedies.

D. PREPA's Current Rate

39. Prior to 2016, PREPA had not raised its base rate – a fixed rate for non-fuel expenses like administrative costs and debt service – since 1989.

40. The RSA required that PREPA agreed to submit a rate case to the Energy Commission asking for a change in PREPA's rate structure. The rate structure was premised on the creditor concessions in the RSA – and sought a rate that would be sufficient to cover debt service on $700 million in Holdout Bonds and certain fuel line debt, on the assumption that the separate Transition Charge would be collected to cover debt service on the new securitization bonds. PREPA's revenue requirement for debt service for FY2017 took into account debt service on the Holdout Bonds only (as well as debt service on certain insured Bonds that were not then part of the RSA and on PREPA's expired fuel lines) and was $314,319,000, even though PREPA owed $611 million in debt service on its Bonds alone in FY2017.

41. After months of hearings involving extensive testimony from PREPA, independent experts, and RSA opponents, the Energy Commission approved the proposed rate on January 10,

9

2017. The approved rate included a charge per kilowatt hour that would be sufficient to cover PREPA's revenue requirement. However, that revenue requirement "assume[d] that the payment for the debt included in the RSA is not an expected expense" because such debt would have been payable from a separate Transition Charge upon the consummation of the transactions contemplated by the RSA. Because the RSA transactions have not occurred, the Transition Charge never became effective and the current rate is not sufficient to pay all of PREPA's debt service.

42. Debt service is only a small component of PREPA's rates. To satisfy bondholder claims in full, current rates would only need to increase by approximately 3.5 cents per kilowatt hour. For comparison, PREPA's all-in electricity charge in April 2017 was 20.1 cents per kilowatt hour, of which only approximately 1.9 cents goes to pay debt service. Rates under the RSA – and rates required to cover all of PREPA's debt service obligations – are, in fact, lower than the 28 cents per kilowatt hour paid by Puerto Ricans as recently as 2014.

F. <u>Payment Default</u>.

43. On July 3, 2017, PREPA owed approximately $442 million in principal and interest on the Bonds.

44. PREPA defaulted on this debt service obligation. This payment default is an Event of Default under Section 802 of the Trust Agreement.

## APPOINTMENT OF A RECEIVER

45. The Authority Act expressly provides that, upon a default, bondholders have an absolute right to automatic appointment of a receiver for PREPA. Section 17(a) of the Authority Act, P.R. Laws Ann. Tit. 22 § 207(a), provides:

> *[I]n the event that [PREPA] shall default in any agreement made with the holders of the bonds, any holder or holders of the bonds . . . shall have the right to apply in an appropriate judicial proceeding to any court of competent jurisdiction in Puerto Rico for the appointment of a receiver* of the undertakings, or parts thereof, the income or revenues of which are pledged to the payments of the bonds

> so in default . . . . Upon such application the court may appoint, and *if the application is made by the holders of twenty-five (25%) per centum in principal amount of such bonds then outstanding, or by any Trustee for holders of bonds in such principal amount, <u>shall</u> appoint a receiver of such undertakings*.

(emphasis added).

46. Neither the Authority Act nor the Trust Agreement requires any other grounds for appointment of a receiver.

47. The Authority Act provides for the Court to appoint a receiver at the request of bondholders (or the Trustee) and for the receiver to continue in possession and control of PREPA until the Bonds have been repaid in full.

48. It is therefore appropriate for Plaintiffs to nominate a qualified person for the Court to consider as a receiver.

49. Although no additional grounds are necessary for the appointment of a receiver, the politicized mismanagement of PREPA's affairs also justifies the appointment of a receiver.

50. PREPA's former Chief Restructuring Officer, Lisa Donahue, testified that a "fundamental issue that PREPA has that must change" is the politicization permeating PREPA's operations.

