# **EXHIBIT A**

EXECUTION VERSION

## FORBEARANCE AGREEMENT

This Forbearance Agreement (as amended or modified from time to time, the "***Agreement***") is dated as of August 14, 2014 and is entered into by and among Puerto Rico Electric Power Authority ("***PREPA***"), National Public Finance Guarantee Corporation ("***National***"), Assured Guaranty Corp., Assured Guaranty Municipal Corp. (together with Assured Guaranty Corp., "***Assured***"), Syncora Guarantee Inc. ("***Syncora***"), and the undersigned members of the Ad Hoc Group of PREPA Bondholders identified on <u>Annex A</u> (the "***Ad Hoc Group***").  National, Assured, and Syncora, and any of their affiliates and predecessors that have insured Bonds (as herein defined) will be referred to herein collectively as the "***Insurers***," the Ad Hoc Group, together with persons who execute a joinder to this Agreement in the form of <u>Annex B</u>, will be referred to herein collectively as the "***Holders***," and the Insurers and the Holders will be referred to herein collectively as the "***Forbearing Creditors***."  All parties hereto will be referred to herein collectively as the "***Parties***."

## RECITALS

**A.**     PREPA is the issuer of power revenue bonds (collectively, the "***Revenue Bonds***") and power revenue refunding bonds (collectively, the "***Refunding Bonds***" and together with the Revenue Bonds, the "***Bonds***") issued pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented through August 1, 2011, between PREPA and U.S. Bank National Association, as successor trustee (the "***Trustee***" and, with respect to said trust agreement, as amended, the "***Trust Agreement***").  Terms used but not defined in this Agreement shall have the meanings given to such terms in the Trust Agreement.

**B.**     Each individual series of Bonds issued under the Trust Agreement was authorized pursuant to specific resolutions of PREPA authorizing the issuance of such series of Bonds.

**C.**     In connection with the issuance of certain of the Bonds (such Bonds, the "***Insured Bonds***"), PREPA entered into various insurance agreements with the Trustee corresponding to insurance policies issued by various insurers (such insurance policies to which any of the Insurers is currently a party, and the insurance agreements related thereto, collectively, the "***Bond Insurance Agreements***" and, together with the Trust Agreement, the Bonds, and any other agreements, supplements, amendments, or other documents executed or delivered in connection with the issuance or maintenance of the Bonds, including the Amendment (as defined herein), the "***Transaction Documents***").

**D.**     PREPA has requested, and the Forbearing Creditors have agreed, subject to the terms and conditions of this Agreement, to consent to an amendment of the Trust Agreement in the form and substance attached hereto as <u>Annex C</u> (the "***Amendment***").

**E.**     The Bond Insurance Agreements provide the Insurers the sole right in lieu of the beneficial owners of the applicable Insured Bonds to consent to the Amendment, for so long as the Insurers are not in default under the Bond Insurance Agreements.

**F.**     As of the date hereof, $8,322,405,000 in principal amount of Bonds is outstanding.

**G.**     As of the date hereof, the total outstanding principal amount of Bonds insured by National under the Bond Insurance Agreements is $1,397,520,000.

**H.**     As of the date hereof, the total outstanding principal amount of Bonds insured by Assured under the Bond Insurance Agreements is $940,260,000.

**I.**     As of the date hereof, the total outstanding principal amount of Bonds insured by Syncora under the Bond Insurance Agreements is $212,855,000.

**J.**     As of the date hereof, the total outstanding principal amount of Bonds that are not Insured Bonds that are beneficially owned by each Holder is listed on each respective Holder's signature page to this Agreement.

**K.**     The Forbearing Creditors collectively control more than 60% of the total outstanding principal amount of the Bonds for purposes of consenting to the Amendment.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     <u>Forbearing Creditors' Agreement to Consent to the Amendment and Forbear</u>.

(a)     Each of the Forbearing Creditors (i) consents to the execution and delivery by PREPA and the Trustee of the Amendment and (ii) shall take all reasonably necessary actions to effectuate the Amendment, including, without limitation, transmitting its consent to its Depository Trust Company participants, and any other person whose action is required to effectuate the Amendment (but without any obligation to indemnify the Trustee).

(b)     During the period from the Effective Date (as such term is defined in Section 2 of this Agreement) until the Forbearance Termination Date (as such term is defined in Section 5 of this Agreement) (the "***Forbearance Period***"), subject to the terms and conditions set forth herein, each of the Forbearing Creditors agrees as follows:

(i)     With respect to the Trust Agreement, such Forbearing Creditor will forbear from exercising, or consenting to the exercise of, any right to direct the Trustee to enforce or exercise any rights or remedies available to the Trustee under the Trust Agreement or applicable law arising solely by reason of any default or event of default under any Transaction Document that may have occurred or may subsequently occur as identified on <u>Annex D</u> attached hereto (the "***Potential Defaults***").

(ii)     Such Forbearing Creditor will forbear from enforcing or exercising any rights or remedies available to such Forbearing Creditor under the Transaction Documents or applicable law in respect of the Potential Defaults.

(c)     Notwithstanding anything to the contrary contained herein, solely to the extent that any entity challenges any trust rights, security interests, collateral, pledges of assets,

liens, or any other property rights under the Transaction Documents for the benefit of the Trustee or the Bonds, either held directly by holders or insurers of Bonds or held through the Trustee (the "***Security Rights***"), nothing in this Agreement shall limit or restrict any of the Forbearing Creditors or the Trustee from taking any action that the Trustee or any such Forbearing Creditor may take under its respective Transaction Documents, at law or in equity, that is necessary or appropriate to preserve, protect or defend (but not to enforce) any of the Security Rights against such challenge, including, without limitation, (i) defending, intervening in or filing any legal proceedings relating to any such Security Rights, (ii) sending notices to any persons, governmental authorities or entities concerning the existence of any such Security Rights, or (iii) otherwise preserving any of the rights, remedies, positions or defenses of such Forbearing Creditor or the Trustee, all of which are hereby expressly reserved.

(d)     During the Forbearance Period, PREPA's obligations to pay any and all Principal and Interest Requirements when due in accordance with the terms of the Transaction Documents shall continue; provided, however, that the Forbearing Creditors agree and acknowledge that, except as otherwise required by the Amendment, PREPA shall not be required to make transfers to the Revenue Fund or the Sinking Fund pursuant to Sections 506 or 507 of the Trust Agreement during the Forbearance Period.

(e)     Except as expressly provided herein and in the Amendment, none of the existence, execution, delivery or performance of any term or provision of this Agreement or the Amendment shall (i) constitute a modification or relinquishment of any term or aspect of, or any right or remedy under or with respect to, the Transaction Documents; (ii) constitute a consent to, waiver of, or admission of any default or event of default (or the absence of a default or event of default) in any of the Transaction Documents; (iii) extend the due date of any obligations under the Transaction Documents; (iv) give rise to any obligation to extend, amend, waive or otherwise modify any term or condition of any of the applicable Transaction Documents, or in the case of the Forbearing Creditors, to direct the Trustee with respect to any of the foregoing; (v) give rise to any defenses or counterclaims to PREPA or the Forbearing Creditors, or to any right of the Forbearing Creditors to direct the Trustee under the Transaction Documents, to compel payment of the obligations under any of the applicable Transaction Documents or to otherwise enforce rights or remedies thereunder; (vi) prohibit any Forbearing Creditor from instituting, commencing, prosecuting, joining, interceding in, supporting or otherwise participating directly or indirectly in any way in any legal proceedings regarding the validity, enforceability or application of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, Act No. 71-2014 (as amended, supplemented, modified, superseded, or replaced with other legislation in respect of a restructuring of PREPA, the "***Recovery Act***") or any provision thereof, or intervening or otherwise participating in any lawsuit filed by any party regarding the Recovery Act (any such legal proceedings, actions or lawsuits, "***Recovery Act Legal Actions***"); or (vii) prejudice the rights of any party to the Recovery Act Legal Actions.  Except as expressly limited herein, each Forbearing Creditor and PREPA hereby expressly reserves all of its rights, remedies, positions and defenses under or with respect to the Transaction Documents and under applicable law, and waives none.  From and after the Forbearance Termination Date (as herein defined), each Forbearing Creditor and PREPA shall be entitled to enforce any of its rights, remedies, positions and defenses under or with respect to the Transaction Documents in accordance with their respective terms.

3

2.      <u>Conditions to Effectiveness</u>.  This Agreement shall become effective as of the date (the "***Effective Date***") that each of the following shall have occurred:

(a)  All Parties shall have duly executed a counterpart of this Agreement;

(b)  PREPA shall have executed agreements (the "***Citibank/Scotiabank Forbearance Agreements***") in form and substance acceptable to the Forbearing Creditors with Citibank, N.A. ("***Citibank***"), as lender under that certain Trade Finance Facility Agreement, dated as of July 20, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time, the "***Citibank Credit Agreement***") and Scotiabank de Puerto Rico ("***Scotiabank***"), as agent, and the requisite threshold of other lenders (together with Scotiabank, the "***Scotiabank Lenders***") that are parties to that certain Credit Agreement, dated as of May 4, 2012 (as amended, restated, extended, supplemented or otherwise modified and in effect from time to time) (the "***Scotiabank Credit Agreement***," and together with the Citibank Credit Agreement, and any related documents to each, the "***Citibank/Scotiabank Lines of Credit***");

For the avoidance of doubt, nothing in this Agreement or in the Citibank/Scotiabank Forbearance Agreements shall prejudice any of the Forbearing Creditors', Citibank's or the Scotiabank Lenders' right to contest or defend, formally or informally, the priority of repayments of the Citibank/Scotiabank Lines of Credit relative to the Bonds.  Notwithstanding the foregoing or anything herein to the contrary, the Forbearing Creditors and PREPA agree not to take any position, whether formally or informally, regarding the priority of repayments of the Citibank/Scotiabank Lines of Credit relative to the Bonds on the basis of (x) any of the following actions or agreements by Citibank and the Scotiabank Lenders on the Effective Date and during the Forbearance Period:  (i) forbearing, delaying or failing to exercise remedies, (ii) agreeing to a postponement or delay in payment of interest or principal, (iii) granting an extension of any maturity date, (iv) not requiring the repayment or readvance of any loans under the Citibank/Scotiabank Lines of Credit or not requiring any loans under the Citibank/Scotiabank Lines of Credit to be revolving loans or (y) the inclusion in this Agreement as a Potential Default, and the inclusion in the Trust Agreement (as amended by the Amendment), as a "Potential Default" (as defined in the Trust Agreement, as amended by the Amendment) of PREPA's use of monies from the General Fund to service its debt under the Citibank/Scotiabank Lines of Credit, and none of the Forbearing Creditors or PREPA shall (or direct the Trustee to) use any such actions as a basis for contesting whether any expense, claim, liability or amount shall be construed as a Current Expense under the Trust Agreement by virtue of the foregoing or use any such actions in making any argument, filing any pleading or complaint, or supporting any other person in doing the same.

(c)  PREPA shall have executed an agreement (the "***GDB Forbearance Agreement***") in form and substance acceptable to the Forbearing Creditors with Government Development Bank for Puerto Rico ("***GDB***");

(d)  No proceeding pursuant to the Recovery Act or any other action or proceeding that seeks to adjust the claims of its creditors pursuant to any

4

federal, state, or Puerto Rico statute, now or hereinafter enacted, has been instituted by or on behalf of PREPA;

(e) PREPA shall have provided an initial 13-week cash flow statement (the "***Initial 13-Week Cash Flow Statement***") to the Forbearing Creditors; and

(f) PREPA shall have received and provided written confirmation to all Forbearing Creditors of all approvals required to enter into and perform this Agreement, including, without limitation, submission to the Forbearing Creditors of (A) resolution(s) duly adopted by the board of directors of PREPA authorizing PREPA to enter into and perform this Agreement and (B) an opinion of counsel that PREPA has the legal right, power and authority to enter into the Amendment.

3. <u>Representations</u>.

