# **EXHIBIT D**

PREPA Ex. 2.0

## COMMONWEALTH OF PUERTO RICO
## PUERTO RICO ENERGY COMMISSION

| | |
|---|---|
| IN RE: THE PUERTO RICO ELECTRIC POWER AUTHORITY | **No.** CEPR-AP-2015-0001 |
| INITIAL RATE REVIEW | **SUBJECT:** TESTIMONY IN SUPPORT OF PETITION |

Direct Testimony of

**LISA J. DONAHUE**

Managing Director,

AlixPartners, LLP

and

Chief Restructuring Officer,

Puerto Rico Electric Power Authority

on behalf of the

Puerto Rico Electric Power Authority

May 27, 2016

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1
       A.     Witness Identification ...................................................................................... 1
       B.     Summary of Direct Testimony and Attachments................................................ 3
       C.     Qualifications and Professional Background........................................................ 8

II.    PREPA'S FINANCIAL SITUATION AND THE RELATIONSHIP OF THIS
       RATE REVIEW TO THE PROPOSED FINANCIAL RESTRUCTURING .................... 8

III.   PREPA'S LONGSTANDING CHALLENGES, AND ITS EFFORTS TO
       IMPROVE ITS OPERATIONS, REDUCE ITS COSTS, AND ADDRESS
       THOSE CHALLENGES ............................................................................................ 19

IV.    CONCLUSION......................................................................................................... 30

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

1   **I.**     **INTRODUCTION**

2        **A.**     **Witness Identification**

3   Q.    **Please state your name, title, employer, and business address.**

4   A.    My name is Lisa J. Donahue. I am a Managing Director and the leader of the Turnaround

5         and Restructuring Practice at AlixPartners, LLP, a global business and advisory firm. I

6         have also served as the Chief Restructuring Officer ("CRO") of the Puerto Rico Electric

7         Power Authority ("PREPA" or the "Authority") since September 2014. My business

8         address is 909 3rd Ave, New York, New York 10022.

9   Q.    **Please describe your role at PREPA.**

10  A.    PREPA's Governing Board selected and appointed me as PREPA's Chief Restructuring

11        Officer in September 2014. I work alongside PREPA's management. I report to the

12        Governing Board and serve at their discretion. I lead a team of approximately 15

13        colleagues that are working on various cost saving initiatives and also assisting me in

14        carrying out my duties as CRO.

15        As CRO, my fundamental role is to lead the development and implementation of a

16        holistic recovery plan that allows PREPA to serve the people of Puerto Rico more

17        efficiently, reliably, and at a reasonable cost. The recovery plan, at the highest level,

18        involves two tasks: (1) addressing the fundamental operational problems that have

19        hindered PREPA for decades and (2) financial restructuring in light of PREPA's debt and

20        liquidity crises.

21        With respect to the first task, my mandates include providing overall leadership to

22        PREPA's restructuring process, which includes:

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

23          • developing a business plan;

24          • implementing revenue improvement and cost reduction plans;

25          • overseeing cash and liquidity management activities;

26          • improving PREPA's ability to analyze, track, and collect accounts

27            receivable;

28          • improving PREPA's capital expenditure plan; and

29          • developing plans to improve PREPA's generation, transmission,

30            distribution, and other operations.

31          This task has involved seven workstreams: governance / organization, a new

32   business plan, the capital structure, the rate structure, the legislative / regulatory

33   framework, operational improvements, and communication with stakeholders.  Since my

34   appointment as CRO, PREPA has made significant strides to improve its operations,

35   lower its operational costs, and remedy many of its longstanding challenges.  PREPA

36   continues and will continue to work on those issues.

37          With respect to the second task, we have had to focus both on PREPA's

38   significant debt burden and on its serious liquidity issues.  In the summer of 2014,

39   negative cash flows, the ongoing recession, outdated generation facilities, and its inability

40   to access capital markets led to debt and liquidity crises that threatened PREPA's ability

41   to operate, including its ability to purchase fuel to run its power plants and thus to keep

42   the lights on in Puerto Rico.  At that time, PREPA faced maturity of approximately $735

43   million in revolving credit lines and $400 million in principal and interest payments due

44   under its power revenue bonds.  In August 2014, as a first step in addressing PREPA's

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

45    severe financial distress, PREPA negotiated forbearance agreements with key financial

46    and fuel line creditors to kept PREPA afloat.  The forbearance agreements were not a

47    long-term solution to PREPA's financial problems.  Rather, they simply gave PREPA

48    some breathing room and flexibility to negotiate and start implementing a comprehensive

49    recovery plan for PREPA.

50         As CRO, I have led PREPA's negotiations with creditors holding, in the

51    aggregate, about 70% of PREPA's debt.  The negotiations have culminated in a lengthy

52    and detailed Restructuring Support Agreement (as amended or restated from time to time,

53    the "RSA"), which provides for the restructuring of PREPA's financial debt subject to the

54    satisfaction of certain conditions and milestones.  The foundation of the RSA is PREPA's

55    recovery plan, which requires equitable burden sharing by all stakeholders, including

56    PREPA's management and employees through labor and operational savings,

57    governments and municipalities through timely payment of energy bills and reform of the

58    CILT system, and PREPA's creditors through creating a sustainable capital structure.

59    Throughout this process, we have been very clear that PREPA's recovery plan cannot be

60    built solely on the backs of ratepayers.  It must be an equitable process with shared

61    burdens and shared benefits.

62  Q.   **On whose behalf are you testifying?**

63  A.   I am testifying on behalf of PREPA.


64       **B.    Summary of Direct Testimony and Attachments**

65  Q.   **What are the purposes and subjects of your direct testimony?**

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

66  A.  My testimony begins with a discussion of PREPA's financial and liquidity situation and

67  how it must be addressed, particularly how it relates to this rate review.  PREPA faces

68  severe debt and liquidity crises.  PREPA currently has approximately $550 million in

69  cash, including approximately $146 million held in Government Development Bank

70  accounts that are currently subject to a moratorium.  PREPA has debt obligations of

71  approximately $9 billion, including approximately $1.3 billion in principal and interest

72  that will be due on July 1, 2016 under its existing revolving credit lines and power

73  revenue bonds.  As a result, absent a successful financial restructuring and addressing the

74  liquidity issues, no version of PREPA, no matter how much its operations are improved,

75  can succeed.