51. Among other things, Ms. Donahue testified that "[s]taffing decisions are made often without regard for prior experience or expertise given the nature of PREPA's role in the political process"; that the top 200 people at PREPA switch every four years with the change of political administrations; and that it is "an impossible task" to "efficiently manage a business where you know your tenure is short-term and you are going to have political pressure to do things that may or may not be in the best interest to the long-term results of the organization."

52. According to Ms. Donahue's testimony, the political influence in PREPA is a "one of the biggest fundamental issues" confronting PREPA.

11

53. Ms. Donahue's contract expired on February 15, 2017. It was not renewed. PREPA has been operating without a Chief Restructuring Officer or other professional management since that time.

54. On information and belief, PREPA's remaining management has been unwilling or unable to make the politically unpopular decisions needed to avoid the payment default in the first place and now to cure the default.

55. In 2017, Governor Rosselló signed into law acts that would allow him to replace PREPA's professional, independent board members with political appointees. He then exercised that right, firing PREPA's board and replacing them with his own nominees.

56. Shortly after taking office, Governor Rosselló also announced his own nominee for the position of PREPA Executive Director to replace the sitting Executive Director, who was chosen by Governor Rosselló's predecessor.

57. On information and belief, PREPA still faces enormous operational problems, including an increase in the number and severity of outages from 2014 to 2017.

58. The receiver appointed by this Court should adopt measures designed to address PREPA's financial and operational problems. The receiver could improve workplace safety, create a long-term plan for capital expenditures, improve collections of accounts receivable, and utilize third-party and renewable energy sources. In short, a receiver would take action to reduce costs and other expenditures, improve productivity, and increase revenues without the chronic mismanagement and politicization that PREPA currently faces.

## COUNT I
### (APPOINTMENT OF A RECEIVER)

59. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 58 of this complaint.

12

60. An event of default under the Trust Agreement has occurred as a result of PREPA's failure to pay principal and interest on the Bonds on July 3, 2017.

61. An event of default having occurred under the Trust Agreement, Plaintiffs as holders of more than 25% of the outstanding principal amount of Bonds are entitled to the appointment of a receiver pursuant to Section 17(a) of the Authority Act and the Trust Agreement. Moreover, equitable cause exists to justify the appointment of a receiver.

62. Accordingly, the Court should enter judgment appointing a receiver.

**WHEREFORE**, Plaintiffs demand judgment:

i. On Count I, the appointment of a receiver, to be nominated by Plaintiffs, to ensure compliance with all of PREPA's obligations under the Trust Agreement, such receiver to have such powers as provided for under the Authority Act and Trust Agreement, and to act under the direction and supervision of the Court, until at least such time as all amounts due on the Bonds have been paid in full and all defaults have been cured.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, July 18, 2017.

**TORO, COLÓN, MULLET, RIVERA & SIFRE, P.S.C.**

By: **s/** *Manuel Fernández-Bared*
Manuel Fernández-Bared
USDC-PR No. 204,204
Linette Figueroa-Torres
USDC-PR No. 227,104
Nayda Pérez-Román
USDC–PR No. 300,208
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760
Email: tmfb@tcmrslaw.com
lft@tcmrslaw.com
nperez@tcmrslaw.com

– and –

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

*s/ Gregory A. Horowitz*
AMY CATON*
THOMAS MOERS MAYER*
GREGORY A. HOROWITZ*
NATAN HAMERMAN**
ALICE J. BYOWITZ**
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: acaton@kramerlevin.com

*admitted *pro hac vice* in No. 17-03283-LTS
**Pro hac vice* applications pending

*Counsel for the Ad Hoc Group*

**GOLDMAN ANTONETTI & CORDOVA, LLC**

*s/ Carlos A. Rodríguez-Vidal*
CARLOS A. RODRÍGUEZ-VIDAL
USDC-PR No. 201213
E-mail: crodriguez-vidal@gaclaw.com

*s/ Solymar Castillo-Morales*
SOLYMAR CASTILLO-MORALES
USDC-PR No. 218310
E-mail: scastillo@gaclaw.com