(a) <u>Mutual Representations</u>. Each Party hereby represents and warrants to the other as follows (each of which is a continuing representation and warranty, and shall be true throughout the Forbearance Period):

(i) it has the legal right, power and authority to enter into this Agreement and consummate the transactions contemplated hereby;

(ii) this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding at equity or law));

(iii) (A) with respect to PREPA, it is a public corporation of the Commonwealth of Puerto Rico, duly existing under the laws of the Commonwealth of Puerto Rico, and (B) with respect to each other Party, it is duly organized and validly existing and in good standing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver, and to perform and observe the terms and provisions of, this Agreement; and

(iv) the execution, delivery, performance and observance of this Agreement by such Party (A) have been duly authorized by all necessary action on the part of such Party, do not and will not conflict with, or result in a violation of, any law applicable to it, and do not require it to obtain any permit, consent, approval, order or authorization of, or provide notice to or make a filing with, any court, governmental or regulator agency or authority or other person or entity that has not been obtained, provided or made, as applicable, (B) (1) with respect to PREPA, do not contravene, or constitute a default under, any provision of applicable law or regulation or of any agreement, judgment, injunction, order, decree or

other instrument binding on PREPA and (2) with respect to each other Party, do not and will not violate, conflict with or result in the breach of any provision of its organizational or governance documents and (C) do not and will not result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage, indenture contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement (including without limitation the Transaction Documents) to which it is a party, which would materially adversely affect its ability to carry out its obligations under and otherwise observe this Agreement or cause the occurrence of a Termination Event (as defined herein).

(b) <u>Representations of PREPA</u>.  PREPA hereby represents and warrants as follows (each of which is a continuing representation and warranty, and shall be true throughout the Forbearance Period):

  (i) except to the extent that a Potential Default has occurred, no default under any Transaction Document has occurred and is continuing to the best of its knowledge;

  (ii) PREPA is in full compliance with, and no breach or default has occurred or is continuing in respect of, the covenants contained in Section 712 of the Trust Agreement;

  (iii) PREPA has made available to the Forbearing Creditors true and correct copies of any agreement relating to money borrowed by PREPA in the amount of $25 million or more;

  (iv) PREPA acknowledges that the Trustee has engaged Maslon Edelman Borman & Brand, LLP and Ballard Spahr LLP (the "***Trustee Advisors***") to provide legal advice to the Trustee in connection with this Agreement and the Amendment, and the Trustee Advisors may be compensated in accordance with the terms of the Trust Agreement; and

  (v) each of the representations in the Recitals set forth above as to PREPA is true and accurate as of the date hereof.

(c) <u>Representations of the Insurers</u>.  Each of the Insurers hereby represents and warrants as follows (each of which is a continuing representation and warranty, and shall be true throughout the Forbearance Period):

  (i) with respect to the Insured Bonds identified on its respective signature page hereto, the applicable Insurer has the sole right in lieu of the beneficial owners of the applicable Insured Bonds to consent to the Amendment;

(ii) no default or event of default has occurred with respect to it under any Bond Insurance Agreement to which it is a party;

(iii) it has not transferred any voting, consent or direction rights related to the applicable Insured Bonds; and

(iv) each of the representations in the Recitals set forth above as to such Insurer is true and accurate as of the date hereof.

(d) <u>Representations of the Holders</u>.  Each of the Holders hereby represents and warrants as follows (each of which is a continuing representation and warranty, and shall, subject to the provisions herein relating to Transfer (as defined in Section 7, below) be true throughout the Forbearance Period):

(i) it owns or has investment management responsibility for accounts that own Bonds that are not Insured Bonds in the principal amounts set forth on its respective signature page hereto or Forbearing Creditor Joinder (as applicable), and that it has not sold, assigned, transferred, participated or otherwise pledged such Bonds, or any voting, consent or direction rights related to such Bonds, to any other person or entity, in each case, except as permitted by Section 7 of this Agreement; and

(ii) each of the representations in the Recitals set forth above as to the Holders is true and accurate as of the date hereof.

4.  <u>Covenants by PREPA</u>.  PREPA hereby covenants as follows:

(a) It shall provide the following to each of the Forbearing Creditors (or such Forbearing Creditor's financial and legal advisors if so directed by such Forbearing Creditor in writing):

(i) Within two (2) business days after receipt, any default, event of default or termination notice received by PREPA under the Citibank/Scotiabank Lines of Credit, the GDB Loan Agreements (as defined in the GDB Forbearance Agreement) or any other agreement under which PREPA could owe more than $10 million if a counterparty exercises remedies thereunder;

(ii) Within five (5) business days after the end of any month, a cash report showing account balances for the General Fund and the Construction Fund;

(iii) Within five (5) business days after execution by PREPA, copies of any agreements with vendors for the delivery of fuel oil or for the purchase of power with projected annual spend of greater than $50 million;

(iv) Within two (2) business days after PREPA has agreed to accept such proposal, any proposal accepted by PREPA (whether formal or

7

informal) that concerns any new financing, loan, or "debtor in possession" facility (including, but not limited to, the provision of any commitment fee, or the payment of any prepayment premium or any prepayment under a forward delivery contract or other agreement for services), or any proposed recovery program or debt enforcement plan;

(v)   Weekly updates to the Initial 13-Week Cash Flow Statement in the same form as the Initial 13-Week Cash Flow Statement (the "***Rolling 13-Week Cash Flow Statement***"), including a weekly variance report showing the variance to the Initial 13-Week Cash Flow Statement or the prior Rolling 13-Week Cash Flow Statement, as applicable;

(vi)   No later than seven (7) business days prior to the end of the period covered by the Initial 13-Week Cash Flow Statement and each subsequent 13-week period, PREPA will provide to the Forbearing Creditors a budget covering the next 13-week period including the same categories as the Initial 13-Week Cash Flow Statement (such budget, a "***Subsequent 13-Week Budget***");

(vii)   Written notice of any default (A) by PREPA under this Agreement, (B) other than a Potential Default, by PREPA under the Trust Agreement, or (C) or termination under the Citibank/Scotiabank Forbearance Agreements or the GDB Forbearance Agreement, and in the case of clause (C) the waiver or cure of any such default, in each case within two (2) business days of the occurrence of such default, or after the same shall become known to PREPA; and

(viii)   On or before the fifth (5th) business day of each month, a report that displays, for the prior month and cumulatively during the Forbearance Period:  (A) weekly disbursements from the Construction Fund, identifying whether such disbursements were applied to pay for the cost of Improvements or Current Expenses, and (B) weekly receipts of moneys credited to the Construction Fund, identifying whether such receipts were the result of replenishment of the Construction Fund by PREPA in accordance with the Amendment.

(b) Absent the consent of Forbearing Creditors holding beneficially or insuring at least 85% of the principal amount of the Bonds outstanding subject to this Agreement, PREPA shall not agree to any amendments, modifications, or supplements to the Citibank/Scotiabank Lines of Credit, Citibank/Scotiabank Forbearance Agreements, the GDB Loan Agreements, or the GDB Forbearance Agreement or other material financial agreements to which PREPA and any of such institutions are parties (collectively, the "***Other Forbearing Creditor Agreements***") that (i) prejudice or impair the Forbearing Creditors' rights under this Agreement, the Trust Agreement or any other Transaction Document, (ii) enhance the existing rights of the Scotiabank Lenders, Citibank, or the GDB, or (iii) without limiting the

8

preceding clauses (i) or (ii), modify any of the Other Forbearing Creditor Agreements in any way that is adverse to the Forbearing Creditors.

Prior to entering into any amendment, modification or supplement to the Other Forbearing Creditor Agreements, PREPA shall provide written notice of any such proposed amendment (each, a "***Proposed Amendment***") to the Forbearing Creditors. If PREPA does not receive any written objection to a Proposed Amendment from a Forbearing Creditor within five (5) business days after providing such notice, no consent of the Forbearing Creditors shall be required pursuant to the preceding paragraph prior to PREPA's entry into the applicable Proposed Amendment;

(c) It shall use reasonable commercial efforts to respond to any reasonable written request for information concerning further diligence requests made by any Forbearing Creditor;

(d) It shall use reasonable commercial efforts and work constructively with the Forbearing Creditors to develop a five-year business plan and a recovery program in respect of PREPA's operations. The business plan (the "***Business Plan***") will be based in part on the integrated resource plan referenced in Section 4(e) of this Agreement, as well as the work of PREPA, including a chief restructuring officer or similar officer, once appointed, and PREPA's advisors in respect of operational and financial improvements for PREPA. The Business Plan will include, but will not be limited to (i) a monthly set of financial projections (profit and loss statement, balance sheet, cash flow statement) for the fiscal year beginning July 1, 2015, a quarterly set of financial projections for the fiscal year beginning July 1, 2016, and annual projections for the three (3) fiscal years beginning July 1, 2017, (ii) projections for maintenance, development and environmental capital expenditures during the period covered by the Business Plan, and (iii) a proposed set of cost saving and revenue enhancement initiatives to be evaluated for implementation prior to and during the period covered by the Business Plan. For purposes of clarity, the Business Plan shall not include a proposed capital structure for PREPA or proposed adjustments to the existing debt of PREPA;

(e) It shall provide to the Forbearing Creditors and their advisors reasonable access to its management and advisors (including any chief restructuring officer or similar officer and the consulting engineering firm responsible for developing in consultation with PREPA management an integrated resource plan for PREPA) from time to time, including, without limitation, if requested, weekly meetings with the financial advisors to the Forbearing Creditors to discuss, among other things, any of the reports provided pursuant to Section 4(a) of this Agreement, and shall use reasonable commercial efforts to provide reasonable access to the management of the GDB associated with the potential restructuring or reorganization of PREPA

9

through regular meetings among such management and advisors and the Forbearing Creditors and/or their advisors;

(f) Within ten (10) days after the Amendment Effective Date, PREPA shall pay to each Forbearing Creditor (or its designee) a forbearance fee equal to its pro rata share (calculated as a percentage of principal amount of Bonds insured or beneficially owned by such Forbearing Creditor compared to the principal amount of all Bonds insured or beneficially owned that are subject to this Agreement) of $1,400,000, upon PREPA's receipt of a written certification by such Forbearing Creditor (or its designee) that such pro rata share does not exceed the aggregate amount of fees and expenses incurred by such Forbearing Creditor relating to work performed in connection with the negotiation and documentation of this Agreement and related diligence, which shall be creditable against any obligation of PREPA to pay any fees and expenses of such Forbearing Creditor;

(g) No later than the first (1st) business day of each month after the Amendment Effective Date during the Forbearance Period, counsel for any Forbearing Creditor shall, by written notice to all Parties, subject to the confidentiality provisions of Section 6(b), advise PREPA of any changes in the aggregate principal amount of Bonds insured or beneficially owned by its clients that are Forbearing Creditors.  On the fifteenth (15th) day of each month after the Amendment Effective Date (or the first business day thereafter), starting on September 15, 2014, PREPA shall pay, in arrears, an amendment fee to each Forbearing Creditor that is  a Forbearing Creditor at such time (or such Forbearing Creditor's designee) its pro rata share (based on the aggregate principal amount of Bonds insured or beneficially owned subject to this Agreement) of the sum of $1,000,000, which shall be creditable against any obligation of PREPA to pay any fees and expenses of such Forbearing Creditor;

(h) It shall use commercially reasonable efforts to pursue any overdue accounts in respect of its accounts receivable from all of its customers (including, without limitation, all governmental entities and municipalities) and take all reasonable actions to seek to collect such Revenues;

(i) It shall consult, in good faith, with the Forbearing Creditors regarding the retention of a chief restructuring officer or similar officer whose scope of authority would include the matters set forth on Annex E, and shall consider, in good faith, any recommendations made by the Forbearing Creditors with respect to such retention;

(j) It shall keep the Forbearing Creditors reasonably informed regarding PREPA's process with respect to (i) any new financing, loan, or "debtor in possession" facility (including, but not limited to, the provision of any commitment fee, or the payment of any prepayment premium or any

10

prepayment under a forward delivery contract or other agreement for services), or (ii) any recovery program or debt enforcement plan;

(k) It shall attempt, in good faith, to minimize potential setoff risks in conducting its cash management practices;

(l) It shall execute the Amendment and take all reasonably necessary actions to effectuate the Amendment in the event that the requisite percentage of beneficial owners or insurers of the Bonds deliver written consents to the Amendment. For purposes of this Agreement, "***Amendment Effective Date***" shall mean the date on which the Amendment becomes effective pursuant to its terms;

(m) It shall satisfy, when due and in accordance with their terms, its payment obligations under (i) the interest rate swap transaction between PREPA and UBS AG, Stamford Branch, evidenced by a confirmation dated April 18, 2007, as amended and supplemented from time to time; and (ii) the interest rate swap transaction between PREPA and JPMorgan Chase Bank, N.A., evidenced by a confirmation dated April 27, 2007, as amended and supplemented from time to time (together, the "***Assured Swaps***");

(n) To the extent such practice is not already in effect, for the period from and after September 1, 2014 (and, for the avoidance of doubt, not on a retroactive basis), PREPA shall record (i) revenue from municipalities and associated receivable balances on a gross basis, without reflecting any offset or accounting adjustment for Contributions in Lieu of Taxes ("***CILT***"); and (ii) CILT liabilities on a gross basis; and

(o) PREPA shall post the following to its publicly accessible website within two (2) business days after the date such documents are delivered to the Trustee: (i) the annual report of the consulting engineers required under Section 706 of the Trust Agreement and (ii) the monthly statements under Section 710 of the Trust Agreement.