76  I also discuss the efforts to restructure PREPA's debt, and how this rate review

77  addresses the debt and liquidity issues.  Over the long term, the debt crisis can be

78  addressed by consummating the transactions contemplated by the RSA.  Implementing

79  these transactions, however, will take several months. For example, the Commission will

80  need to approve the calculation methodology and the adjustment mechanism for the

81  Transition Charge, the validation proceedings contemplated by the Revitalization Act

82  will need to be completed, and the exchange of debt for new securitization bonds will

83  need to be completed successfully, and the new PREPA Revitalization Corporation will

84  need to begin charging and collecting the Transition Charge.

85  I next discuss PREPA's immediate liquidity crisis that requires immediate action.

86  This cannot wait for the completion of the RSA transactions, or even until approval of a

87  "permanent rate." To address PREPA's liquidity crisis, PREPA is requesting approval of

88  the proposed rates on a provisional basis in accordance with the PREPA Revitalization

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

89   Act.  I also am submitting a separate piece of direct testimony regarding PREPA's

90   liquidity issues in support of PREPA's request for provisional rates (PREPA Ex. 11.0).

91   Other witnesses testifying for PREPA also discuss and support the proposed provisional

92   rates.

93         Finally, I discuss PREPA's longstanding challenges and what PREPA and my

94   team are doing to face those challenges, including work on the recovery plan, which

95   includes the Business Plan.   The challenges have included, among other things,

96   significant operational deficiencies and the failure to implement best industry practices

97   and the influence of political considerations that have negatively affected PREPA's

98   ability to make effective long-term strategic and management decisions.  PREPA and my

99   team have been working for the better part of two years to develop the recovery and

100  business plans, improve PREPA's operations, lower its operational costs, and address

101  those challenges.  We have made great progress, but we are far from done.  Executing

102  PREPA's transformation will require continued operational improvements, broad

103  organizational change, and a new strategic direction.  Our task is to transform PREPA for

104  the benefit of the people and businesses of Puerto Rico and in doing so we must learn

105  from PREPA's historical experiences that led to its state of crisis.  Other witnesses for

106  PREPA discuss and support that PREPA's proposed new rates give customers the

107  benefits of the recovery work, including actual and estimated costs savings.

108  Q.   **Does your testimony comply with Sections 2.17(c), 2.02(B) and (E) of the**

109  **Commission's rules as you understand them?**



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

110   A.   Yes.  I have been advised that the Commission's Regulation No. 8720, Section 2.17(C),

111        requires either PREPA's Chief Executive Officer or its CRO, or both, to submit direct

112        testimony concerning whether PREPA's revenue requirement includes any costs that are

113        not prudently or reasonably incurred.  My work as CRO has not involved a formal,

114        in-depth, "prudence investigation" of PREPA's actions over the past decades.  Such an

115        investigation would be beyond the scope of the mandate approved by PREPA's

116        governing board and would be an extraordinarily time-consuming and expensive process

117        that would impose demands on personnel who are needed to implement the  recovery

118        plan.  In addition, because the subject involves a large entity over decades, and the factors

119        that affect its operations are multitudinous and interrelated, it would be very difficult to

120        quantify the total net effects of each of the various challenges that have faced PREPA.

121        That being said, our work has involved recognizing PREPA's challenges, and reviewing

122        in detail how PREPA operates, how those operations can be improved and their costs

123        reduced, and how those challenges can be met, as I indicated above.  My testimony on

124        those subjects is intended to comply with Section 2.17(C).  I understand that PREPA also

125        is submitting cost "benchmarking" testimony (the direct testimony of Lawrence

126        Kaufmann, Senior Advisor, Navigant Consulting, Inc., PREPA Ex. 6.0) that also sheds

127        light on that subject.

128        I also understand that the Commission's Regulation No. 8720, Section 2.02(B),

129        contains language regarding the prudence and reasonableness of costs addressed by a

130        witness.  My testimony is intended as high level and background testimony, not as detail

131        on the specifics of PREPA's revenue requirement, and is intended to comply with

132        Section 2.17(C) as noted above.  Nonetheless, to the extent applicable, I can state from



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

133     my perspective as CRO that it is my professional view that the costs sought to be incurred

134     through PREPA's proposed rates generally are reasonable and prudently incurred, but

135     that such conclusion must be tempered by my testimony about PREPA's challenges and

136     recovery.   I cannot directly quantify the total net effects of if or how each of the

137     challenges faced by PREPA historically has affected its operational costs, or affects its

138     current costs, but it would be unrealistic to believe that there have been no effects.

139     However, we have agreed upon a debt restructuring that, when implemented, would

140     reduce PREPA's costs of debt, and as part of the recovery plan we have estimated

141     significant cost savings in operations that can be achieved.   Those cost reductions to

142     some extent may shed light on how past challenges have affected costs, although I do not

143     mean to suggest or imply that they are a measure of past imprudence. They are not. The

144     cost reductions also reflect improved practices and new opportunities. Not every action

145     that is not optimal is imprudent. .

146             Finally, I also understand that the Commission's Regulation No. 8720,

147     Section 2.02(E), requires separation of testimony supporting provisional rates, although it

148     allows that testimony to refer back to the testimony supporting permanent rates.   My

149     direct testimony in PREPA Ex. 2.0 is intended to support the request for new

150     "permanent" rates, but portions of it also may be referenced in support of the request for

151     provisional rates.   Also, again, I am submitting a separate piece of direct testimony

152     regarding PREPA's liquidity issues in support of PREPA's request for provisional rates

153     (PREPA Ex. 11.0).