P.O. Box 70364
San Juan, PR 00936-8364
Tel.: (787) 759-4117
Fax: (787) 767-9177

– and –

**DEBEVOISE & PLIMPTON LLP**

*s/ My Chi To*
MY CHI TO*
CRAIG A. BRUENS*
ELIE J. WORENKLEIN*
919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email: mcto@debevoise.com

15

    cabruens@debevoise.com
    eworenklein@debevoise.com

\*admitted *pro hac vice* in No. 17-03283-LTS

*Counsel for Syncora Guarantee Inc.*

| **ADSUAR MUNIZ GOYCO SEDA & PEREZOCHOA PSC** | **WEIL, GOTSHAL & MANGES LLP** |
|---|---|
| By: *s/ Eric Pérez-Ochoa* <br> ERIC PÉREZ-OCHOA <br> USDC-PR No. 206,314 <br> E-mail: epo@amgprlaw.com <br><br> *s/ Luis A. Oliver-Fraticelli* <br> LUIS A. OLIVER-FRATICELLI <br> USDC-PR NO. 209,204 <br> E-mail: loliver@amgprlaw.com <br><br> 208 Ponce de Leon Ave, Suite 1600 <br> San Juan, PR 00936 <br> Phone: (787) 756-9000 <br> Facsimile: (787) 956-9010 <br><br> *Counsel for National Public Finance Guarantee Corp.* | By: *s/ Marcia Goldstein* <br> Jonathan Polkes\* <br> Marcia Goldstein\* <br> Salvatore A. Romanello\* <br> Gregory Silbert\* <br> 767 Fifth Avenue\* <br> New York, N.Y. 10153 <br> Telephone: (212) 310-8000 <br> Facsimile: (212) 310-8007 <br> Stephen A. Youngman <br> 200 Crescent Court, Suite 300 <br> Dallas, Texas 75201-6950 <br> Tel.: (214) 746-7700 <br> Fax: (214) 746-7777 <br> Email: jonathan.polkes@weil.com <br>     marcia.goldstein@weil.com <br>     salvatore.romanello@weil.com <br>     gregory.silbert@weil.com <br>     stephen.youngman@weil.com <br><br> \* admitted pro hac vice in No. 17-03283-LTS <br><br> *Counsel for National Public Finance Guarantee Corp.* |

| | |
|---|---|
| **CASELLAS ALCOVER & BURGOS P.S.C.** | **CADWALADER, WICKERSHAM & TAFT LLP** |
| By: *s/ Heriberto Burgos Pérez* | By: *s/ Howard R. Hawkins, Jr.* |
|   Heriberto Burgos Pérez<br>  USDC-PR 204809<br>  Ricardo F. Casellas-Sánchez<br>  USDC-PR 203114<br>  Diana Pérez-Seda<br>  USDC-PR 232014<br>  P.O. Box 364924<br>  San Juan, PR 00936-4924<br>  Telephone: (787) 756-1400<br>  Facsimile: (787) 756-1401<br>  Email: hburgos@cabprlaw.com<br>        rcasellas@cabprlaw.com<br>        dperez@cabprlaw.com |   Howard R. Hawkins, Jr.*<br>  Mark C. Ellenberg*<br>  Nathan Bull (*pro hac vice* admission forthcoming)<br>  Ellen M. Halstead*<br>  Thomas J. Curtin*<br>  Casey J. Servais*<br>  200 Liberty Street<br>  New York, NY 10281<br>  Telephone: (212) 504-6000<br>  Facsimile: (212) 406-6666<br>  Email: howard.hawkins@cwt.com<br>        mark.ellenberg@cwt.com<br>        nathan.bull@cwt.com<br>        ellen.halstead@cwt.com<br>        thomas.curtin@cwt.com<br>        casey.servais@cwt.com |
| *Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* | * admitted pro hac vice in No. 17-03283-LTS<br><br>*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this same day, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> LINETTE FIGUEROA-TORRES
> USDC-PR No. 227,104
> E-mail: lft@tcmrslaw.com

# **EXHIBIT A**

**[To be provided]**