5.   Termination.

(a) This Agreement shall terminate at 11:59 p.m. (prevailing Eastern Time) on March 31, 2015 (the "***Forbearance Termination Date***"), unless terminated earlier in accordance with the terms of this Agreement.

(b) In addition, this Agreement shall terminate automatically if:

(i)   The Amendment is not effective on or before fifteen (15) business days after the Effective Date; or

(ii)   A suspension period notice or proceeding pursuant to the Recovery Act or any other action or proceeding that seeks to adjust or challenge the claims of PREPA's creditors pursuant to any federal, state, or Puerto

11

Rico statute, now or hereinafter enacted, is instituted by or on behalf of PREPA, in which case the Forbearance Termination Date shall be deemed to have occurred.

(c) In addition, PREPA shall have the right, upon written notice to the Forbearing Creditors, Citibank, Scotiabank and the GDB to terminate this Agreement upon the occurrence of any of the following events (each, a  "***PREPA Termination Event***"):

   (i) Any of the Forbearing Creditors fails to comply with any of the material terms, covenants, provisions, or conditions of this Agreement or any such material terms, provisions or conditions are otherwise subject to any breach, default or violation on the part of any Forbearing Creditor, or any of the material representations or warranties of any of the Forbearing Creditors as set forth in this Agreement is not true or accurate in any material respect at any time during the Forbearance Period (each of the foregoing, a "***Forbearing Creditor Default***"), which Forbearing Creditor Default, if capable of being cured, is not cured within five (5) business days after receipt of a written notice thereof from PREPA;

   (ii) PREPA determines, after consultation with counsel, to terminate the Agreement in the exercise of its fiduciary or statutory duties; and

   (iii) Any Forbearing Creditor commences, prosecutes, joins, intercedes, or otherwise supports by filing pleadings or appearing to argue in any way in a Recovery Act Legal Action, other than any Forbearing Creditor that has, prior to the Effective Date, filed a Recovery Act Legal Action, and any affiliate of such Forbearing Creditor.

The Forbearance Termination Date shall be deemed to have occurred as of the date and time when PREPA delivers such written notice.

(d) In addition, if PREPA fails to satisfy its payment obligations under the Assured Swaps on October 1, 2014 or January 1, 2015, Assured shall have the right in either case, upon written notice to PREPA, Citibank, Scotiabank, the GDB, and the advisors to the other Forbearing Creditors, in each case, solely to the notice addresses listed for such advisors in Section 14 hereof, to withdraw from this Agreement, in which case Assured shall no longer be considered a Forbearing Creditor as of the date of delivery of such written notice.

(e) In addition, upon the occurrence of any of the following events, each member of the Ad Hoc Group shall have the right, upon written notice to PREPA, Citibank, Scotiabank, the GDB, and the advisors to the other Forbearing Creditors, in each case, solely to the notice addresses listed for such advisors in Section 14 hereof, to withdraw from this Agreement, in which case it shall

12

no longer be considered a Forbearing Creditor as of the date of delivery of such written notice:

(i) A default, event of default, or termination event has occurred with respect to PREPA's obligations under any of the Citibank/Scotiabank Forbearance Agreements or the GDB Forbearance Agreement and such default, event of default, or termination event has not been waived by Citibank, the Scotiabank Lenders or the GDB, as applicable, or if subject to a cure period, has not been cured by PREPA within the applicable cure period (a "***Cross-Termination Event***"); or

(ii) During the Forbearance Period, except as expressly permitted under this Agreement, PREPA (A) makes any principal repayment under either the Citibank/Scotiabank Lines of Credit or the GDB Loan Agreements, or (B) enters into any new financing, loan, or "debtor in possession" facility (including the provision of any commitment fee, or the payment of any prepayment premium or any prepayment under a forward delivery contract) to borrow greater than $10 million (not including any insurance premium financing, any unsecured federally guaranteed loan financing, or any vehicle or equipment leases), in the aggregate, whether or not such arrangement would comply with or otherwise require the consent of holders of Bonds pursuant to the Trust Agreement or any other Transaction Document (a "***Financing Termination Event***").

(f) **[Reserved]**

(g) In addition, after 11:59 p.m. (prevailing Eastern Time) on January 15, 2015, Forbearing Creditors holding beneficially or insuring at least 25% of the principal amount of the Bonds outstanding subject to this Agreement, shall have the right, upon written notice to PREPA, to terminate this Agreement. The Forbearance Termination Date shall be deemed to have occurred as of the date and time when any such Forbearing Creditors deliver such written notice.

(h) In addition, upon the occurrence of any of the following (each a "***Termination Event***"), Forbearing Creditors holding beneficially or insuring at least 66 2/3% of the principal amount of the Bonds outstanding subject to this Agreement, shall have the right, upon written notice to PREPA and the other Forbearing Creditors, to terminate this Agreement:

(i) A default by PREPA or an event of default (except for the Potential Defaults) has occurred and is continuing under any Transaction Document and, if subject to a cure period, has not been cured by PREPA within the applicable cure period;

(ii) Measured as of (A) the end of the fourth (4th) week of the Initial 13-Week Cash Flow Statement or (B) the end of each week during a Subsequent 13-Week Budget (taking into account for purposes of the

13

following calculations, the necessary number of weeks from the previous budget period such that the calculations are made over a four (4)-week period), a variance of:

(x) 10% or more occurs in respect of actual results in the collections line item in the Initial 13-Week Cash Flow Statement or Subsequent 13-Week Budget then in effect, such that total actual collections on the measurement date are, in the aggregate, 10% less than the budgeted amounts, it being agreed and acknowledged that if collections in a prior week during the applicable 13-week period exceed the budgeted amounts such amounts shall carry forward to subsequent weeks within the 13-week period; or

(y) 20% or more occurs in respect of actual results in the disbursements and capital expenditure line items included in the Initial 13-Week Cash Flow Statement or Subsequent 13-Week Budget then in effect, such that actual disbursements and capital expenditures are, in the aggregate, 20% greater than the budgeted amounts, it being agreed and acknowledged that if disbursements and capital expenditures are not used in a prior week during a 13-week period, such amounts shall carry forward to subsequent weeks within the 13-week period, provided that (1) professional fees shall be excluded from the disbursements test, and (2) any #6 fuel oil purchases will be included in the Initial 13-Week Cash Flow Statement at current prices and 60-day terms, with no credit limit, and (3) for purposes of the disbursement test, such amounts will be reflected either at the then-in effect terms or contract terms, as applicable;

(iii) If PREPA makes a disbursement to GDB of a type that is not contemplated by the Initial 13-Week Cash Flow Statement or a Subsequent 13-Week Budget, as applicable;

(iv) Any Puerto Rico law is enacted or a legal action is commenced by a party other than a holder of Bonds either of which has a material adverse effect on PREPA or the rights or interests of the Forbearing Creditors, in their capacity as creditors of PREPA; provided, that in no event shall a Recovery Act Legal Action constitute a material adverse effect on PREPA;

(v) A Cross-Termination Event;

(vi) A Financing Termination Event;

(vii) PREPA fails to comply with any of the material terms, covenants, provisions, or conditions of this Agreement or any such material terms, covenants provisions or conditions are otherwise subject to any breach, default or violation on the part of PREPA, or any of the material

14

representations or warranties of PREPA as set forth in this Agreement is not true or accurate in any material respect at any time during the Forbearance Period, other than as set forth in subsection (viii) below) (each of the foregoing, a "***PREPA Forbearance Default***"), which PREPA Forbearance Default, if capable of being cured, is not cured within five (5) business days after receipt of a written notice thereof from any Forbearing Creditor;

(viii)   If PREPA does not provide to the advisors to the Forbearing Creditors the Rolling 13-Week Cash Flow Statement in accordance with Section 4(a)(v), including the weekly variance report described in such Section 4(a)(v), or a Subsequent 13-Week Budget in accordance with Section 4(a)(vi), if such failure to so provide is not cured within three (3) business days;

(ix)   If a Subsequent 13-Week Budget is not in form and substance reasonably acceptable to such Forbearing Creditors; provided, however, that such Forbearing Creditors may only issue a written notice under this section in the seven (7) business day period prior to such Subsequent 13-Week Budget becoming effective unless PREPA, at the request of any Forbearing Creditor, agrees to extend such period for up to five (5) business days;

(x)   If PREPA does not retain a chief restructuring officer or similar officer with the scope of authority set forth on Annex E that is reasonably acceptable to the Forbearing Creditors on or before September 8, 2014;

(xi)   If PREPA does not hire FTI Consulting, which shall consult in good faith with the Forbearing Creditors in the course of its work to (w) examine, evaluate and make recommendations with respect to PREPA's billing practices, (x) examine, evaluate and make recommendations with respect to collection of the outstanding receivables owed to PREPA by the Commonwealth, and the public corporations, agencies, municipalities or other instrumentalities of the Commonwealth, (y) examine, evaluate and make recommendations with respect to CILT, and (z) develop and recommend "best practices," and a proposed timeline for implementing such best practices, in a report to be produced to PREPA no later than November 15, 2014 (with a copy to the Forbearing Creditors);

(xii)   If PREPA has not delivered a Business Plan by December 15, 2014; or

(xiii)   If PREPA has not delivered a proposed recovery program or debt enforcement plan that is reasonably acceptable to Forbearing Creditors holding beneficially or insuring at least 66 2/3% of the principal amount of the Bonds outstanding subject to this Agreement on or before March 2, 2015;

15

The Forbearance Termination Date shall be deemed to have occurred as of the date and time when Forbearing Creditors holding beneficially or insuring at least 66 2/3% of the principal amount of the Bonds outstanding subject to this Agreement issue such written notice.

(i) Once a Party is no longer a Party to this Agreement, such Party shall be entitled to exercise any rights or remedies it may have under the Transaction Documents or applicable law, at law or in equity, and any applicable statutes of limitation with respect to any such rights or remedies shall be tolled during the Forbearance Period applicable to such Party.

(j) Except with respect to PREPA's obligations pursuant to Sections 4(f) and 4(g) of this Agreement and any Party's obligations pursuant to the second paragraph of Section 2(b) and Sections 7, 9, 10 or 11 or as otherwise set forth in this paragraph, the sole and exclusive remedy of any Party for any breach of this Agreement by any other Party shall be termination under this Section 5, and such breach shall not give rise to any claims against any Party at law or in equity; provided, however, that notwithstanding the foregoing, the Parties agree that irreparable damage would occur in the event that any Forbearing Creditor does not perform in accordance with the specific terms of this Agreement, and accordingly PREPA shall be entitled to equitable relief, including specific performance, in the event of any breach or threatened breach of this Agreement by a Forbearing Creditor.