154   Q.   **What are the attachments to your direct testimony?**

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

155  A.    Attached to my direct testimony is my *curriculum vitae* as Exhibit 2.01.

156      **C.   Qualifications and Professional Background**

157  Q.    **Please describe your educational background and professional experience.**

158  A.    In addition to serving as CRO of PREPA and as a Global Head of the Turnaround and

159        Restructuring Practice at AlixPartners, I have served as a senior executive at several

160        energy companies, most recently as Chief Financial Officer at Atlantic Power

161        Corporation, a publicly traded power and infrastructure company. Prior to that, I served

162        as Executive Vice President and Chief Financial Officer at Calpine Corporation, an

163        energy company with operations in several North American countries, and as the Chief

164        Restructuring Officer at SemGroup, L.P., a mid-stream oil & gas, pipeline, storage, and

165        commodity trading company. My professional education includes a Bachelor of Science

166        (B.S.) degree in Finance from Florida State University. My complete *curriculum vitae*,

167        which reviews my education, professional qualifications, and experience in detail, is

168        attached as PREPA Ex. 2.01.

169  **II.**  **PREPA'S FINANCIAL SITUATION AND THE RELATIONSHIP OF THIS**
170      **RATE REVIEW TO THE PROPOSED FINANCIAL RESTRUCTURING**

171  Q.    **Is the restructuring of PREPA's debt before the Energy Commission for approval in**

172      **the instant review?**

173  A.    No. However, the debt restructuring and this rate review are related in several ways, as I

174      will explain below.

175  Q.    **What is the genesis of the efforts to restructure PREPA's debt?**

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

176 A.   Utility rates that do not keep up with costs of service are not sustainable.  Over time,

177   insufficient rates tend to drive up a utility's costs of capital, and at some point a utility

178   will become unable to access capital at a reasonable cost, if at all.  During the past several

179   decades, PREPA's rates did not keep pace with its cost of service.  In fact, PREPA's base

180   rates have not been updated since 1989.  By 2015, it was estimated that, all else being

181   equal (absent concessions from creditors and operational improvements), the difference

182   between PREPA's costs and what it was charging was between 7.8¢ and 10.99¢ per

183   kilowatt hour ("kWh").   This range depends on whether you examine 2017-2019

184   averages and assume the fuel line creditors would accept a 3-year amortization schedule,

185   or you examine just 2017 and assume that the entire fuel line would be due in that year.[1]

186   Not surprisingly, therefore, for many years PREPA borrowed to make up for the shortfall

187   in cost recovery through rates.  The money to run PREPA had to come from somewhere

188   and there was a market of investors willing and able to invest in PREPA debt.

189      In addition, the current design of PREPA's rates diverges significantly from

190   PREPA's actual costs of serving its Customers.   Fixed and variable charges do not

191   correspond to fixed and variable costs and often chronically under recover costs.   For

192   example, Contributions in Lieu of Taxes ("CILT") which is a subsidy to municipalities

193   recovered through the markup of fuel costs (along with other rate subsidies) has left 

194   PREPA unable to cover the costs of CILT and subsidies.   This problem has been

---

[1] Please note that I am not suggesting that PREPA's customers should face rates that fail to reflect concessions from creditors and that fail to reflect cost savings resulting from operational improvements. Just the opposite is true.  Closing the gap is something that needs to be achieved in an equitable manner by all stakeholders, including PREPA, the creditors, and customers.

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

195      exacerbated as fuel costs have dropped. CILT alone has approximately $48 million and

196      $78 million in FY2014 and FY2015 respectively of unrecovered subsidies.

197         Lacking sufficient rates, PREPA incurred substantial debt to fund capital

198      expenditures and, in the case of the revolving credit lines, certain operating expenses.

199      Over time, PREPA's ability to access the capital markets on reasonable terms dried up.

200      As a consequence, PREPA's ability to fund essential investments was compromised and

201      those investments that were made had to be funded from current operating revenues.

202      This ultimately threatened PREPA's ability to satisfy its obligations to creditors and to

203      provide safe and reliable service to its customers.

204         As I discussed earlier, although the problems have existed for many years, the

205      crisis really hit PREPA in the summer of 2014. At that time, negative cash flows

206      (reflecting the insufficient rates), the ongoing recession, outdated generation plants, and

207      PREPA's lack of access to capital markets led to financial and liquidity crises that

208      threatened its ability to operate, including its ability to purchase fuel to run its power

209      plants and thus to provide electricity to Puerto Rico.

210         In August 2014, as a first step in addressing such crisis, PREPA negotiated

211      forbearance agreements with key financial and fuel line creditors. The forbearance

212      agreements were not a long-term solution. Rather, they afforded PREPA necessary

213      breathing room and flexibility to work on real solutions. In fact, given PREPA's severe

214      liquidity position at the time, the forbearance agreements permitted PREPA to use

215      construction reserve funds for operating purposes. That is not a sustainable strategy. An

216      operating entity cannot make a long-term practice of using funds designated for critical

217      capital projects to instead fund operations. In addition, the forbearance agreements



218   excused PREPA from the obligation to make monthly sinking fund payments to the bond

219   debt service reserve fund totaling approximately $600 million annually.   Absent this

220   relief, PREPA would have run out of money several months ago.   As is customary, the

221   forbearance agreements imposed a number of obligations and milestones on PREPA,

222   including an obligation to retain a CRO to be chosen by the governing board.

223        The forbearance agreements were extended as we continued to work with all

224   stakeholders to develop a recovery plan to transform PREPA into a modern self-

225   sustaining utility.   The continued forbearance allowed us the time required to develop the

226   business plan, generate initial savings and ultimately negotiate the Recovery plan that

227   became part of the Restructuring Support Agreement (RSA) that exists today.

228        That, in brief, is the situation that led to the creation of the position of CRO, and

229   to my work together with PREPA on the financial crisis and the recovery of PREPA as an

230   operating entity.