6.   <u>Disclosure of Information</u>.

(a) Notwithstanding anything herein to the contrary:

(i) PREPA shall not be required to provide any documents or information that is confidential information to any Forbearing Creditor that is not a party to a non-disclosure agreement that is in effect at the time of such disclosure (an "***NDA***").

(ii) PREPA may elect to designate as confidential information, including on an advisors-only basis, any documents or information that (A) are not otherwise required to be provided to the Trustee under the Trust Agreement, any Transaction Document, or applicable law or (B) have not been transmitted to other entities without an NDA.

(b) Notwithstanding anything herein to the contrary, information concerning the Bonds beneficially owned or insured by the Forbearing Creditors, including, without limitation, the description of such Bonds reflected on the signature pages hereto, the description of such Bonds on any documentation related to the Amendment, and information delivered pursuant to Section 7(c), below, shall be confidential, and shall not be disclosed to any person without the prior written consent of the applicable Forbearing Creditor, except to PREPA's and the other Forbearing Creditors' attorneys or advisors (solely

16

to the extent necessary for it to perform its obligations under this Agreement) (collectively, the "*Authorized Persons*"); provided, however, that an Authorized Person that receives such confidential information shall be permitted to disclose such information (i) to the extent required by any law, rule or regulation or by any subpoena or similar judicial and/or administrative order, or other regulatory authority (including any self-regulatory organization having jurisdiction or claiming to have jurisdiction over such person), or (ii) to the extent that such information is or becomes generally available to the public other than as a result of disclosure by an Authorized Person; provided further, however, that an Authorized Person that receives such confidential information concerning the Bonds beneficially owned or insured by the Forbearing Creditors shall be permitted to disclose to its respective clients the aggregate percentage of Bonds beneficially owned or insured by the any group of Holders, without disclosure of the amount or percentage of Bonds beneficially owned or insured by any individual Holder.

(c) PREPA authorizes the Trustee to disclose to a beneficial holder or insurer of Bonds, upon request of such holder or insurer, (i) any reports or certificates required to be filed with the Trustee under the following sections of the Trust Agreement: 502 (revisions of rates), 504 (annual and supplemental budgets), 505 (report of expenditure in excess of annual budget), 706 (report of the Consulting Engineers), 710 (monthly reports on income, expense and other matters set forth therein, annual audits and additional reports or audits required by law) and 712 (abandonment, sale or lease of any part of the system); and (ii) the balances for any funds or accounts held by the Trustee for the benefit of holders of Bonds.

7.   Transfer of Interests and Securities; Holders' Disclosures.

(a) For the period commencing as of the date any Forbearing Creditor executes this Agreement until the earliest to occur of (i) the fifteenth (15th) business day following such date if the Effective Date has not occurred and (ii) termination of this Agreement pursuant to the terms hereof (the "*Transfer Limitation Period*"), such Forbearing Creditor shall not sell, assign, transfer or otherwise pledge or dispose of ("*Transfer*") any Bonds beneficially owned by such Forbearing Creditor, or any voting, consent or direction rights related to such Bonds, except such Transfer may be made (A) if the transferee is a Forbearing Creditor at the time of the Transfer, (B) if the transferee is not a Forbearing Creditor, such transferee (a "*Qualified Transferee*") delivers to each of the Forbearing Creditors, PREPA, Citibank and Scotiabank at or prior to the time of the Transfer, the joinder attached hereto as Annex B, pursuant to which such transferee shall assume all obligations of the Forbearing Creditor transferor hereunder in respect of the Bonds Transferred (such transferee, if any, shall also be a "Forbearing Creditor" hereunder), or (C) if the Bonds sold, assigned, transferred or otherwise pledged or disposed of are Insured Bonds, and the representations

and warranties of the applicable Insurer contained in Section 3(c) hereof are true at that time with respect to such Bonds.  In addition, subject to subclause (C) above and without limiting the foregoing, each of the Insurers agrees that it will not transfer any voting, consent or direction rights related to Insured Bonds during the Transfer Limitation Period unless the transferee agrees to be bound by the terms of this Agreement and delivers notice of such agreement to each of the Forbearing Creditors, Citibank, Scotiabank, and PREPA.  To the extent that a Transfer violates the provisions of this section, the Transfer shall be void ab initio and the applicable Bonds and Forbearing Creditor shall continue to remain subject to the terms of this Agreement.  This Agreement shall in no way be construed to preclude any of the Forbearing Creditors from acquiring additional Bonds; provided that any such acquired Bonds shall automatically and immediately upon acquisition by a Forbearing Creditor be deemed subject to all of the terms of this Agreement.

(b)  Notwithstanding anything contained in this Agreement to the contrary, a Forbearing Creditor may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in the Bonds to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a Forbearing Creditor; provided that such Qualified Marketmaker transfers (by purchase, sale, assignment, participation or otherwise) such right, title and or interest within ten (10) business days after receipt thereof to a Forbearing Creditor or a Qualified Transferee; provided further that such Forbearing Creditor shall notify such Qualified Marketmaker that it is party to this Agreement prior to transferring any right, title or interest in the Bonds to such Qualified Marketmaker and such Qualified Marketmaker shall have no duty to make any investigation or inquiry as to whether any transferred Bond is subject to this Agreement.

"*Qualified Marketmaker*" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the Bonds or enter with customers into long and short positions in debt securities such as the Bonds, in its capacity as a dealer or market maker in such Bonds; (ii) is in fact regularly in the business of making a market in debt securities; and (iii) is registered with the Securities and Exchange Commission and Financial Institutions Regulatory Authority.

(c)  No later than the first (1st) business day of each month, and upon PREPA's reasonable request, each Holder shall disclose to PREPA, the aggregate principal amount of Bonds beneficially owned by such Holder, which disclosures shall be treated as confidential information by PREPA in accordance with Section 6(b).  The foregoing shall not prohibit PREPA from disclosing the approximate aggregate holdings of all Forbearing Creditors collectively.

8.      Announcements.  None of the Parties shall issue any press release or other public statement announcing this Agreement without the consent of the other Parties, which consent shall not be unreasonably withheld or delayed.

9.      Release of Claims and Waiver of Defenses.  In further consideration of the Forbearing Creditors' entry into and performance under this Agreement, PREPA, on behalf of itself and its successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, agents and attorneys hereby forever, fully, unconditionally and irrevocably waives and releases the Forbearing Creditors and their respective successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, attorneys and agents (collectively, the "*Releasees*") from any and all claims, liabilities, obligations, debts, causes of action (whether at law or in equity or otherwise), defenses, counterclaims and setoffs of any kind, whether known or unknown, liquidated or unliquidated, matured or unmatured, fixed or contingent, or otherwise, directly or indirectly arising out of, connected with, resulting from or related to any act or omission by the Forbearing Creditors or any other Releasee with respect to the Trust Agreement, the Bond Insurance Agreements, or any other Transaction Documents, except to the extent that any such claims, liabilities, obligations, debts, causes of action, defenses, counterclaims and setoffs are found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Releasees.  Nothing herein shall release any obligations of the Insurers under the Bond Insurance Agreements.

10.      Amendment.  Once effective, this Agreement may not be modified, amended, supplemented or otherwise altered (except as expressly provided herein), and no term or condition may be waived, except in a writing signed by PREPA and Forbearing Creditors holding beneficially or insuring at least 85% of the principal amount of the Bonds outstanding subject to this Agreement.  Notwithstanding the foregoing, (a) any such modification, amendment, or supplement that alters (i) the percentage of Bonds required for determining consents, amendments, terminations, extensions or other actions hereunder or (ii) any provision relating to termination or extension of this Agreement, including, without limitation, Section 5 of this Agreement, or (b) materially and adversely affects the rights or obligations of any Forbearing Creditor in a manner disproportionate to those of any other Forbearing Creditor or group of Forbearing Creditors (provided that a disproportionate effect cannot arise solely on the basis that certain Forbearing Creditors are Holders and others are Insurers), in each case, shall not be effective unless in writing and signed by PREPA and each Forbearing Creditor.  In addition, absent the consent of Citibank and Scotiabank, acting as agent on behalf of the Scotiabank Lenders, this Agreement shall not be amended, modified or supplemented in any way that would (i) prejudice or impair Citibank or the Scotiabank Lenders' rights under this Agreement, the Citibank/Scotiabank Lines of Credit or the Citibank/Scotiabank Forbearance Agreements, (ii) enhance the existing rights of the Forbearing Creditors, or (iii) without limiting the preceding clauses (i) or (ii), modify the provisions of this Agreement in any way that is adverse to Citibank or the Scotiabank Lenders.  Prior to entering into any amendment, modification or supplement this Agreement, PREPA shall provide written notice of any such proposed amendment (each, a "***Proposed Forbearance Amendment***") to Citibank and Scotiabank, acting as agent on behalf of the Scotiabank Lenders.  If PREPA does not receive any written objection to a Proposed Forbearance Amendment from Citibank or Scotiabank, acting as agent on behalf of the Scotiabank Lenders within five (5) business days after providing such notice, no consent of Citibank or Scotiabank, acting as agent on behalf of the Scotiabank

Lenders, shall be required pursuant to this paragraph prior to PREPA's entry into the applicable Proposed Forbearance Amendment.

11.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives and assigns. PREPA shall not assign or transfer its rights under this Agreement without the consent of each of the Forbearing Creditors.  No Forbearing Creditor shall assign or transfer its rights under this Agreement other than in connection with a Transfer pursuant to Section 7 of this Agreement. This Agreement is entered into for the exclusive benefit of the parties hereto, no other party shall derive any rights or benefits herefrom, and all third-party beneficiary rights are hereby expressly disclaimed, other than (a) Citibank and the Scotiabank Lenders, which are made express third party beneficiaries to Sections 1(a)-(b), 2(b) (second paragraph), 5(j) and 10 hereof, provided the remedy of such third-party beneficiaries shall be limited to specific performance thereof, and (b) the Trustee, which is made an express third party beneficiary to Sections 1(c), 3(b)(iv) and 6(c) hereof.

12.     <u>Further Assurances</u>.  The parties hereto agree that upon the reasonable request of any other Party to this Agreement, each such Party will execute and deliver to the requesting Party such other additional instruments and documents or perform or cause to be performed such other and further acts and things, as may be reasonably necessary to more fully consummate the transactions as set forth in this Agreement; provided, however, that performance by any Party under this paragraph shall not create any new liability or obligation on the performing Party whatsoever.

13.     <u>Reaffirmation of Transaction Documents</u>.  PREPA  hereby ratifies and reaffirms all of the terms, provisions and covenants contained in each of the Trust Agreement, as amended by the Amendment, and Transaction Documents to which it is a party, which continue to be in full force and effect as written and, except as provided in the Amendment, unmodified hereby.