231   Q.   **What is the magnitude of the current debt and liquidity issues?**

232   A.   As I previously noted, PREPA has debt obligations of approximately $9 billion, including

233   approximately $1.3 billion in principal and interest that will be due on July 1, 2016 under

234   its existing revolving credit lines and power revenue bonds.   PREPA currently has

235   approximately $550 million in cash, including $146 million that is held in GDB accounts

236   subject to a moratorium.   PREPA has exhausted all of its debt service reserves because it

237   has not been able to make any monthly sinking fund payments since late 2014.   Thus,

238   PREPA faces a liquidity crisis as well as a debt crisis.   PREPA cannot meet its immediate

239   financial obligations absent a financial restructuring and transformative change.   Indeed,

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

240        without action to restructure PREPA's debt and reduce its immediate cash flow burdens,

241        PREPA faces a funding gap of more than $700 million as of July 1, 2016.  PREPA also

242        faces the need to replenish its self-insurance fund, which helps protect PREPA against

243        unexpected needs, *e.g.*, extraordinary maintenance and repair costs following a hurricane.

244        As the Legislative Assembly concluded in adopting the Revitalization Act, PREPA's

245        financial situation requires immediate action if it is to achieve financial solvency and

246        meet its obligations in a manner that is orderly and satisfactory to all its stakeholders.

247  Q.    **Has PREPA negotiated with its creditors in an effort to gain concessions and arrive**

248        **at a plan that could allow for PREPA's revitalization?**

249  A.    Yes.  In light of its financial situation, PREPA negotiated with major creditors to arrive at

250        a broad, consensual financial settlement that addresses both PREPA's financial and

251        operational challenges.   The Legislative Assembly also has played a role in the debt

252        restructuring through the passage of the Revitalization Act.

253        Since entering into the forbearance agreements with its key creditors in August

254        2014, PREPA has negotiated extensively with its creditors with the ultimate goal of

255        reaching agreement on a comprehensive restructuring plan that addresses both PREPA's

256        financial and operational challenges. The lack of an available legal framework within

257        which to restructure its debts has complicated and extended PREPA's negotiation

258        process. At this point, PREPA has no ability to compel anyone to agree or even

259        participate in the process. Therefore, the overall solution, which must be consensual, has

260        to be fair, balanced and holistic.

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

261        In particular, PREPA has negotiated with major creditors and entered into the

262    Restructuring Support Agreement (RSA) with creditors holding or insuring

263    approximately 70% of the face amount of PREPA's outstanding financial indebtedness

264    including the Government Development Bank for Puerto Rico ("GDB"), beneficial

265    owners and insurers of existing PREPA bonds, banks (and their transferees) that had

266    provided revolving lines of credit used to pay for fuel and other expenses (collectively,

267    the "Supporting Creditors"), and others.  In the RSA, an *ad hoc* group of PREPA's

268    bondholders and insurers, PREPA's fuel line credit lenders, and the GDB have agreed to

269    support a revitalization plan for PREPA that includes significant financial concessions for

270    the benefit of PREPA specifically and Puerto Rico generally.

271        The Revitalization Act, as I noted earlier, created the Revitalization Corporation

272    to help implement the restructuring.  The Revitalization Corporation now also is a party

273    to the RSA, and is to be the issuer of the new securitization bonds that are essential to

274    accomplishing the debt restructuring.  A copy of the RSA is attached hereto as PREPA

275    Ex. 2.02.



276    Q.    **What are the economic terms of the RSA?**

277    A.    This is an over-simplification, but, in brief, the key economic terms of the RSA involve:

278        (1) holders of uninsured bonds exchanging their existing outstanding bonds for new

279        securitization bonds at 85% of the face value of their existing bonds, with a 5-year

280        principal holiday and a fixed interest rate that is lower than the rates of the existing

281        bonds; (2) fuel line credit lenders agreeing to one of two options, either converting their

282        existing credit agreements into term loans, with a fixed interest rate, to be repaid over six

283   years, or exchanging some or all of the principal due to them for securitization bonds on

284   the same terms as those for holders of uninsured bonds; and (3)  bond insurers agreeing to

285   issue surety insurance policies to support a portion of the debt service reserve fund for the

286   securitization bonds.

287        Those economic terms, however, are not the end of the story under the RSA.

288   There are many noneconomic contingencies that must be met under the RSA, most of

289   which are not a part of the instant rate review.  Those contingencies include, among

290   others, consent by holders of $2 billion of the $2.7 billion in bonds  that are not currently

291   parties to the RSA, the appointment of a new independent board for PREPA, approval of

292   the calculation methodology and true-up mechanism for the Transition Charge, obtaining

293   an investment grade rating for the new securitization bonds, successful completion of the

294   validation proceedings with respect to the Revitalization Act and the issuance of the new

295   securitization bonds, and the continuing implementation of operational reforms leading to

296   cost savings.  All of those contingencies are works in progress.  Failure to meet any of the

297   milestone and other conditions precedent could result in termination of the RSA and the

298   loss of nearly $1.4 billion in liquidity savings and debt reductions embodied by the RSA.



299        Several important contingencies, however, have already been satisfied.   For

300   example,   the   enactment   of   the   PREPA   Revitalization   Act,   Act 4-2016   (the

301   "Revitalization Act") is a condition to the obligations under the RSA that has been

302   satisfied.   The legislation includes, among other things, the creation of the PREPA

303   Revitalization Corporation (the "Revitalization Corporation") to issue the securitization

304   bonds, and provisions for the payment of those bonds through Transition Charges to be

305   collected by PREPA (as a servicer), and for an associated Adjustment Mechanism (a

306 reconciliation mechanism). The revenues collected by PREPA under the Transition

307 Charges are the property of the Revitalization Corporation, not of PREPA. On April 7,

308 2016, the Revitalization Corporation filed a petition with the Puerto Rico Energy

309 Commission (the "Commission") to approve the calculation methodology for the

310 Transition Charges and the Adjustment Mechanism. The filing of the Petition, which is

311 now pending in a docket that is separate from the instant rate review, *i.e.*, docket

312 No. CEPR-AP-2016-0001, is also a condition to the RSA.[2] Similarly, the filing of this

313 rate review case, including the approval of the provisional, is a condition to the parties'

314 obligations under the RSA.