14.     <u>Notices</u>.  All notices or demands given or made by one Party to the other relating to this agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission with a copy by first-class mail, and shall be deemed given for purposes of this Agreement on the earlier of the date of actual receipt or three (3) days after the deposit thereof in the mail.  Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent solely to the notice addresses listed below for advisors to the Forbearing Creditors and the other below-listed entities:

20

If to PREPA:

Richard J. Cooper, Esq. and
Sean A. O'Neal, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
rcooper@cgsh.com
soneal@cgsh.com

and

Puerto Rico Electric Power Authority
Attention: Office of the General Counsel
P.O. Box 364267
San Juan, Puerto Rico 00936-4267

If to Syncora:

c/o Richard F. Hahn, Esq. and
My Chi To, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
rfhahn@debevoise.com
mcto@debevoise.com

If to GDB:

Jose R. Coleman Tió
Government Development Bank for Puerto
Rico
P.O. Box 42001
San Juan, PR 00940-2001
Jose.R.Coleman@bgfpr.com

If to National:

Marcia Goldstein, Esq. and
Debra A. Dandeneau, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Marcia.goldstein@weil.com
Debra.dandeneau@weil.com

and

Patricia Ferrari and
Adam Bergonzi
National Public Finance Guarantee Corporation
113 King St.
Armonk, NY 10504
Trish.Ferrari@optinuityar.com
Adam.bergonzi@nationalpfg.com

21

<u>If to Assured</u>:

Lary Stromfeld, Esq. and
Howard Hawkins, Esq.
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Lary.stromfeld@cwt.com
Howard.hawkins@cwt.com

and

Kevin Lyons
Assured Guaranty Municipal Corp.
31 W. 52nd St.
New York, NY 10019
klyons@assuredguaranty.com

<u>If to Citibank</u>:

Citibank, N.A.
Physical #271 Muñoz Rivera Ave.
6th Floor
San Juan, Puerto Rico 00918
Attn:  Guillermo Gómez,
guillermo.gomez@citi.com

and

Citibank, N.A.
388 Greenwich Street
New York, New York 10013
Attn:  Tatiana Iliczewa,
tatiana.iliczewa@citi.com

and

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Donald S. Bernstein
(donald.bernstein@davispolk.com) and
Brian M. Resnick
(brian.resnick@davispolk.com)

<u>If to the Ad Hoc Group</u>:

Thomas Moers Mayer, Esq. and
Amy Caton, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York  NY 10036
tmayer@kramerlevin.com
acaton@kramerlevin.com

and

Ari Gabinet
Michael Sternhell
Oppenheimer Funds
Two World Financial Center
225 Liberty Street, New York, NY 10281
agabinet@ofiglobal.com
msternhell@ofiglobal.com

<u>If to Scotiabank</u>:

Richard G. Mason and
Austin T. Witt
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
rgmason@wlrk.com
awitt@wlrk.com

and

Rafael Flores
Scotiabank de Puerto Rico
Scotiabank Plaza
290 Jesus T. Pinero Avenue
8th Floor
San Juan, PR 00918
Rafael.flores@scotiabank.com

15.     Governing Law.  This Agreement, but for the avoidance of doubt, not the Amendment, shall be governed and construed and enforced in accordance with the laws of the State of New York.  Terms used in the Amendment that are defined herein shall be construed in accordance with the laws of the Commonwealth of Puerto Rico.

16.     Jurisdiction.  Any dispute arising under or in connection with this Agreement shall be brought in the exclusive jurisdiction and venue of the courts of the Commonwealth of Puerto Rico or the United States District Court for the District of Puerto Rico.

17.     WAIVER OF TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING SOLELY OUT OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF, WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

18.     Survival.  The following provisions shall survive the termination of this Agreement and shall remain in full force and effect notwithstanding the occurrence of the Forbearance Termination Date:  Sections 1(e), 2(b) (second paragraph), 4(f), 4(g), 5(i), 5(j), 6, 9, 11, 13, 15, 16, 17, 18, and 19.

19.     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page of this Agreement by facsimile or email transmission shall be effective as delivery of a manually executed counterpart hereof.

20.     Business Day.  The term "business day" means any day other than a Saturday, Sunday, or legal holiday on which the banking institutions in the Municipality of San Juan, Puerto Rico are authorized by law to be closed.

21.     Entire Agreement.  This Agreement and the Amendment constitute the entire agreement, and supersedes any prior agreements, including any deemed agreements, among the Parties regarding the subject matter hereof.

[Signature Pages Follow]

23

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____

Name: _Juan F. Alicea_____

Title: _Executive Director_____

NATIONAL PUBLIC FINANCE GUARANTEE
CORPORATION

By: _William C. Fallon_

Name: William C. Fallon

Title: President and Chief Executive Officer

REDACTED

ASSURED GUARANTY MUNICIPAL CORP.

By: _____

Name: _____
                    HOLLY HORN
                CHIEF SURVEILLANCE OFFICER
Title: _____PUBLIC FINANCE_____


ASSURED GUARANTY CORP.

By: _____

Name: _____
                    HOLLY HORN
                CHIEF SURVEILLANCE OFFICER
Title: _____PUBLIC FINANCE_____


# REDACTED

SYNCORA GUARANTEE INC.

By: _____

Name: _Susan Comparato_____

Title: _Chief Executive Officer and President_____

# REDACTED

AG ELEVEN PARTNERS, L.P.

By: _Thomas M. Fuller_

Name: Tom Fuller

Title:  Senior Managing Director

REDACTED

ANGELO GORDON CENTRE STREET
PARTNERSHIP, L.P.

By: _____

Name: Tom Fuller

Title: Senior Managing Director

REDACTED

AG CAPITAL RECOVERY PARTNERS VIII, L.P

By: _Thomas M. Fuller_

Name: Tom Fuller

Title: Senior Managing Director

# REDACTED

AG MM, L.P.

By:

Name: D. Forest Wolfe

Title:     General  Counsel  &  Chief  Compliance
Officer

REDACTED

AG SUPER FUND, L.P.

By: _____

Name: D. Forest Wolfe

Title: General Counsel & Chief Compliance Officer

REDACTED

AG PRINCESS, L.P.

By: _____

Name: D. Forest Wolfe

Title: General Counsel & Chief Compliance Officer

REDACTED

NUTMEG PARTNERS, L.P.

By: _____

Name: D. Forest Wolfe

Title:      General  Counsel  &  Chief  Compliance
Officer

REDACTED

AG SUPER FUND INTERNATIONAL
PARTNERS, L.P.

By: _____

Name: D. Forest Wolfe

Title: General Counsel & Chief Compliance
Officer

REDACTED

BLUEMOUNTAIN DISTRESSED MASTER
FUND L.P.
BLUEMOUNTAIN GUADALUPE PEAK FUND
L.P.
BLUE MOUNTAIN CREDIT ALTERNATIVES
MASTER FUND L.P.
BLUEMOUNTAIN CREDIT OPPORTUNITIES
MASTER FUND I L.P.
BLUEMOUNTAIN LONG/SHORT CREDIT
MASTER FUND L.P.
BLUEMOUNTAIN STRATEGIC CREDIT
MASTER FUND L.P.
BLUEMOUNTAIN TIMBERLINE LTD.
BLUEMOUNTAIN LONG/SHORT CREDIT AND
DISTRESSED REFLECTION FUND, a SUB-
FUND OF AAI BLUEMOUNTAIN FUND PLC


BY: BLUEMOUNTAIN CAPITAL
MANAGEMENT LLC, AS INVESTMENT
MANAGER

By: _____

Name: David O'Mara _____

Title:  Assistant General Counsel _____

*See attached schedule for holdings information

**FRANKLIN ADVISERS, INC. on behalf of the following funds:**

**CALIFORNIA INTERMEDIATE TERM TAX FREE INCOME FUND**

**CALIFORNIA HIGH YIELD MUNICIPAL BOND FUND**

**TENNESSEE MUNICIPAL BOND FUND**

**CALIFORNIA TAX FREE INCOME FUND**

**NEW YORK TAX FREE INCOME FUND**

**FEDERAL TAX FREE INCOME FUND**

**DOUBLE TAX FREE INCOME FUND**

**COLORADO TAX FREE INCOME FUND**

**GEORGIA TAX FREE INCOME FUND**

**PENNSYLVANIA TAX FREE INCOME FUND**

**HIGH YIELD TAX FREE INCOME FUND**

**MISSOURI TAX FREE INCOME FUND**

**OREGON TAX FREE INCOME FUND**

**VIRGINIA TAX FREE INCOME FUND**

**FLORIDA TAX FREE INCOME FUND**

**LOUISIANA TAX FREE INCOME FUND**

**MARYLAND TAX FREE INCOME FUND**

**NORTH CAROLINA TAX FREE INCOME FUND**

NEW JERSEY TAX FREE INCOME
FUND

FRANKLIN STRATEGIC INCOME
FUND

FIST-FRANKLIN TOTAL RETURN
FUND

FRANKLIN STRATEGIC INCOME
FUND

FTIF - FRANKLIN US TOTAL
RETURN FUND

FTVIP-FRANKLIN STRATEGIC
INCOME VIP FUND

FDP SERIES FT TOTAL RETURN FDP
FUND

FTIF - FRANKLIN STRATEGIC
INCOME FUND

FT OPPORTUNISTIC DISTRESSED
FUND, LTD.

By: _Sheila Amoroso_____

Name: _Sheila Amoroso_____

Title: _Senior Vice President_____

SEE ATTACHED SCHEDULE FOR
HOLDINGS INFORMATION

*Signature Page – Forbearance Agreement – PREPA/Insurers/Holders*

Knighthead (NY) Fund, L.P.
By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: Ara Cohen
Managing Member

Title: _____

REDACTED

Knighthead Master Fund, L.P.
By: Knighthead Capital Management, LLC, its
Investment Manager

By: _____

Name: Ara Cohen
Managing Member

Title: _____

REDACTED

LMA SPC for and on behalf of the MAP 84
Segregated Portfolio
By: Knighthead Capital Management, LLC, its
Investment Advisor

By: _____

Name: _____Ara Cohen_____
_____Managing Member_____

Title: _____

REDACTED

OPPENHEIMER ROCHESTER AMT-FREE
MUNICIPAL FUND

OPPENHEIMER ROCHESTER AMT-FREE
NEW YORK MUNICIPAL FUND

OPPENHEIMER ROCHESTER CALIFORNIA
MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED
TERM CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED
TERM MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MUNICIPAL FUND)

OPPENHEIMER ROCHESTER LIMITED
TERM NEW YORK MUNICIPAL FUND (A
SERIES OF ROCHESTER PORTFOLIO
SERIES)

OPPENHEIMER ROCHESTER NEW JERSEY
MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MULTI-STATE MUNICIPAL
TRUST)

OPPENHEIMER ROCHESTER
PENNSYLVANIA MUNICIPAL FUND   (A
SERIES OF OPPENHEIMER MULTI-STATE
MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER HIGH YIELD
MUNICIPAL FUND (A SERIES OF
OPPENHEIMER MULTI-STATE MUNICIPAL
TRUST)

OPPENHEIMER ROCHESTER FUND
MUNICIPALS

OPPENHEIMER ROCHESTER OHIO
MUNICIPAL FUND

OPPENHEIMER ROCHESTER MICHIGAN
MUNICIPAL FUND

OPPENHEIMER ROCHESTER
MASSACHUSETTS MUNICIPAL FUND

**OPPENHEIMER ROCHESTER VIRGINIA
MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER ARIZONA
MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER MARYLAND
MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER NORTH
CAROLINA MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER MINNESOTA
MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER
INTERMEDIATE TERM MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER SHORT
TERM MUNICIPAL FUND**

By: _____

Name:  Daniel Loughran
Title: Vice President


**OPPENHEIMERFUNDS, INC.,** as investment
adviser for the following investment accounts:

MassMutual International Holding MSC and
MassMutual Unified Traditional Separate Account:

By: _____
Name:  Daniel Loughran
Title: Senior Vice President



SEE ATTACHED SCHEDULE FOR
HOLDINGS INFORMATION

*Signature Page – Forbearance Agreement – PREPA/Insurers/Holders*

REDWOOD MASTER FUND, LTD.
By Redwood Capital Management, LLC, its
Investment Manager

By: _____

Name: Ruben Kliksberg

Title: Authorized Signatory

# REDACTED

REDWOOD DRAWDOWN MASTER FUND, L.P.
By Redwood Capital Management, LLC, its
Investment Manager

By: _____

Name: Ruben Kliksberg

Title:  Authorized Signatory

REDACTED

APPALOOSA MANAGEMENT L.P., on behalf of
the funds set forth below:

By: _James E. Bolin_____

Name: James E. Bolin

Title:  Partner

REDACTED

## Annex A – Ad Hoc Group

**AG ELEVEN PARTNERS, L.P.**

**ANGELO GORDON CENTRE STREET PARTNERSHIP, L.P.**

**AG CAPITAL RECOVERY PARTNERS VIII, L.P**

**AG MM, L.P.**

**AG SUPER FUND, L.P.**

**AG PRINCESS, L.P.**

**NUTMEG PARTNERS, L.P.**

**AG SUPER FUND INTERNATIONAL PARTNERS, L.P.**

**APPALOOSA MANAGEMENT L.P. on behalf of:**

    **APPALOOSA INVESTMENT LIMITED PARTNERSHIP I**

    **PALOMINO FUND LTD.**

    **THOROUGHBRED FUND L.P.**

    **THOROUGHBRED MASTER LTD.**

**BLUEMOUNTAIN CAPITAL MANAGEMENT LLC, as investment manager for:**

    **BLUEMOUNTAIN DISTRESSED MASTER FUND L.P.**

    **BLUEMOUNTAIN GUADALUPE PEAK FUND L.P.**

    **BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P.**

    **BLUEMOUNTAIN CREDIT OPPORTUNITIES MASTER FUND I L.P.**

    **BLUEMOUNTAIN LONG/SHORT CREDIT MASTER FUND L.P.**

    **BLUEMOUNTAIN STRATEGIC CREDIT MASTER FUND L.P.**

    **BLUEMOUNTAIN TIMBERLINE LTD.**

    **BLUEMOUNTAIN LONG/SHORT CREDIT AND DISTRESSED REFLECTION FUND, A SUB-FUND OF AAI BLUEMOUNTAIN FUND PLC**

**FRANKLIN ADVISERS, INC. on behalf of:**

    **CALIFORNIA INTERMEDIATE TERM TAX FREE INCOME FUND**

**CALIFORNIA HIGH YIELD MUNICIPAL BOND FUND**

**TENNESSEE MUNICIPAL BOND FUND**

**CALIFORNIA TAX FREE INCOME FUND**

**NEW YORK TAX FREE INCOME FUND**

**FEDERAL TAX FREE INCOME FUND**

**DOUBLE TAX FREE INCOME FUND**

**COLORADO TAX FREE INCOME FUND**

**GEORGIA TAX FREE INCOME FUND**

**PENNSYLVANIA TAX FREE INCOME FUND**

**HIGH YIELD TAX FREE INCOME FUND**

**MISSOURI TAX FREE INCOME FUND**

**OREGON TAX FREE INCOME FUND**

**VIRGINIA TAX FREE INCOME FUND**

**FLORIDA TAX FREE INCOME FUND**

**LOUISIANA TAX FREE INCOME FUND**

**MARYLAND TAX FREE INCOME FUND**

**NORTH CAROLINA TAX FREE INCOME FUND**

**NEW JERSEY TAX FREE INCOME FUND**

**FRANKLIN STRATEGIC INCOME FUND**

**FIST-FRANKLIN TOTAL RETURN FUND**

**FRANKLIN STRATEGIC INCOME FUND**

**FTIF - FRANKLIN US TOTAL RETURN FUND**

**FTVIP-FRANKLIN STRATEGIC INCOME VIP FUND**

**FDP SERIES FT TOTAL RETURN FDP FUND**

**FTIF - FRANKLIN STRATEGIC INCOME FUND**

- 2 -

FT OPPORTUNISTIC DISTRESSED FUND, LTD.

KNIGHTHEAD CAPITAL MANAGEMENT, LLC, as investment advisor for:

KNIGHTHEAD (NY) FUND, L.P.

KNIGHTHEAD MASTER FUND, L.P.

LMA SPC for and on behalf of the MAP 84 SEGREGATED PORTFOLIO

OPPENHEIMER ROCHESTER AMT-FREE MUNICIPAL FUND

OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND

OPPENHEIMER ROCHESTER CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM CALIFORNIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER LIMITED TERM MUNICIPAL FUND (A SERIES OF OPPENHEIMER MUNICIPAL FUND)

OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND (A SERIES OF ROCHESTER PORTFOLIO SERIES)

OPPENHEIMER ROCHESTER NEW JERSEY MUNICIPAL FUND (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER PENNSYLVANIA MUNICIPAL FUND    (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER HIGH YIELD MUNICIPAL FUND (A SERIES OF OPPENHEIMER MULTI-STATE MUNICIPAL TRUST)

OPPENHEIMER ROCHESTER FUND MUNICIPALS

OPPENHEIMER ROCHESTER OHIO MUNICIPAL FUND

OPPENHEIMER ROCHESTER MICHIGAN MUNICIPAL FUND

OPPENHEIMER ROCHESTER MASSACHUSETTS MUNICIPAL FUND

OPPENHEIMER ROCHESTER VIRGINIA MUNICIPAL FUND

OPPENHEIMER ROCHESTER ARIZONA MUNICIPAL FUND

OPPENHEIMER ROCHESTER MARYLAND MUNICIPAL FUND

OPPENHEIMER ROCHESTER NORTH CAROLINA MUNICIPAL FUND

KL2 2860194.1

**OPPENHEIMER ROCHESTER MINNESOTA MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER INTERMEDIATE TERM MUNICIPAL FUND**

**OPPENHEIMER ROCHESTER SHORT TERM MUNICIPAL FUND**

**OPPENHEIMERFUNDS, INC.,** as investment adviser for the following investment accounts:

   **MassMutual International Holding MSC**

   **MassMutual Unified Traditional Separate Account:**

**REDWOOD CAPITAL MANAGEMENT, LLC,** as investment manager for:

   **REDWOOD MASTER FUND, LTD.**

   **REDWOOD DRAWDOWN MASTER FUND, L.P.**

KL2 2860194.1

## Annex B – Forbearing Creditor Joinder

1

## **FORM OF JOINDER**

This Joinder to the Forbearance Agreement (as amended, supplemented or otherwise modified from time to time, the "Forbearance Agreement"), dated as of August [●], 2014 by and among: [INITIAL PARTIES] and the Forbearing Creditors from time to time party thereto, is executed and delivered by [_____] (the "Joining Forbearing Creditor").  Each capitalized term used herein but not defined herein shall have the meaning set forth in the Forbearance Agreement.

1.      Agreement to be Bound.  The Joining Forbearing Creditor hereby agrees to be bound by all of the terms of the Forbearance Agreement.  The Joining Forbearing Creditor shall hereafter be deemed to be a "Forbearing Creditor" and a Party for all purposes under the Forbearance Agreement.

2.      Representations and Warranties. With respect to the aggregate principal amount of Bonds held by the Joining Forbearing Creditor upon consummation of the Transfer of such Bonds to the Joining Forbearing Creditor, the Joining Creditor Party hereby makes, as of the date hereof, the representations and warranties of the Holders set forth in Sections [3(a) and 3(d)] of the Forbearance Agreement to each of the other Parties to the Forbearance Agreement.

3.      Governing Law.  Section 15 of the Forbearance Agreement is incorporated by reference as if set forth fully herein, except that any references to "Agreement" shall be replaced with references to "Joinder".

* * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the Joining Forbearing Creditor has caused this Joinder to be executed as of the date first written above.

                                                _____

Entity Name of Joining Forbearing Creditor

Authorized Signatory:

By: _____

Name:

Title:

Address:


        Principal amount of Bonds beneficially owned by Joining Forbearing Creditor, or beneficially owned by accounts for  which Joining Forbearing Creditor has investment management responsibility, that are not Insured Bonds:

3

**Annex C – Amendment**

1

## SIXTEENTH SUPPLEMENTAL AGREEMENT

THIS SIXTEENTH SUPPLEMENTAL AGREEMENT, dated for convenience of reference as of the [_____ day of August], 2014, by and between

PUERTO RICO ELECTRIC POWER AUTHORITY,

a government instrumentality of the Commonwealth of Puerto Rico (formerly Puerto Rico Water Resources Authority), and

U.S. BANK NATIONAL ASSOCIATION,

a national banking association existing under the laws of the United States of America and having an office in the Borough of Manhattan, City and State of New York, which is authorized under such laws  to exercise corporate trust powers and is subject to examination by federal authority, successor Trustee under the Agreement hereinafter referred to (hereinafter sometimes called the "Trustee"),

## W I T N E S S E T H:

WHEREAS, Puerto Rico Electric Power Authority (hereinafter sometimes called the "Authority") and the Trustee have heretofore caused to be executed and delivered a Trust Agreement, dated as of January 1, 1974, as amended (the "Agreement"), for the purpose of fixing and declaring the terms and conditions upon which revenue bonds are to be issued, authenticated, delivered, secured and accepted by all persons who shall from time to time be or become owners thereof, and in order to secure the payment of all the bonds at any time issued and outstanding thereunder, and the interest thereon, according to their tenor, purport and effect; and

WHEREAS, Section 1102 of the Agreement provides that the Authority and the Trustee may, from time to time, enter into such agreements supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to, repealing or rescinding, in any particular, any of the terms and conditions contained in the Agreement or in any supplemental agreement, with certain exceptions not here applicable, upon receipt of the written consent of the holders of not less than sixty percent (60%) in aggregate principal amount of the bonds then outstanding; and

WHEREAS, the Trustee has received an opinion of counsel (the "Sixteenth Supplemental Opinion") that (a) the Authority has the right, power and authority to enter into this Sixteenth Supplemental Agreement, (b) this Sixteenth Supplemental Agreement is duly authorized, executed and delivered by the Authority, and is enforceable against the Authority in accordance with its terms, (c) this Sixteenth Supplemental Agreement complies with the provisions of the Agreement, and that it is proper for the Trustee to join in the execution hereof under the provisions of Article XI of the Agreement with the written consent of the holders of at least sixty percent (60%) in aggregate principal amount of the outstanding bonds, (d) all of the conditions precedent to the execution and delivery by the Trustee of this Sixteenth Supplemental Agreement have been satisfied, and (e) this Sixteenth Supplemental Agreement (including the Authority's use of moneys on deposit in the Construction Fund and Reserve Account for

purposes that are permitted by the Agreement as amended by this Sixteenth Supplemental Agreement) will not have an adverse effect on the exclusion of interest on the outstanding bonds from gross income for federal income tax purposes; and

WHEREAS, the execution and delivery of this Sixteenth Supplemental Agreement have been duly authorized by the resolution of the Governing Board of the Authority, and the Authority has requested the Trustee to join with it in the execution of this Sixteenth Supplemental Agreement; and

WHEREAS, the notice and publication requirements of Section 1102 of the Agreement for this Sixteenth Supplemental Agreement have been satisfied; and

WHEREAS, the Trustee has received written evidence of the consent of the holders or (without duplication) insurers of at least sixty percent (60%) in aggregate principal amount of the outstanding bonds in a form acceptable to the Trustee under Section 1001 of the Agreement; and

WHEREAS, all other acts, conditions and things required by the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth of Puerto Rico and by the rules and regulations of the Authority to happen, exist and be performed  precedent to and in the execution and delivery of this Sixteenth Supplemental Agreement have happened, exist and have been performed as required and the Authority has delivered to the Trustee a certificate dated the date of this Sixteenth Supplemental Agreement, representing the same; and

WHEREAS, the Trustee in reliance on the foregoing has accepted the trusts created by this Sixteenth Supplemental Agreement and in evidence thereof has joined in the execution hereof;

NOW, THEREFORE, THIS SIXTEENTH SUPPLEMENTAL AGREEMENT WITNESSETH, that in consideration of the premises and of the existing rights and duties of the parties under the Agreement, it is mutually agreed and covenanted by and between the parties hereto, as follows:

1.      The Agreement is hereby amended and supplemented in the following respects:

A.      Section 101 is hereby amended or modified by the addition of and changes to the following definitions in appropriate alphabetical order in said Section (and all capitalized terms that are used but not defined herein shall have the same meanings as given in the Agreement):

"The term 'Additional Construction Fund Usage' shall have the meaning given to it in Section 405.

"The term 'Ad Hoc Group' shall mean such term as defined in the Forbearance Agreement.

"The term 'Amending Creditors' shall mean Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation,

2

Syncora Guarantee Inc., and the Ad Hoc Group, including successors and assigns thereof. For the purposes of this Agreement, the Trustee shall be entitled to rely on a certification of an Amending Creditor that it is an Amending Creditor.