315 In order to implement the restructuring contemplated by the RSA and the

316 recovery plan, this rate review focuses on four major items: (1) establishing new PREPA

317 base rates[3] for electric service that allow PREPA the opportunity to recover its "revenue

318 requirement", *i.e.*, the cost of offering and providing its services covered by its base rates;

319 (2) conforming PREPA's new rates with the Transition Charges and the Adjustment

320 Mechanism, which for practical purposes primarily means that the new rates are reduced

321 to reflect the amounts collected under the Transition Charges; (3) making sure that the

322 new rates reflect the benefits of the debt restructuring to PREPA's customers; and

323 (4) establishing a formula rate mechanism that will update PREPA's rates on an annual

324 basis, so that PREPA neither over- nor under-recovers its costs of service from its



---

[2] The Revitalization Corporation's petition is complicated and has many attachments, as required by Article 6.25 of the Revitalization Act. Describing that petition and its subject matter in full in my direct testimony is not required and it would be inappropriate and inefficient. The descriptions in my testimony are only a very brief high level summary intended to give background information and context.

[3] An electric utility's basic rates for electric service, not including charges that are passed through or fluctuate through a tariff rider or other mechanism, often are referred to by the general term "base rates".

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

325      customers.  These steps will allow PREPA to maintain rates at stable levels significantly

326      below historical highs, and to bring down the cost of energy and reduce rates over time,

327      which are the primary goals of PREPA's restructuring. Other witnesses testifying for

328      PREPA discuss and support that the proposed new rates are designed to meet those four

329      objectives.

330  Q.   **What are the cost savings to PREPA customers associated with these financial**

331      **concessions?**

332  A.   The creditors' concessions include a permanent deleveraging of more than $600 million

333      of debt principal owed by PREPA, five year liquidity relief of PREPA's debt service

334      obligations of nearly $800 million, and liquidity relief and interest rate savings with

335      respect to fuel line credit facilities.

336          The debt restructuring involves the issuance of certain securitization bonds by the

337      Revitalization Corporation, as I noted above.   Under the Revitalization Act, the

338      Revitalization Corporation may issue those bonds only if, as a result of the issuance of

339      such bonds, the present value of the debt service in respect of all such bonds is at least

340      $725 million lower than the present value of the debt service of all of such PREPA bonds

341      refinanced by such issue of bonds (this is called the "savings test").  The Revitalization

342      Corporation has consulted with its financial advisors and their calculations demonstrate

343      that the present value of the expected debt service in respect to the issuance of the bonds

344      pursuant to the terms of the RSA is at least $725 million lower than the present value of

345      the debt service of all PREPA bonds refinanced by such issue of bonds.

346          If PREPA had not made any operational improvements, or secured any of these

347      concessions from its creditors, the gap between PREPA's existing rates and the rates the



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

348   Authority would need to charge consumers to cover all these costs (*i.e.*, the "rate

349   deficit"), would be would be between 7.8 and 10.99 cents per kilowatt hour ("kWh") and

350   would need to be paid for by the ratepayers. Again, this range depends on whether you

351   examine 2017-2019 averages and assume that fuel lines will accept a 3 year amortization,

352   or whether you just examine 2017 and assume that the fuel lines are due in that year. Our

353   consistent goal has been to share the burden so that no one constituent is unduly impacted

354   by this large existing gap. To the extent that the financial concessions from creditors will

355   be taken into account in PREPA's new rates, they will greatly benefit PREPA's

356   customers as their rates would be lower than the rates that would be applicable if the

357   creditors had not agreed to this debt restructuring.

358   Q.   **What is the status of the debt restructuring as of the time of your direct testimony in**

359        **this rate review?**

360   A.   The parties have entered into the RSA, which remains in effect. To implement the

361        restructuring contemplated in the RSA requires certain additional actions are required by

362        the Revitalization Corporation and the Energy Commission, including, among other

363        things, the Commission's approval of the calculation methodology for the Transition

364        Charges and the Adjustment Mechanism, which the Corporation has proposed in

365        compliance with the Revitalization Act when it filed the Petition on April 7, 2016, In

366        addition to having filed this Petition, PREPA is continuing to work to implement all

367        aspects of the agreed upon recovery plan, including, by way of example, engaging a

368        search firm to select new independent directors, implementing operational improvements,

369        dealing with credit agencies with respect to the rating of the securitization bonds,



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

370      participating in the validation proceedings described above and seeking agreement with

371      additional creditors who are not parties to the RSA.

372  Q.   **Why do you state that the restructuring of PREPA's debt is not before the**

373      **Commission for approval purposes in this rate review?**

374  A.   The specific jurisdiction that the Revitalization Act vests in the Commission with respect

375      to the debt restructuring is prescribed in detail in the statute and that jurisdiction is to be

376      exercised by the Commission in docket No. CEPR-AP-2016-0001 and not in this rate

377      review.

378  Q.   **Why is the debt restructuring relevant to this rate review?**

379  A.   While the debt restructuring is not subject to the Commission's approval as part of this

380      rate review, and many other contingencies needed to implement the debt restructuring do

381      not involve the rate review, the rates to be set here need to "sync up" (be coordinated)

382      with the applicable requirements in the RSA.

383      In brief, PREPA's new rates must help to effectuate the recovery plan agreed

384      upon in the RSA in four ways. Consistent with Schedule VI to the RSA, PREPA is

385      seeking approval of new rates that will: (1) allow PREPA the opportunity to recover its

386      revenue requirement; (2) conform PREPA's new rates with the Transition Charges and

387      the Adjustment Mechanism, which primarily means that the new rates are reduced by the

388      amounts collected under the Transition Charges; (3) make sure that the new rates reflect

389      the benefits to PREPA's customers of the debt restructuring; and (4) establish a formula

390      rate mechanism that will update PREPA's rates on an annual basis, so that PREPA

391      neither over- nor under-recovers its costs of service from its customers. Again, other

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

392     witnesses discuss and support that PREPA's proposed new rates are designed to meet

393     those four objectives.