"The term 'Amending Creditor Bonds' shall mean, with respect to any date, all outstanding bonds that are beneficially owned or (without duplication) insured by the Amending Creditors as of such date (which outstanding bonds that are beneficially owned by the Amending Creditors shall only include such bonds of which the other Amending Creditors have received written notice, which notice will be effective one (1) business day after receipt). For purposes of this Agreement, the Trustee shall be entitled to rely on a certification by an Amending Creditor that it beneficially owns or (without duplication) insures certain principal amount of outstanding bonds.

"The term 'Amendment' shall refer to this Sixteenth Supplemental Agreement, dated [August   , 2014], by and among the Authority and the Trustee.

"The term 'Amendment Effective Date' shall mean [August [  ], 2014], being the effective date of this Amendment.

"The term 'Amendment Period' shall mean the period from the Amendment Effective Date until the Amendment Termination Date.

"The term 'Amendment Period Budget' shall mean the Initial 13-Week Cash Flow Statement or Subsequent 13-Week Budget, as applicable (each as defined in the Forbearance Agreement).

"The term 'Amendment Termination Date' shall mean the earliest of (a) the Scheduled Amendment Termination Date, (b) the filing of a proceeding by or on behalf of the Authority pursuant to the Puerto Rico Public Corporation Debt Enforcement and Recovery Act or any other action or proceeding that seeks to adjust or challenge the claims of its creditors pursuant to any federal, state, or Puerto Rico statute, now in effect or enacted after the Amendment Effective Date, and (c) the date on which (i) the "Forbearance Period" (as defined in the Forbearance Agreement) has expired or terminated, and (ii) the Trustee has received written notice from the Authority or the Required Amending Creditors confirming the same.

"The term 'Construction Fund Replenishment Amount' shall mean in respect of a Construction Fund Replenishment Date an amount equal to:

(a)     the aggregate amount of all Additional Construction Fund Usages prior to such Construction Fund Replenishment Date,

less, the sum of:

(b)     the aggregate amount that the Authority has applied to the cost of Improvements from any source other than the Construction Fund from or after the

3

Amendment Effective Date, irrespective of whether such amount has been applied prior to or after the commencement of any bankruptcy proceeding, insolvency proceeding, proceeding under the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, Act No. 71-2014, or any similar proceeding, and

(c)     the aggregate amount theretofore credited to the Construction Fund by the Authority pursuant to Section 406 of this Agreement.

"The term 'Citibank/Scotiabank Forbearance Agreements' shall mean the forbearance agreements, dated August 14, 2014, by and among the Citibank/Scotiabank Lenders and the Authority, as the same may be amended from time to time as therein permitted.

"The term 'Citibank/Scotiabank Lenders' shall mean Citibank, N.A. and the Lenders (as defined in the Scotiabank Credit Agreement).

"The term 'Citibank/Scotiabank Lines of Credit' shall mean that certain Trade Finance Facility Agreement, dated as of July 20, 2012, between the Authority and Citibank, N.A. as amended or otherwise modified from time to time, and the Scotiabank Credit Agreement.

"The term 'Construction Fund Replenishment Date' shall mean the twenty-fifth (25) day of each month (or if such day is not a business day, the immediately succeeding business day) on which the Construction Fund Replenishment Amount is greater than zero.

"The term 'Forbearance Agreement' shall mean the forbearance agreement, dated August 14, 2014, by and among the Amending Creditors and the Authority, as the same may be amended from time to time as therein permitted.

"The term 'Fractional Defeasance Amount' shall mean $34,112,097.79.

"The term 'Potential Default' shall mean each of the events specified on Schedule 1, the occurrence of which would give rise to a default under this Agreement.

"The term 'Required Amending Creditors' shall mean Amending Creditors that beneficially own or (without duplication) insure not less than two-thirds (66 2/3%) of the aggregate principal amount of the Amending Creditor Bonds.

"The term 'Retained General Fund Amount' shall mean $50,000,000.

"The term 'Scheduled Amendment Termination Date' shall mean 11:59 p.m. (prevailing Eastern Time) on March 31, 2015.

"The term 'Scotiabank Credit Agreement' shall mean that certain Credit Agreement, dated as of May 4, 2012, between the Authority, as borrower, the lenders party thereto, and Scotiabank de Puerto Rico, as administrative agent, as amended or otherwise modified from time to time.

4

"The term 'Specified Period Principal and Interest Requirements' shall mean the Principal and Interest Requirements for all outstanding bonds which accrue and are payable on or before January 1, 2015, excluding for purposes of the calculation of such Requirements any Federal Subsidy Payments.

"The term 'Specified Period Defeasance Fund' shall have the meaning given to it in Section 517.

B.      The following definitions in Section 101 shall be amended as follows:

The following sentence shall be added at the end of the definition of 'Current Expenses':

"Notwithstanding the foregoing or anything herein to the contrary, none of the holders, the Trustee, and the Authority shall contest whether an expense, claim, liability, or amount shall be construed as a Current Expense under this Agreement based solely on (x) the Citibank/Scotiabank Lenders' actions on the Amendment Effective Date or during the Amendment Period, including (i) forbearing, delaying or failing to exercise remedies, (ii) agreeing to a postponement or delay in payment of interest or principal, (iii) granting an extension of any maturity date, or (iv) not requiring the repayment or reborrowing of any loans or not requiring any loans to be revolving loans, or (y) the inclusion in this Agreement as a Potential Default, and the inclusion in the Forbearance Agreement as a "Potential Default" (as defined in the Forbearance Agreement) of the Authority's use of moneys from the General Fund to service its debts under the Citibank/Scotiabank Lines of Credit."

The last sentence of "Reserve Account Insurance Policy" shall be deleted and replaced with the following:

"The issuer providing such insurance shall be a municipal bond insurer that is rated, at the time of deposit into the Reserve Account, in one of the three highest rating categories (without regard to gradations within a category) by either (i) Standard & Poor's Corporation or its successor, or Moody's Investors Service, Inc. or its successors or (ii) if both such corporations shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, a nationally recognized rating agency."

C.      Section 401 shall be amended by the addition of the following paragraph immediately preceding Section 402:

"Notwithstanding the foregoing, during the Amendment Period, moneys in the Construction Fund shall be held by the Authority in trust, separate and apart from all other funds of the Authority, and shall be applied:

(a)     to the payment of the cost of any Improvements, provided that such cost is in accordance with the Amendment Period Budget, inclusive of any permitted variances specified in the Forbearance Agreement; or

5

(b)      as provided in Section 405;

and, except for any moneys in separate accounts in the Construction Fund received from the United States Government or any agency thereof or from the Commonwealth of Puerto Rico or any agency thereof, pending such application, shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement and for the further security of such holders until paid out or transferred as herein provided."

D.      Section 402 shall be amended to read as follows:

"Section 402. <u>Payments from Construction Fund</u>. Payment of the cost of Improvements or any other payment permitted pursuant to Section 401 shall be made from the Construction Fund as herein provided. Moneys in the Construction Fund shall be disbursed by check, voucher, order, draft, certificate or warrant signed by the Executive Director or by any officer or employee of the Authority designated by him for such purpose."

E.      A new Section 405 shall be added immediately preceding Section 406 to read as follows:

"Section 405. <u>Additional application of moneys in Construction Fund</u>. During the Amendment Period, the Authority may apply moneys in the Construction Fund to the payment of the cost of any Current Expense that is not a cost of Improvement (each such application, an "Additional Construction Fund Usage"), provided that:

(a)      there are not sufficient moneys to pay such Current Expense held by the Authority in the General Fund in excess of the Retained General Fund Amount on the date such payment is required;

(b)      the representations of the Authority given in Section 3(b) of the Forbearance Agreement are true and correct as of the date of such application;

(c)      such Current Expense is in accordance with the Amendment Period Budget in effect at the time of such payment, inclusive of any permitted variances specified in the Forbearance Agreement;

(d)      none of the material facts that formed the basis for the officer's certificate delivered by the Authority in connection with the Sixteenth Supplemental Opinion has changed since the date of such certification and the Current Expense to be paid with such Additional Construction Fund Usage is in compliance with the covenants of the Authority in such certification; and

(e)      the Trustee and the Amending Creditors receive a certification from the Authority (in the form of Exhibit A hereto) specifying the amount of moneys to be applied and the Current Expenses to be paid with such moneys, and certifying that the statements in paragraphs (a) through (d) above are true as of the date of the certification, signed by the Executive Director or by any other officer or employee of the Authority with fiscal authority, designated by the Executive Director for such purpose. The Trustee shall have no duty to review any such certification for any purpose, except to confirm that a certification has been made, and

the Trustee shall be authorized to provide any requesting bondholder with a copy of any such certifications received."

        F.      A new Section 406 shall be added immediately preceding Article V to read as follows:

        "Section 406.  <u>Replenishment of the Construction Fund</u>.  On any Construction Fund Replenishment Date, to the extent that moneys in the General Fund exceed the Retained General Fund Amount, the Authority shall transfer from the General Fund to the credit of the Construction Fund an amount equal to the lesser of (x) the excess over the Retained General Fund Amount and (y) the Construction Fund Replenishment Amount, in accordance with Section 505 of this Agreement."

        G.      Section 502 is hereby amended by the addition of the following paragraph immediately prior to Section 503 to read as follows:

        "Notwithstanding the foregoing, during the Amendment Period, in the event that the Authority shall fail to adjust the schedule of rates and charges in accordance with the provisions of this Section, the Trustee, without regard to whether an event of default, as defined in Article VIII of this Agreement, shall have occurred, shall, upon the request of the holders of a majority in principal amount of all bonds then outstanding upon being indemnified to its satisfaction, institute and prosecute in a court of competent jurisdiction an appropriate suit, action or proceeding to compel the Authority to adjust such schedule in accordance with the requirements of this Section, and the Authority covenants that it will adopt and charge rates and charges in compliance with any judgment, order or decree entered in any such suit, action or proceeding."

        H.      Section 505 shall be amended by the addition of the following sentence immediately prior to Section 506 to read as follows:

        "On each Construction Fund Replenishment Date, the Authority shall apply moneys credited to the General Fund to satisfy its replenishment obligation under Section 406 prior to using such moneys for the payment of Current Expenses.  Notwithstanding anything in this Agreement to the contrary, after the Amendment Period, the obligation to replenish the Construction Fund in accordance with Section 406 shall be junior and subject to the obligation to pay Current Expenses in accordance with this Section 505 and to transfer moneys from the General Fund to the Revenue Fund in accordance with Section 506 of this Agreement until the bonds are paid or deemed paid in full under the provisions of this Agreement."

        I.      The second sentence  of Section 506 shall be amended by the addition of the following language at the beginning of such sentence:

        "Other than during the Amendment Period,"

        J.      A new Section 510A shall be added as follows:

        "Section 510A.  <u>Additional application of moneys in Reserve Account</u>. Notwithstanding the provisions of Section 510 of this Agreement, on the Amendment Effective

Date and on the first (1st) business day of each month thereafter through and including December 1, 2014, the Trustee shall withdraw the Fractional Defeasance Amount from the Reserve Account, and credit this amount to the Specified Period Defeasance Fund; provided, however, that if the Amendment Effective Date occurs on or after September 1, 2014, the Trustee shall withdraw two times the Fractional Defeasance Amount on the Amendment Effective Date.