394  Q.  **Will the debt restructuring, if it is achieved, solve PREPA's short-term liquidity**

395     **crisis?**

396  A.  No.  PREPA also needs to address separately its summer 2016 liquidity crisis, because

397     the debt restructuring is not designed to and will not completely solve that problem.  The

398     liquidity crisis can be managed only by the Commission also establishing provisional

399     rates for PREPA that are in effect until the new rates begin to be recovered.  Again, I also

400     am submitting a separate piece of direct testimony regarding PREPA's liquidity issues in

401     support of PREPA's request for provisional rates (PREPA Ex. 11.0).

402  **III.**  **PREPA'S LONGSTANDING CHALLENGES, AND ITS**
403     **EFFORTS TO IMPROVE ITS OPERATIONS, REDUCE**
404     **ITS COSTS, AND ADDRESS THOSE CHALLENGES**

405  Q.  **To what extent has your role as CRO of PREPA involved assessing and working on**

406     **plans to address PREPA's fundamental challenges?**

407  A.  Although negotiating with creditors and working with other stakeholders on PREPA's

408     financial issues has been an essential part of my work as CRO, , the primary focus of my

409     work, and most of my time has been spent  on identifying and tackling the fundamental

410     operational problems that have hindered PREPA for decades.  This work has involved the 

411     development of a recovery plan, and, within that, a business plan, among other steps.

412     As noted above, our work to develop and implement a recovery plan for PREPA

413     has not involved a formal, in-depth, prudence investigation of PREPA's actions over the

414     past decades.   That type of investigation would take a great deal of time, cost the

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

415     company and the rate payers a great deal of money, and impose very significant burdens

416     on PREPA when its priorities at the moment are to stabilize its operations through

417     addressing  its financial issues and making operational improvements.  Moreover, even

418     such an investigation would have difficulty producing reliable figures on if and how any

419     specific challenge has affected PREPA's operations. As discussed previously, the issues

420     with PREPA did not materialize overnight or as a result of any one significant decision;

421     but rather through decades of mismanagement and poor decision making. Nonetheless,

422     our recovery work has involved recognizing and working to tackle PREPA's current

423     challenges, and my testimony should be understood as being based on that work.

424  Q.   **Has PREPA faced significant challenges at the governance and strategic levels in**

425     **recent decades?**

426  A.   Yes.  For many years, PREPA has been run by successive Governing Boards and senior

427     management teams that have been subject to the changing direction and policies of

428     different administrations.  Management and other strategic decisions, including staffing

429     and capital investment, too often have been based on political considerations rather than

430     best practices or sound business judgment.  There have been frequent changes of

431     positions and responsibilities with each electoral cycle.  Staffing decisions have been

432     made often without regard for prior experience or expertise given the nature of PREPA's

433     role in the political process.  This pattern has made it difficult for PREPA to tackle

434     critical multi-year projects such as environmental and capital investment.  In the past,

435     scarce capital has been spent on multi-year expensive projects that later administrations

436     have determined not to pursue – losing the value of prior investments and at times

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

437 incurring costs to remove partially constructed projects. I cannot quantify the total net

438 effects of how decisions such as these have impacted PREPA. Yet, they are very real

439 issues that we have had to recognize as we worked on the recovery plan, and they are

440 issues that must continue to be addressed going forward.

441 Q. **Have improvements been made in PREPA's governance structure?**

442 A. Yes. The government of Puerto Rico itself has taken some significant statutory steps to

443 improve the governance and strategic decisions of PREPA. The Puerto Rico Energy

444 Transformation and RELIEF Act, Act 57- 2014 (the "RELIEF Act"), contained a number

445 of provisions intended to improve PREPA's governance. For example, Article 2.3 of the

446 RELIEF Act amended Section 4 of Act 83-1941 with respect to PREPA's Governing

447 Board, while Article 2.4 amends Section 5 of Act 83-1941 with respect to PREPA's

448 Executive Director.

449 The Revitalization Act included further provisions on governance. The

450 Revitalization Act (in its Articles 5 and 6) made further amendments in Sections 4 and 5

451 of Act 83-1941, including provisions on the appointment, performance, and conduct of

452 the Governing Board; a new provision intended to enhance the independence of the

453 Governing Board from political pressures; and new provisions on the appointment,

454 performance, and conduct of PREPA's executive officers. The recovery plan

455 contemplates governance and legislative reforms to ensure that changes made at PREPA

456 take hold and remain in place. PREPA's board will be composed of a majority of

457 experienced independent directors identified by a nationally recognized search firm who

458 will serve in staggered terms to ensure continuity past the four-year election cycle. This




No. CEPR-AP-2015-0001
PREPA Ex. 2.0

459   will ensure that PREPA's board and management remains independent from political

460   interference and able to plan for the long term.

461   Q.   **What other serious operational challenges have faced PREPA in recent decades?**

462   A.   I will not attempt to provide an exhaustive catalog, but PREPA's serious operational

463   challenges in recent decades have included the items listed below.  I should note that my

464   team and I have worked, and we continue to work, with PREPA on these items.  So, the

465   status of these items is evolving, and they have been addressed to varying degrees.

466   Accordingly, the list should be understood as characterizing PREPA's operational

467   challenges in recent decades, but with the additional understanding that the work to

468   implement the recovery plan has made progress (to varying degrees) on these items.

469   •   A lack of institutionalized processes and procedures.

470   •   Outdated systems and information technology ("IT").   Information

471   systems that are not integrated, resulting in duplicate data, poor data

472   utilization, and poor data quality.   Underfunding of these systems, and

473   frequent outages.  Inadequate training to effectively use and improve IT. 

474   This is a major cause of delays when customers are waiting for help from

475   the call center or are disconnected. 

476   •   Government agencies, corporations, and other public institutions, and even

477   for-profit entities operating in public facilities, that fail to pay their electric

478   bills, either because PREPA's billing systems are unreliable and outdated,

479   or because PREPA does not take sufficient actions to collect its bills.

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

480      Non-technical losses – by which I mainly mean theft of power – also are

481      considerable and costly.