K.    A    new    Section    517    shall    be    added    as    follows:

"Specified Period  Principal and Interest Requirements Defeasance.  A special fund within the Reserve Account is hereby created and designated the "Puerto Rico Electric Power Authority Revenue Bonds Specified Period Defeasance Fund" (herein sometimes called the "Specified Period Defeasance Fund") to be held by the Trustee separate and apart from all other funds and accounts held under this Agreement.  The transfer of moneys from the Reserve Account to the Specified Period Defeasance Fund in accordance with Section 510A hereof shall constitute an irrevocable deposit of such moneys in trust solely for the purpose of paying the Specified Period Principal and Interest Requirements, and such moneys will not constitute property of the Authority.  Upon such transfer and deposit to the Specified Period Defeasance Fund, the obligation of the Authority to pay the Specified Period Principal and Interest Requirements will be discharged to the extent of each such deposit, and the sole recourse of the holders of outstanding bonds in respect of the portion of the Specified Period Principal and Interest Requirements equal to the aggregate of amounts so deposited shall be to the amounts then to the credit of the Specified Period Defeasance Fund. The transfer and deposit set forth above shall not in any way affect the obligations of the Authority to pay the Principal and Interest Requirements with respect to the outstanding bonds other than the obligation to pay the portion of the Specified Period Principal and Interest Requirements equal to the aggregate of the amounts that are credited to the Specified Period Defeasance Fund. On each date on which any Specified Period Principal and Interest Requirements are payable, the Trustee shall apply moneys in the Specified Period Defeasance Fund to pay the Specified Period Principal and Interest Requirements that are payable on such date.  Any amounts remaining in the Specified Period Defeasance Fund after all Specified Period Principal and Interest Requirements are paid in full shall be transferred to the Reserve Account.  Moneys held in the Special Period Defeasance Fund shall, as nearly as may be practicable, be continuously invested and reinvested by the Trustee in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held in said Fund will be required for the purposes intended."

L.    Section 802(h) is hereby amended by the addition of the following language immediately prior to the semi-colon:

"provided, however, that during the Amendment Period, the Trustee may give such notice only upon the written request of the holders of a majority in the aggregate principal amount of the bonds then outstanding"

8

      M.     The first paragraph of Section 804 is hereby amended by the addition of the following language in the last sentence immediately before the period:

      "provided, further, that during the Amendment Period, the Trustee may proceed to take action pursuant to this paragraph only upon the written request of the holders of not less than a majority in the aggregate principal amount of bonds then outstanding"

      2.     The modifications to the Agreement contained in this Sixteenth Supplemental Agreement shall remain in effect only during the Amendment Period and shall terminate automatically on the Amendment Termination Date, except (a) the amendments in Section 1.F. and Section 1.H., and any related definitions, which will continue in effect until the replenishment obligations in Section 406 of the Agreement are satisfied in full and (b) Section 1.B and 1.K., and any related definitions, which will continue in effect until all series of bonds outstanding under the Agreement have been paid or deemed paid in full in accordance with the Agreement.  The Authority shall, and the Trustee shall be authorized to, notify all holders of bonds of any Amendment Termination Date and the basis therefor.

      3.     The recitals, statements and representations contained herein shall be taken and construed as made by and on the part of the Authority and not by the Trustee, and the Trustee assumes and shall be under no responsibility for the correctness of the same.

      4.     This Sixteenth Supplemental Agreement may be amended and supplemented in accordance with the provisions of Article XI of the Agreement.

      5.     Except to the extent expressly modified herein, all terms and provisions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, Puerto Rico Electric Power Authority has caused this Sixteenth Supplemental Agreement to be executed by its Executive Director and its corporate seal to be impressed hereon and attested by its Secretary or an Assistant Secretary, and U.S. Bank National Association, has caused this Sixteenth Supplemental Agreement to be executed in its behalf by one of its Assistant Vice Presidents and its corporate seal to be impressed hereon and attested by one of its Trust Officers, all as of the day and year first above written.

PUERTO RICO ELECTRIC POWER AUTHORITY

(SEAL)

By:_____
Executive Director

Attest:

_____
        Secretary

U.S.BANK NATIONAL ASSOCIATION,
as successor Trustee

By:_____
Vice President

Attest:

_____
    Trust Officer

10

COMMONWEALTH OF PUERTO RICO   )
                                                                    )          ss.:
MUNICIPALITY OF SAN JUAN                   )

On the _____ day of _____, in the year 2014, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he resides in the Municipality of _____, Puerto Rico; that he is the Executive Director of Puerto Rico Electric Power Authority, the body corporate described in and which executed the above instrument; that he knows the seal thereof; that the seal affixed to said instrument is the corporate seal of Puerto Rico Electric Power Authority; that it was so affixed by order of the Governing Board of Puerto Rico Electric Power Authority; and that he signed his name thereto by like order.


Affidavit #_____                          _____
                                                         NOTARY PUBLIC

My commission expires:


(SEAL)



STATE OF NEW YORK      )
                                            )       ss.:
COUNTY OF NEW YORK)

On the _____ day of _____, in  the year 2014, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he resides at _____; that he is an Assistant Vice President of U.S. Bank National Association, the banking association described in and which executed the above instrument; that he knows the seal of said association; that the seal affixed to said instrument is the corporate seal of said association; that it was so affixed by authority of Board of Directors of said association; and that he signed his name thereto by like authority.


                                            _____
                                                 NOTARY PUBLIC

My commission expires:


(SEAL)

11

## **Schedule 1**

1.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 501 of the Trust Agreement insofar as such noncompliance or failure is a result of PREPA's failure to establish and enforce reasonable regulations in relation to the collection of bills for services and facilities provided by PREPA.

2.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 502 of the Trust Agreement insofar as such noncompliance or failure is a result of PREPA's failure to revise the rates and charges for the services and facilities furnished by PREPA, or the result of PREPA's failure to revise its regulations in relation to the collection of bills for such services and facilities.

3.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 503 or section 505 of the Trust Agreement, insofar as such noncompliance or failure is a result of PREPA's use of monies from the General Fund to service its debt under the Citibank/Scotiabank Lines of Credit.

4.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 504 of the Trust Agreement, insofar as such noncompliance or failure is a result of PREPA's failure to adopt and file a budget that is consistent with the procedural and/or substantive requirements of section 504.

5.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 506 of the Trust Agreement, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the General Fund to the Revenue Fund in a manner consistent with section 506.

6.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 507 of the Trust Agreement, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the Revenue Fund to the Sinking Fund in a manner consistent with section 507.

7.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 702 of the Trust Agreement, insofar as such noncompliance or failure is a result of PREPA's failure to operate in an efficient and economical manner, maintain the system in good repair and sound operating condition (including by making all necessary repairs, renewals and replacements), or as a result of PREPA's employment of more persons than are necessary and compliance with all valid and applicable rules, regulations, and orders.

8.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to keep accurate records or complete and file its audited financial statements within the time periods specified in section 710 of the Trust Agreement.

**<u>Exhibit A – Form of Certification</u>**

**CERTIFICATION OF ADDITIONAL CONSTRUCTION FUND USAGE**

To:      THE TRUSTEE

         THE AMENDING CREDITORS

From:  PUERTO RICO ELECTRIC POWER AUTHORITY

Date:   [            ]

Trust Agreement, dated as of January 1, 1974, as amended, restated, supplemented or otherwise modified from time to time, between Puerto Rico Electric Power Authority (the "Authority") and U.S. Bank, as successor trustee (the "Trustee" and, with respect to said trust agreement, as amended, the "Trust Agreement").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Trust Agreement.

1.  We refer to the Trust Agreement.  This is a certification of Additional Construction Fund Usage (as defined below).

2.  The Authority wishes to apply moneys in the Construction Fund to the payment of the cost of any Current Expense that is not a cost of Improvement (each such application, an "Additional Construction Fund Usage") on the following terms:

    a.  Date of application: [    ]

    b.  Amount to be applied from the Construction Fund:  U.S.$[            ]

    c.  Current Expense to be paid:  [            ]

3.  There are not sufficient moneys to pay such Current Expense held by the Authority in the General Fund in excess of the Retained General Fund Amount on the date such payment is required.

4.  The representations of the Authority given in Section 3(b) of the Forbearance Agreement are true and correct as of the date of such application.

5.  Such Current Expense is contemplated by the Amendment Period Budget currently in effect, inclusive of any permitted variances.

6.  None of the material facts that formed the basis for the officer's certificate delivered by the Authority in connection with the Sixteenth Supplemental Opinion has changed since the date of such certification and the Current Expense to be paid with the Additional Construction Fund Usage set forth above is in compliance with the covenants of the Authority in such certification.


PUERTO RICO ELECTRIC POWER AUTHORITY


By:    _____
          Name:
          Title:

<u>**Annex D – Potential Defaults**</u>

1.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 501 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's failure to establish and enforce reasonable regulations in relation to the collection of bills for services and facilities provided by PREPA.

2.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 502 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's failure to revise the rates and charges for the services and facilities furnished by PREPA, or the result of PREPA's failure to revise its regulations in relation to the collection of bills for such services and facilities.

3.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 503 or section 505 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's use of monies from the General Fund to service its debt under its line of credit with Scotiabank de Puerto Rico and/or its line of credit with Citibank, N.A. in accordance with the Citibank/Scotiabank Forbearance Agreements in effect as of the Effective Date.

4.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 504 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's failure to adopt and file a budget that is consistent with the procedural and/or substantive requirements of section 504 of the Trust Agreement or any such similar provision contained in the Transaction Documents, as applicable.

5.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 506 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the General Fund to the Revenue Fund in a manner consistent with section 506 of the Trust Agreement or any such similar provision contained in the Transaction Documents, as applicable.

6.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 507 of the Trust Agreement or any similar provision of any other Transaction Document, insofar as such noncompliance or failure is a result of PREPA's failure to transfer monies from the Revenue Fund to the Sinking Fund in a manner consistent with section 507 of the Trust Agreement or any such similar provision contained in the Transaction Documents, as applicable.

7.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to comply with or perform its obligations under section 702 of the

1

Trust Agreement or any similar provision of any other Transaction Document, as applicable, insofar as such noncompliance or failure is a result of PREPA's failure to operate in an efficient and economical manner, maintain the system in good repair and sound operating condition (including by making all necessary repairs, renewals and replacements), or as a result of PREPA's employment of more persons than are necessary and non-compliance with all valid and applicable rules, regulations, and orders.

8.      Any default or event of default under section 802(h) of the Trust Agreement as a result of PREPA's failure to keep accurate records or complete and file its audited financial statements within the time periods specified in section 710 of the Trust Agreement or any similar provision of any other Transaction Document; provided that the failure to cause to be filed with the Trustee and the Consulting Engineers the monthly reports required by section 710 of the Trust Agreement shall not be a Potential Default.

9.      Any default or event of default under Section 802(i) of the Trust Agreement.

10.     Any default or event of default under the Bond Insurance Agreements as a result of PREPA's failure to pay or reimburse the Insurers for any and all charges, fees, costs and expenses incurred by the Insurers in connection with the Bond Insurance Agreements.

11.     Any default or event of default under the Bond Insurance Agreements as a result of PREPA's failure to comply with any reporting requirements to the Insurers under the Bond Insurance Agreements.

2

## Annex E – Scope of CRO Authority

The Chief Restructuring Officer ("CRO") shall report to the Board of Directors (the "Board") of the Puerto Rico Electric Power Authority ("PREPA").

The CRO shall work alongside PREPA's CEO (Executive Director) to develop, organize and manage a financial and operational restructuring of PREPA on terms to be approved by the Board.

The CRO shall, subject to applicable law and regulations:

1. Provide overall leadership of the restructuring process.

2. Serve as the primary point of contact on behalf of PREPA in communications and negotiations with PREPA's creditors.

3. Provide expert testimony with respect to any case filed by PREPA under provisions of Chapter 2 and/or Chapter 3 of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act.

4. Serve on and participate in the Integrated Resource Plan ("IRP") committee.

5. Lead PREPA's process to develop a comprehensive business plan (the "Business Plan") which will serve as the underpinning for the overall Restructuring.

6. Work alongside PREPA's CEO to improve PREPA's worker protection and safety record.

7. Work alongside PREPA's CFO to lead the efforts for any revenue improvement and cost reduction plans that are necessary or appropriate for the implementation of the Business Plan.

8. Work alongside PREPA's CFO to oversee and implement cash and liquidity management/preservation activities.

9. Work alongside PREPA's CEO to improve analysis, tracking and collection efforts and related processes for accounts receivables.

10. Work alongside the CEO to review, refine and implement improvements to PREPA's capital expenditure plan, including the timing and amount of capital expenditures.

11. Work alongside the CEO to develop generation, transmission, distribution and other operational improvements.

12. Attend and participate in all meetings of the Board.

1

13.    Subject to the approval of the Board and CEO, appoint additional officers that report to the CRO, with responsibilities for specific operational and financial aspects of the Restructuring.