482  •   PREPA's generation structure predominately consists of old and outdated

483      systems.   This results in a high rate of forced outages, which prevents

484      optimal, and therefore least cost, dispatch of the fleet.  Also, much of the

485      fleet is outdated such that it relies on expensive fuel.

486  •   Inventory controls that are below industry standards.  (PREPA had no fuel

487      inventory controls when I arrived, but now it does.)

488  •   Procurement practices that focus on a very large number of small vendors.

489      A lack of product standardization leads to vendor management issues,

490      delays, and higher costs.

491  •   PREPA's deteriorated financial situation and vessel requirements under

492      the federal Jones Act compound PREPA's purchasing challenges, by

493      limiting the vendors that are able and willing to supply fuel.

494  •   The vehicle fleet is too large and the vast majority of it is technically

495      obsolete, making them very expensive to maintain.  Limited visibility into

496      fleet movements because of a lack of central tracking makes optimizing

497      vehicles   and   implementing   performance   measures   very   difficult.

498      Maintenance and repair shops that had to focus on repairs and therefore

499      fell behind on preventive maintenance.




500  •   A  disorganized  and  ineffective  customer  service  infrastructure.    As

501      indicated above, collection efforts are incomplete.  Service disconnection

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

502   processes are ineffective and costly.  As also indicated above, the call

503   center has unacceptably long wait times for response.

504   • Safety issues arising from a lack of training, lack of compliance and a lack

505   of appropriate protocols, and a physically deteriorated infrastructure.

506   Q.   **What significant improvements in PREPA's operations have been made or are**

507   **underway?**

508   A.   The Business Plan is addressed primarily and in more detail in the panel testimony of

509   Sonia Miranda of PREPA, Antonio Pérez Sales and Virgilio Sosa of AlixPartners,

510   ("Business Plan Panel Testimony") in PREPA Ex. 3.0.  I will answer this question at a

511   high level.  PREPA has focused on operational improvements to core business functions

512   that increase efficiency, improve customer service, centralize controls and decision-

513   making utilizing industry best practices, increase revenue generation, and instill a culture

514   of safety in the workplace.  By addressing shortcomings in accounts receivable and

515   collections, fuel inventory, procurement, inventory management, and safety, PREPA has

516   begun the process to transform into a modern self-sustaining utility.

517   PREPA has made great strides in its accounts receivable and collections processes

518   with respect to government and private customers alike. PREPA has directly engaged

519   with the central Commonwealth government and its agencies to set appropriate Fiscal

520   Year 2016 budgets and has implemented payment plans for past due government

521   accounts.  Given the current financial situation within the Commonwealth, these efforts

522   have become even more important.




No. CEPR-AP-2015-0001
PREPA Ex. 2.0

523   Benefits from improved receivables processes are already clear. Since August

524   2015, government Corporations and Agencies accounts receivable more than 30 days

525   overdue have been reduced by $11 million.   PREPA has also worked to reduce

526   outstanding receivable balances from PREPA's general customers by implementing new

527   service suspension processes, addressing a large balance of disputed invoices (through

528   the Act 33 process) and also has conducted an RFP process to select and retain

529   collections agencies for inactive accounts.    Overdue general customer accounts

530   receivable have been reduced by over $50 million since August 2015.  Overall, PREPA

531   projects that the general customer initiatives being undertaken will result in one-time

532   value of as much as $96 million, and as much as $10 million in annual value.

533   PREPA has also implemented new information technology tools to identify cases

534   of energy theft and decrease other non-technical losses, delivered workforce training in

535   several customer service areas, increased the use of a 3rd party call center and

536   implemented other customer care and billing improvements, that will reduce the number

537   of estimated billings thereby reducing billing errors.  Going forward, PREPA is adding

538   more field investigators and administrative personnel to pursue and prevent theft and

539   improve customer interaction in this area, taken together, all these reforms create a

540   platform for PREPA to work collaboratively with customers to reduce past due accounts,

541   energy theft and non-technical losses as well as improve customer service.





542   PREPA has also worked to improve fuel inventory controls.  In September 2014,

543   PREPA's controls were sporadic at best. PREPA did not consistently measure fuel based

544   on industry standards or test for variations in consumption. Additionally, PREPA lacked

545   a uniform process to forecast its fuel requirements based on optimized dispatch and

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

546   deliver power at the lowest possible cost, leading to unnecessarily high fuel inventory

547   levels and limitations on PREPA's ability to negotiate better terms. Our team has worked

548   with PREPA to implement an integrated process that addresses these issues. We measure

549   and track fuel inventory and investigate variances point to point. We have also improved

550   inventory controls and reduced inventory levels with respect to all inventory. In addition,

551   we have implemented a Request for Proposal ("RFP") process and negotiated with fuel

552   suppliers to secure more favorable fuel purchase terms.

553   One issue of importance to PREPA, especially as it transitions to burning a

554   significantly higher percentage of natural gas, is the Jones Act, which increases the cost

555   of transporting fuel from the mainland to Puerto Rico. The impact of the Jones Act on

556   PREPA's operations today is in the range of $3 to $5 million per year, due to the required

557   use of Jones Act-compliant barges to distribute fuel oil between units. Based on current

558   operational assumptions, this impact could increase by approximately $20 to $30 million

559   per year if the Aguirre Offshore Gas Port ("AOGP") is constructed and PREPA elects to

560   source liquefied natural gas from the mainland. If Puerto Rico were to get any relief from

561   the Jones Act's stringent requirements, this could allow PREPA to save these amounts

562   over time, and those savings would be passed along to its customers. 

563   The safety of employees should be at the heart of every well-run utility. In the

564   past 10 years, PREPA has had 15 fatalities and approximately 14,000 safety incidents. Its

565   incident rate is significantly higher, in fact more than double, than that of its industry

566   peers. In September 2014, we ran an RFP process and selected and engaged industry

567   leader DuPont to conduct an analysis of safety practices and procedures. PREPA is

568   currently implementing the short- and long-term recommendations made by DuPont and

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

569    tracking its performance in those areas. PREPA is undertaking these safety initiatives to

570    save lives and make PREPA a safe workplace. PREPA owes this to its employees and

571    their families. From 2014 to 2015, PREPA reduced its incident rate from 16.1 to 12.6

572    (approximately 21%), which represents a productive first step, but still falls short of our

573    ultimate goal.

574    PREPA is also working to improve its organizational culture and instill a focus on

575    excellence.  Many of PREPA's employees have embraced this effort and the board and

576    management have also committed to these critical changes. Work is underway to

577    introduce selected key performance indicators ("KPI's") to heighten the visibility of key

578    priorities within the organization and focus process improvements where they will have

579    the greatest possible impact.  PREPA's workforce and organizational structure is being

580    evaluated to reduce overlapping roles, streamline cross-divisional work and clarify job

581    descriptions.   PREPA is also undertaking succession planning for key positions to

582    address potential retirements and other retention pressures.

583    All of these efforts have already had a significant financial impact, and

584    demonstrate that PREPA has  taken actions to reduce costs, improve efficiency and apply 

585    industry standards. PREPA has achieved approximately $165 million in one-time cash

586    generation savings and approximately $200 million in recurring annual savings. As new 

587    operational initiatives are phased in, we expect additional onetime savings of

588    approximately $100 million and recurring annual savings of  approximately $120 million.

589    These savings are important because they contribute to closing the rate deficit and

590    because as part of the recovery plan, all stakeholders need to contribute to PREPA's

591    transformation, including PREPA's management and employees.

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

592   Q.   **You have mentioned PREPA's Business Plan, its capital expenditure plan, plans to**

593        **improve PREPA's generation, transmission, distribution, and other operations, and,**

594        **in particular, PREPA's Integrated Resource Plan. What is the nature of the IRP?**

595   A.   PREPA, with the assistance of outside independent experts Siemens Industry, Inc., has

596        developed a proposed Integrated Resource Plan ("IRP"), which, in revised form, is

597        pending before the Commission in another docket, No. CEPR-AP,2015-0002. At the

598        highest level, the IRP is intended to allow PREPA to comply with applicable law,

599        especially the United States Environmental Protection Agency's Mercury and Air Toxics

600        Standards and $CO_2$ regulation; reduce the long term cost of electricity supply to PREPA's

601        customers by replacing inefficient generating units; address reliability, *i.e.*, maintain

602        system security and adequacy of supply; achieve the statutory Renewable Portfolio

603        Standard; and give flexibility to make the plan adaptable to deal with Puerto Rico's many

604        unknowns and future developments.

605   Q.   **Why is the IRP needed?**

606   A.   With respect to generation and the grid and their operations, PREPA's IRP is vital to

607        whether PREPA will become a utility that operates in a modern manner and meets its

608        Customers' needs, including but not limited to providing basic reliable electric service.

609        PREPA will invest at least $2.3 billion in new infrastructure in two phases over the next

610        15 years. Phase 1 will cover infrastructure investments PREPA is required to make to

611        comply with environmental regulations and improve system reliability. Phase 2 will

612        cover additional investments to improve energy efficiency.

No. CEPR-AP-2015-0001
PREPA Ex. 2.0

613        The IRP is pending before the Commission in a separate proceeding, docket no.

614    CEPR-IN-2015-0002.  The results of that case are to be determined.  PREPA clearly

615    cannot meet its environmental law requirements, or provide reliable and low cost service

616    over time, without the approval and implementation of a sound IRP.  I discuss the IRP

617    further later in my testimony.

618        Overall, the IRP is needed in order to comply with legal requirements, specifically

619    Act 57.  Beyond that, PREPA's generation fleet is outdated and inefficient, and its

620    transmission system needs extensive reconstruction even apart from building, replacing,

621    or repowering any generation.  These systems also make it difficult to accommodate

622    unplanned outages and to integrate renewables.  The current states of these systems are

623    key causes of high forced outage rates, poor efficiency, low reliability, and high costs that

624    are ultimately borne by PREPA's customers.  PREPA's capital expenditure plan is driven

625    largely by the need to make the investments contemplated by the IRP.

626        I should add a little more information about the IRP being flexible.  While the IRP

627    covers the required 20 year planning period, it is designed to afford flexibility in the

628    event of, for example, significant changes in demand.  Moreover, the plan is not just a

629    plan to build, replace, or reconstruct.    The plan also enables greater use and

630    implementation of energy efficiency and demand response efforts, as well as other

631    innovations and improvements besides construction.

632    Q.    **Are the costs of the IRP included in PREPA's revenue requirement in this rate**

633        **review?**



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

634    A.    I am not one of PREPA's witnesses on the specifics of the revenue requirement or the

635        proposed rates, as I have indicated earlier.   That said, my understanding is that the

636        amount of spending contemplated in the Revenue Requirement aligns with the assumed

637        timing of the capital spend that is outlined in the IRP.   The Revenue Requirement

638        includes known and measureable adjustments through the date of June 2017.

639    **IV.**    **CONCLUSION**

640    Q.    **Does this complete your direct testimony?**

641    A.    Yes.



No. CEPR-AP-2015-0001
PREPA Ex. 2.0

## ATTESTATION

Affiant, Lisa J. Donahue, being first duly sworn, states the following:

The prepared pre-filed Direct Testimony and the Schedules and Exhibits attached thereto and the Schedules I am sponsoring constitute the direct testimony of Affiant in the above-styled case. Affiant states that she would give the answers set forth in the pre-filed Direct Testimony if asked the questions propounded therein at the time of the filing. Affiant further states that, to the best of her knowledge, her statements made are true and correct.

_____
Lisa J. Donahue

Affidavit No. 3,569

Acknowledged and subscribed before me by Lisa J. Donahue, of the personal circumstances above mentioned, in her capacity as a Managing Director of AlixPartners, LLP, and Chief Restructuring Officer of the Puerto Rico Electric Power Authority, who is <u>personally known to me</u> or whom I have identified by means of her driver's license number _____, in San Juan, Puerto Rico, this ___ th day of May 2016.

_____
Public Notary

EXENTO PAGO ARANCEL
**LEY 47**
4 DE JUNIO DE **1982**