# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA)<br><br>Debtor<br><br>UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO, INC. (UTIER)<br><br>Plaintiff,<br><br>v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY; COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; RICARDO ANTONIO ROSSELLÓ NEVARES; RICARDO RAMOS RODRÍGUEZ; GERARDO PORTELA FRANCO; HON. RAÚL MALDONADO GAUTIER; JOSÉ IVÁN MARRERO ROSADO; NATALIE A. JARESKO and JOHN DOES 1-6,<br><br>Defendants | PROMESA Title III<br><br>No.  BK 17 BK 04780 (LTS)<br><br><br><br>ADV. PROC. NO.: 2017-_____ |

## ADVERSARY COMPLAINT

TO THE HONORABLE COURT:

Comes now Plaintiff, Union de Trabajadores de la Industria Eléctrica y Riego, (UTIER), through its attorneys, Bufete Emmanuelli, C.S.P., for their Adversary Complaint against defendants: the Puerto Rico Electric Power Authority; the Commonwealth of Puerto Rico; the Financial Oversight and Management Board for Puerto Rico; Hon. Ricardo Rosselló Nevares; Ricardo Ramos Rodríguez; Gerardo Portela Franco; Hon. Raúl Maldonado Gautier; José Ivan Marrero Rosado; Natalie A. Jaresko; and John Does 1-6 (collectively, the "Defendants"), and alleges, states, prays, and requests relief as follows:

## I.    NATURE OF THIS ADVERSARY PROCEEDING

1. The Puerto Rico Electric and Power Authority, ("PREPA") is a public corporation organized under the laws of the Commonwealth of Puerto Rico, (the "Commonwealth"). It is an instrumentality of the Government of Puerto Rico, (the "Government"), and it employs approximately 9,550 employees.[1]

2. PREPA is one of the providers and the sole distributor of electric power for the Island. There are no other companies on the island that provide this combination of services, making PREPA a very important and essential service provider to the Commonwealth.

3. Of PREPA's 9,550 employees, approximately 6,775 belong to a labor union; of those, an estimate of 3,600 are affiliated to the UTIER.

4. The UTIER was founded in the early 1940´s and it is one of four labor unions that represent PREPA employees. Its members are responsible for the operation and

---

[1] Puerto Rico Electric Power Authority,  https://www2.aeepr.com/aeepr2009/AEEES.ASP (accessed  July 10, 2017)

conservation aspect of PREPA. They are responsible for the repairs, renovations, and improvements of PREPA property.[2]

5. The UTIER's job is to protect and defend PREPA workers, as well as negotiate collective bargaining agreements on their behalf. The latest collective bargaining agreement (CBA) is from the 2008-2012 period. (EXHIBIT A)[3].

6. Even though the CBA was enacted with a lifespan lasting from August 2008 through August 2012, it has a provision that establishes that it will continue dictating the labor relations between PREPA and UTIER until a new collective bargaining agreement is negotiated and comes in effect.[4] Seeing as though no new collective agreement has been negotiated and established, the CBA is still valid and binding.

7. This CBA was entered upon by both PREPA and the UTIER, on behalf of its members. As such, it is a binding contract between both parties that dictates the labor relations that shall exist amongst them.

8. This agreement serves the unequivocally important purpose of maintaining and creating a peaceful work environment. [5]

9. Some of the major areas covered by the CBA are: vacation and illness accrual and pay, employee classifications, job reclassifications, fringe benefits, job stabilization, and dispute resolution procedures, among others.

10. Such an agreement is extremely important to the well-being of the UTIER members, and as a result PREPA. These employees perform high risk jobs that require them to be continually exposed to danger, and as such need assurance that in case any fateful event

---

[2] CBA, Art. III, sec. 1 &3, p.3.
[3] A motion requesting an extension of time to submit a certified translation of the relevant articles of the CBA has been submitted on this same date. Thus, Exhibit A is not submitted with this Complaint.
[4] CBA, Art. L, "Duration of the Collective Bargaining Agreement",  p. 154.
[5] CBA, "Declaration of Principles", p. 8.

might happen they will be covered and taken care of, and that neither they nor their families will have to incur in losses. This CBA is what keeps these employees feeling secure, motivated, and with the desire to do their job and do it well.

11. This is of significant importance since the UTIER members play a fundamental role in PREPA´s productivity. The "Salaries and Benefits Report" [6], prepared by economists José I. Alameda Lozada and Alfredo González Martínez, reflects that PREPA has suffered a significant and drastic loss of capital productivity from 2008 through 2017[7] but have been able to continue providing its service, due to the fact that labor production has gone up, with the UTIER members leading the productivity growth.[8] Essentially, it is their labor what has allowed PREPA to continue rendering its service. If this labor were to be affected, PREPA would run a serious risk of having to cease operations, totally or partially.

12. Any scenario in which PREPA´s productivity was to diminish, or its operations were to cease, would be disastrous for the Commonwealth. The service that PREPA renders cannot be obtained by other means. This would imply that the Government, its businesses, hospitals, and schools, among others, would not be able to function properly. Vital operations would be impacted and forced to reduce the services rendered. The latter would in turn cause PREPA, the Government, and the people of the Commonwealth to lose business, lose productivity, spend less, and accrue more debt. It would have a negative impact on any possible economic growth or stability that either PREPA or the Commonwealth were to achieve.

---

[6] José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*".
[7] Alameda & González, *Id*., 34.
[8] Alameda & González, *Id*., 34,38.

4

13. Nonetheless, despite the fact the these employees play a vital role in PREPA´s economy, and as a result in the Commonwealth´s economy as well, the Government has enacted legislation directed at undermining and impairing their CBA, and the agreements in it established, agreements that provide for the health and well-being of these workers. Such legislation has also been adopted in the Commonwealth Fiscal Plan certified on March 13, 2017 and in the PREPA Fiscal Plan, certified on April 28, 2017.

14. The following laws alter, impair, take away without just compensation, or nullify different aspects of the CBA, most of them being economic aspects.

   a. The first is the "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act", Act Num. 66 of June 17, 2014. ("Act. Num. 66").[9] This law alters the CBA by establishing a limit to the amount of vacation and illness days a UTIER member could accumulate and receive a monetary compensation for.

   b. Earlier this year the "Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico", Act Num. 3 of January 23, 2017, was enacted.[10] ("Act Num. 3"). It suspended all collective bargaining agreement provisions that were contrary to its clauses, suspended all non-economic clauses that had any economic impact, whether it be direct or indirect, on the corporation budget, eliminated monetary compensations, and imposed on public corporations the creation of a plan so employees would exhaust all excess vacation balance.

---

[9] "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", ley número 66 de 17 de junio de 2014.

[10] "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria par Garantizar el Funcionamiento del Gobierno de Puerto Rico", ley número 3 de 23 de enero de 2017.

c. Afterwards came the "Administration and Transformation of the Human Resources of the Government of Puerto Rico Act", Act Num. 8 of February 4, 2017.[11] ("Act Num. 8"). Its purpose is to make the Government the sole employer of all public employees, allowing it to consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies and corporations, and facilitate the transfer or movement of employees between agencies, without regard to what agency or corporation an employee works for.

d. Lastly came the, "Fiscal Plan Compliance Act", Act Num. 26 of April 29, 2017 ("Act Num. 26").[12] It eliminates monetary compensation for excess vacation and illness days, alters the amount of days an employee can accrue of vacation or illness to make it less, eliminates any and all monetary compensations, and sets a time limit for the use of excess vacation or illness days. If these are not used by the established date, they will be lost.

15. The enactment of these laws represents drastic and substantial impairments of the CBA by the Government. Impairments which render it almost useless. These actions are in direct violation of the Contract Clause of the U.S. Constitution as well as the Commonwealth´s Constitution.

16. The Contract Clause of the U.S. Constitution establishes in its Art. I, section 10, cl. 1 that, "No State shall […] pass any […] Law impairing the Obligation of Contracts…". This

---

[11] "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", ley número 8 de 4 de febrero de 2017.
[12] "Ley de Cumplimiento con el Plan Fiscal", ley número 26 de 29 de abril de 2017.

Contract Clause has its equal in the Constitution of the Commonwealth of Puerto Rico in its Art. II, sec. 7.

17. The Contract Clause prohibits a State from passing laws that will impair contractual obligations entered upon between parties. Nonetheless, this prohibition is not absolute. A state may alter contractual obligations under certain circumstances, based on its police power.

18. When a State passes laws hindering a contract, the Courts are called upon, to determine if such a violation is allowed by the Constitution. For this, the legislation enforced must pass a two-prong test. First, if there is in fact a substantial impairment of a contract, and second, if such impairment is reasonable and necessary to serve an important government purpose.[13]

19. As to the first part of the test, all four laws represent a substantial impairment of the CBA. They drastically alter and take away previously contracted rights. Regarding the second part of the test, if such impairment is reasonable and necessary to serve an important government purpose, the answer is no. There are many other ways in which the Government and PREPA can obtain funds in the midst of this fiscal crisis, which do not have to impair the contractual rights of PREPA employees. For example, the outstanding accounts of clients can be targeted as a means to save the income that is being lost, subsidies can be reevaluated as to see which are not necessary and which can be reduced, contracts that are handed out without a proper auction being held should be regulated and better scrutinized in an effort to evaluate how beneficial and cost efficient they are for PREPA, and the theft of electric service should be targeted, allowing for the capture of lost revenue, among other things. It is crucial that these options be evaluated before establishing that the employee´s benefits have to be taken away

---

[13] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 41 (2011); *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977).

since, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well".[14]

20. Since the abovementioned laws significantly impair the CBA and they do not qualify as a necessary and reasonable impairment, the Government's actions do not withstand the two-prong test. As a result, these laws and the Government are in violation of the Contract Clause, making any budget or fiscal plan that adopts these measures or laws, illegal and unconstitutional by association.

21. In regard to a taking, the UTIER members were allowed through the CBA to accrue a certain amount of vacation and illness days. Regarding illness days, employees could accrue these without a set limit and PREPA would compensate in money the accumulation when they retire or upon death.[15] About vacation days, the employees could accrue a year's worth of vacation and use it the following year; PREPA would also compensate in money any and all vacation accrued when the employee ceased to work with PREPA.[16]

22. Since the negotiated CBA endowed employees with this flexibility, many would accumulate vacation and sick days for long periods. In many cases these days represented an extra income for employees for retirement. In other cases, as seen in their Financial Statement, PREPA allowed employees to exchange sick days accrued for supplemental pension benefits.[17] For many, these days were the equivalent of a monetary fund. (Exhibit B).

---

[14] U.S. Trust Co. of New York v. New Jersey, 431 U.S. 30-31 (1977)
[15] CBA, Art. XV, sec. 1 & 8.
[16] CBA, Art. XII, sec. 2 & 8.
[17] Financial Statements, Required Supplementary Information and Supplemental Schedules 2014, sec. 12, p.77.

23. Notwithstanding the reason for which they were accrued, these days were earned by the employees through their months of service and as such belong to them. Seeing as though they are the product of the UTIER members rendered services, they are entitled to accrue, use, and dispose of them as negotiated in the CBA.

24. The use of the days accrued is not something unexpected for which PREPA could not be prepared. On the contrary, as seen in its Financial Statement, the corporation established as an item on the budget, a predetermined amount for the payment of accrued vacation, sick leave, and payroll benefits.[18]

> "The Authority records as a liability and as an expense **the vested accumulated vacation and sick leave** as benefits accrue to employees. The cost of vacation and sick leave expected to be paid in the next twelve months is classified as current and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities."[19] [Emphasis Supplied].

25. In other words, a fund was set aside and tailored to the amount of benefits the employees had accrued. To be specific, the accrued sick leave and payroll benefits – exclusive of benefits to be liquidated after one year, were of approximately $114.5 million for the year 2014 and $122.4 million for 2013.[20]

26. The United States Constitution states in its Fifth Amendment that, "…private property [shall not] be taken for public use, without just compensation."   The Taking Clause has its equivalent in the Art. II, sec. 9 of the Constitution of the Commonwealth of Puerto Rico and is applied to the States and the Commonwealth through Amend. XIV of the United States Constitution.

---

[18] *Id*., sec. 9, p.59.
[19] *Id*., sec. 2, p.41.
[20] *Id*., sec. 9, p.59.

27. The Taking Clause is divided into two aspects, one, whether an actual taking occurred, and two, if the person received a just compensation for the property taken. If no just compensation is given, the taking is unconstitutional.

28. In the case at hand, there is a taking of employees' hard earned benefits and accrued licenses that are the product of services rendered. These belong to the employees and as such constitute their private property.

29. The Government is forcing the employees to use their excess days and telling them that the days not used will be lost and will not be compensated. They are eliminating not only the possibility of getting a money compensation for the excess not used, but are also denying employees the opportunity of using the excess balance through an extended period of time.

30. Thus, it can be established that the Government's actions of enacting the abovementioned laws violate the Taking Clause of the United States Constitution and the Constitution of the Commonwealth of Puerto Rico. They deprive, take away, and force employees to dispose of the vacation and sick days they have worked to accrue without offering a just compensation in exchange. The Government and PREPA have, through the enactment and adoption of these laws, violated the Taking Clause of the U.S. and P.R. Constitution. This in turn makes any fiscal plan or budget that adopts these laws unconstitutional by default or association.

31. The impairment of the CBA holds severe and negative consequences for the UTIER members, PREPA, and the Commonwealth. It throws employees into a trustless, illegal, unsafe, and economically unstable environment. These governmental actions serve a harsh blow to the workforce that can only result in the diminishment of labor productivity.

10

Unfortunately, it affects the main thing that is maintaining PREPA's productivity and capability of continuing to provide the Commonwealth with electric power service.

32. Loss of labor will only lead to PREPA having to cease, totally or partially its production and distribution of electric power. Seeing as though PREPA is the main producer and the sole distributor of electric power on the Island, if it were to cease operations, this would be disastrous for the Commonwealth and its economy.

33. Targeting the employees and hurting what little income safety they have, has a domino effect on the economy. The repercussions of the abovementioned Acts are felt by the employees, which in turn hurts PREPA, the Commonwealth, its citizens and the Government. It has the devastating effect of stumping any much-needed fiscal stability or economic growth that all fiscal plans and budgets require.

34. The lack of economic growth and stability impedes the approval of a plan of adjustment, since the repayment capability of the Commonwealth has nowhere to stem from.

35. It is also important to emphasize that the violations of the CBA by the abovementioned Acts could entail a massive exodus of employees using their excess vacation and sick days, for fear of losing them. Some employees have enough excess days to take months off their work. This leaves PREPA under staffed, and having to incur not only in the payment of the days being used, but also having to pay for substitute employees.

36. It is as such of great relevance and importance that these Acts not be included in any fiscal plan or budget approved. The abovementioned legislations only promote economic chaos.

37. On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of

Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes".[21]

38. PROMESA: (i) establishes a process for the Oversight Board (OB) to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the OB to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

39. Pursuant to PROMESA, "A Fiscal plan developed under this section shall, with respect to a territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets…".[22]

40. Once a fiscal plan is certified by the OB, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan.[23]

41. Commonwealth Fiscal Plan, was certified on March 13, 2017. This Fiscal Plan embraces and makes part of its reform measures, Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 as previously mentioned in this document. It specifically adopts the employee mobilization policy, uniform fringe benefits, and the elimination of vacation and sick days liquidations. These, as previously explained, violate the CBA, the Contract Clause, the Taking Clause, and have disastrous effects on the economy. (EXHIBIT C)

---

[21] H.R. 5278, 114th Cong. (2016) (Preamble).
[22] 48 U.S.C. §§ 2141 (b)(1),(2).
[23] 48 U.S.C. §§ 2142.

42. The PREPA Fiscal Plan was certified on April 28, 2017. This Fiscal Plan adopts and implements both Act Num. 66 and Act Num. 3 as part of the measures that will be taken to transform the corporation. (EXHIBIT D)

43. Both Fiscal Plans have been certified by the OB. In doing so, the OB has, through the approval and certification of these measures, become complicit of the impairment and taking of the CBA and is as a result, in violation of the Contract and Taking Clause of the United States Constitution.

44. In addition, on Friday, June 30, 2017, the OB approved the Commonwealth's 2017-2018 Fiscal Year Budget (the "P.R. Budget")[24] and the PREPA 2017-2018 Budget (the "PREPA budget"). (EXHIBITS E & F). Theses Budgets are aligned with their respective Fiscal Plans, without correcting the incongruences, legal deficiencies, and constitutional violations of such Plans. Resulting in the Budgets also being unconstitutional.

45. The adoption of the abovementioned legislation by these Fiscal Plans and their respective Budgets not only makes them illegal and unconstitutional, but it causes them to be in violation of, and unable to, comply with PROMESA.

46. In its Section 201(b)(1)(A),(B),(G),(N)[25], PROMESA specifically requires that any fiscal plan must:

> (A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—
>
> (i)  applicable laws; or
> (ii)  specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

---

[24] P.R. Budget is comprised of Budget Resolutions H.R. 186 to189, as provided by the OB in their official website: https://juntasupervision.pr.gov/index.php/en/documents/
[25] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(N).

(B) ensure the funding of essential public services
[…]

(G) enable the achievement of fiscal targets;
[…]

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

47. If a fiscal plan "does not satisfy such requirements," then the "Board shall provide to the Governor a notice of violation." *Id*. § 201(c)(3)(B).[26]

48. The Fiscal Plans and the Budgets, completely disregard the abovementioned PROMESA requirements.

   a. Section 201(b)(1)(A)[27] of PROMESA specifically requires that any fiscal plan must: "(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on: (i) applicable laws; or (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;". The Commonwealth and PREPA Fiscal Plans, and the 2017-2018 Budgets, have based their foundation on legislations that violate the CBA and the Constitution, and that cut and undermine employees' benefits and rights, causing economic loss and employment instability.

   b. Section 201(b)(1)(B)[28] of PROMESA, specifically requires that any fiscal plan must: "(B) ensure the funding of essential public services". By adopting the illegal Acts, these Fiscal Plans attack and take away benefits from the backbone and foundation of PREPA. This loss of labor will only result in PREPA being

---

[26] 48 U.S.C. §§ 2141 (c)(3)(B).
[27] 48 U.S.C. §§ 2141(b)(1)(A).
[28] 48 U.S.C. §§ 2141(b)(1)(B).

unable to provide its service. If no service is being provided then no revenue can be expected.

c. PROMESA in Section 201(b)(1)(G)[29] specifically requires that any fiscal plan must: "(G) enable the achievement of fiscal targets". Both Fiscal Plans' goals include economic growth and stability. Yet, the foundation for these plans is built on legislations that take money, job benefits, financial certainty, and stability from its employees, thus weakening the corporation and its chances of achieving economic growth and stability.

d. Lastly, PROMESA in Section 201(b)(1)(N)[30] specifically requires that any fiscal plan must: "(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act". Regarding this point, both Fiscal Plans and Budgets violate the CBA, an agreement that is prior to the enactment of PROMESA.

49. The certifications of the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, by the OB seem arbitrary, lacking a rational basis, and in clear and open violation of the requirements of Section 201 of PROMESA as here stated, and in blatant violation of the Constitution of the United States and Puerto Rico.

50. Allowing these Fiscal Plans and Budgets to continue, without making the necessary and constitutional corrections, would equal a gross violation not only of PROMESA, but also of the contractual rights of these employees and the Constitutions of the U.S. and the Commonwealth. Furthermore, it seriously encumbers the possibility of reversing the

---

[29] 48 U.S.C. §§ 2141(b)(1)(G).
[30] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G), (N).

country's continuing economic contraction since, as mentioned, taking from the UTIER members their legally acquired benefits, would have a negative effect on the employees, their families, PREPA, and the Commonwealth. It would make economic recovery an even more tortuous and tough climb. As a result, impairing the goals of PROMESA of generating an economy capable of repaying the debt of the Commonwealth, creating financial stability, and sustaining economic growth.

51. Allowing the Fiscal Plans and the Budgets to continue as they are, diminishes the ability to address the claims of other creditors in a plan for the adjustments of debts that conforms to Section 314 of PROMESA[31], since the financial stability necessary to be able to make a repayment plan would have nowhere to stem from. Stability and growth would be lacking.

52. Unless totally recast to protect the rights of PREPA employees, the Fiscal Plans and the 2017-2018 Budgets cannot possibly be permitted to serve as the basis for any lawful plan of adjustment of debt that complies with the U.S. Constitution and the laws of the United States. Accordingly, Defendants should be enjoined and stayed from presenting any plan of adjustment, until the Fiscal Plans are reformulated to comply with the law.

## II.    THE PARTIES

53. Plaintiff Union de Trabajadores de la Industria Eléctrica y Riego, Inc., ("UTIER"), is a labor union created as a corporation under the Laws of the Commonwealth of Puerto Rico, with its principal place of business at San Juan, Puerto Rico.

---

[31] 48 U.S.C. §§ 2174.

54. Defendant the Commonwealth of Puerto Rico, (the "Commonwealth"), is a territory of the United States.

55. Defendant the Puerto Rico Electrical Power Authority, ("PREPA"), is a public instrumentality and the main provider and sole distributor of electric power for the Commonwealth of Puerto Rico, represented in this Title III case under PROMESA by the Financial Oversight and Management Board for Puerto Rico.

56. Defendant the Financial Oversight and Management Board for Puerto Rico, (the "OB"), was created under Section 101(b)(1) of PROMESA[32] as an "entity within the [Commonwealth] government", acting in this Title III case of PROMESA as representative of PREPA.[33]

57. Defendant Hon. Ricardo Rosselló Nevares, ("Governor Rosselló"), is the Governor of the Commonwealth. Plaintiff sues Governor Rosselló in his official capacity.

58. Defendant Ricardo Ramos Rodríguez, (the "PREPA Executive Director"), is the Executive Director of PREPA and in that capacity has the authority to implement the PREPA Fiscal Plan. Plaintiff sues the PREPA Executive Director in his official capacity.

59. Defendant Gerardo Portela Franco, (the "AAFAF Executive Director"), is the Executive Director of AAFAF and in that capacity is empowered to implement the Fiscal Plan and the Fiscal Plan Act. Plaintiff sues the AAFAF Executive Director in his official capacity.

60. Defendant Hon. Raúl Maldonado Gautier, (the "Secretary of Treasury"), is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to

---

[32] 48 U.S.C. § 2121(b)(1).
[33] 48 U.S.C. § 2121(c)(1).

implement the Fiscal Plan and the Fiscal Plan Act. Plaintiff sues the Secretary of Treasury in his official capacity.

61. Defendant José Iván Marrero Rosado, (the "OMB Director"), is the Director of the Commonwealth's Office of Management and Budget (the "OMB") and in that capacity is empowered to implement the Fiscal Plans. Plaintiff sues the OMB Director in his official capacity.

62. Defendant Natalie A. Jaresko, (the "OB Executive Director"), is the Executive Director of the Oversight Board and in that capacity is empowered to implement the Fiscal Plan. Plaintiff sues the Oversight Board Executive Director in her official capacity.

63. Defendant John Doe 1, is any successor to Governor Rosselló as Governor of the Commonwealth. Plaintiff sues John Doe 1 in his or her official capacity.

64. Defendant John Doe 2, is any successor to Ricardo Ramos Rodríguez as Executive Director of PREPA and in that capacity has the authority to implement the PREPA Fiscal Plan. Plaintiff sues John Doe 2 in his official capacity.

65. Defendant John Doe 3, is any successor to Gerardo Portela Franco as Executive Director of AAFAF and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 3 in his official capacity.

66. Defendant John Doe 4, is any successor to Hon. Raúl Maldonado Gautier as Secretary of Treasury of the Commonwealth and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 4 in his official capacity.

67. Defendant John Doe 5, is any successor to José Iván Marrero Rosado as the Director of the Commonwealth's Office of Management and Budget and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 5 in his official capacity.

68. Defendant, Jane Doe 6, is any successor to Natalie A. Jaresko as the Executive Director of the OB and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues Jane Doe 6 in his official capacity.

### III.     JURISDICTION AND VENUE OF THIS HONORABLE COURT

69. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under PROMESA and the U.S. Constitution.

70. In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part".[34]

71. Plaintiff seeks a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

72. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]".[35]

---

[34] 48 U.S.C. § 2126(a).
[35] 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.

73. Venue is proper in this District under Section 307 of PROMESA.[36]

74. Plaintiff has standing to bring this adversary proceeding, as parties in interest in the above-captioned Title III case according to Section 301 of PROMESA [37] which incorporates Section 1109 of the Bankruptcy Code.[38]

## IV.   LEGAL AND FACTUAL BACKGROUND

### A. PREPA  AS AN ESSENTIAL PUBLIC SERVICE PROVIDER

75. PREPA, the Puerto Rico Electric Power Authority, is a public corporation organized under the laws of the Commonwealth of Puerto Rico.

76. This corporation is an instrumentality of the Government of the Commonwealth and it employs approximately 9,550 employees.

77. PREPA is the main provider and sole distributor of electric power for the Commonwealth. Although, there are private companies that generate energy, they supply their production through PREPA's grid. There are no other companies on the Island that distribute electric power. Thus, it is of vital importance that PREPA´s services continue working properly, since it is the only company on which the people on the Island must rely on for the distribution of electric power.

78. Due to these particular circumstances, the provision and distribution of a unique service and its lack of replacement, PREPA´s services can be defined **as essential and necessary services.** Electric power is a key utility without which the Island could not subsist. Without it, the Commonwealth, its Government, businesses, schools, hospitals, and others would have to cease vital operations. As a result, any scenario in

---

[36] 48 U.S.C. § 2167.
[37] 48 U.S.C. §§ 2161.
[38] 11 U.S.C. 1109.

which PREPA´s services where to diminish, its productivity where to be lessened, or where it shuts down, the outcome would be disastrous for the Commonwealth.

79. The abovementioned scenario would definitely thwart any economic growth that might be expected. Economic growth is vital, indispensable, and absolutely necessary to achieve the goals and financial stability that all budgets or fiscal plans aim for. The lack of economic growth and financial stability of any fiscal plan or budget impedes the proper establishment of a plan of adjustment of debt since the Commonwealth´s repayment capability would have nowhere to stem from.

80. As a result, it is of vital and utmost importance that funding for PREPA be ensured. It performs an essential public service and is the only corporation able to, and responsible for, that specific service. It is the sole distributor of electric power to an island which has no other possible supplier, or means available to receive such a service.

## B. UTIER, THE COLLECTIVE BARGAINING AGREEMENT AND UTIER EMPLOYEES´ LABOR PRODUCTIVITY.

81. The UTIER was founded in the early 1940´s and it is one of four labor unions that represent thousands of employees of PREPA.

82. There are approximately 9,550 employees in PREPA, of which an estimate of 6,775 belong to a union. Of those 6,775, approximately 3,600 are represented by the UTIER.

83. UTIER employees are responsible for the operation and conservation aspect of PREPA. This means that they are responsible for the repairs, renovations, and improvements of PREPA property. They have the crucial task of making sure that PREPA's property is working well and efficiently. This means carrying out high risk jobs to ensure the electric

power service is continuously and correctly working. The operation and conservation tasks do not include the construction of new projects; their sole and main responsibility is keeping up to date the already existing property.

84. Due to the vital functions and services these employees render, the UTIER has dedicated itself to protecting and defending these PREPA workers, ensuring they have proper work conditions. As such they have the task of negotiating collective bargaining agreements on their behalf.

85. Collective bargaining agreements have always been a key instrument of the Government's public policy concerning industrial peace in the workplace and healthy labor relations between employers and employees.

> "Industrial peace, adequate and assured salaries for the employees, as well as the uninterrupted production of services and items, through collective bargaining, are essential factors for the economic development of Puerto Rico. The achievement of these purposes depends to the highest degree on the relationships between employers and employees being fair, friendly, mutually satisfactory, and that the supply of adequate means be provided for the peaceful resolution of employer-employee controversies. The terms and conditions of employment should be set through collective bargaining. To achieve such bargaining, employers and employees will have the right to associate with the organizations of their choosing. It is the Government's policy to eliminate the causes of certain labor disputes by promoting collective bargaining and establishing an adequate, efficient, and impartial court that implements this policy. All collective bargaining agreements in effect, and those that will be made in the future, are hereby declared instruments to promote the public policy of the Government of Puerto Rico in an effort to promote production to its maximum; and it is declared that as such, are coated in public interest. The exercising of rights and fulfillment of obligations of the parties in such collective bargaining agreements, are subject to the reasonable ruling necessary to achieve the public policy established in this subchapter."[39]

---

[39] "Labor Relations Act of Puerto Rico", 29 L.P.R.A. sec. 62(2-5).

86. The latter policy of establishing collective bargaining as an important part of a government's public policy on labor relations, has its equal in the federal sphere through the Taft-Hartley Act.[40]

87. The CBA also implements this policy as part of its Declaration of Principles. [41]

> "The industrial peace and the best labor relations should be maintained through good faith and constructive actions of setting satisfactory work conditions for both the employer and the employee. The parties declare that the collective bargaining of reasonable salaries and decent work conditions is an efficient means to achieve and maintain peace and industrial democracy."

88. The current CBA between PREPA and UTIER is from 2008. Even though it was enacted with a lifespan lasting from August 2008 through August 2012, it has a provision that establishes that it will continue dictating the labor relations between PREPA and UTIER until a new collective bargaining agreement is negotiated and in effect. [42] Seeing as though no new collective agreement has been negotiated and established, the CBA is still valid.[43]

89. Agreements such as the CBA have the strategic purpose of creating a healthy work environment between PREPA and the UTIER members who carry out a vital, yet high risk labor. Ensuring these employees that the risks taken are duly compensated.

---

[40] Taft-Hartley Act, "Findings and declaration of policy", 29 U.S.C. § 151.
[41] CBA, "Declaration of Principles", p. 8.
[42] CBA, Art. L, "Duration of the Collective Bargaining Agreement", p. 154.
[43] This period is known as a Hiatus. The same situation was experienced by the UTIER with PREPA from 2006 through 2008. The validity of that agreement was questioned and ignored by the PREPA corporation, who despite the existence of a disposition in the CBA that established the agreement would subsist until a new CBA was negotiated, decided to unilaterally decree that the CBA was no longer valid. UTIER sued on behalf of its members, and the continuance of the CBA during that period was validated through the Board of Labor Relations (case num. CA-2007-09) and Court of Appeals of Puerto Rico (case num. KLRA201400689). A certiorari was presented to the Supreme Court of Puerto Rico, but review was denied, thus sustaining the Court of Appeals determination that the CBA was still valid through those years.

90. The latter since, according to PREPA´s Fiscal Plan, the "Total [r]ecordable [i]ncident [r]ate (2012) is 5x greater than industry average".[44] PREPA employees are at a 5 times greater risk of being injured than other electrical industry workers in the United States.

91. The CBA was willingly and freely entered into by both PREPA and the UTIER. As such it is a binding contract between both parties that dictates the labor relations that shall exist amongst them. It covers everything from vacation and illness pay, training, employee classifications, job reclassifications, fringe benefits, licenses due to job accidents, employee suspensions, job stabilization (when PREPA has to suspend or reorganize certain areas or activities and employees must be relocated), and dispute resolution, amongst other things. It is a very detailed and vast agreement that has been meticulously prepared by both parties.

92. Such an agreement is extremely important to the well-functioning of the UTIER members, and as a result PREPA. These employees have bargained for very specific and important procedures, benefits, and licenses, as a result of them performing high risk level jobs that demand they constantly expose themselves to different dangers. These employees need assurance that in case any fateful event might happen they will be covered and taken care of, and that neither they nor their families will have to incur in losses. The assurance of health and safety that the CBA provides is what keeps these employees motivated to do their job and do it well. It is what assures them that the risks taken, and a job well done, will in exchange guarantee them certain legal rights and benefits.

93. At times like these, when the country is going through a difficult fiscal moment it is important that the employees, that are the Government's and the country's economic

---

[44] PREPA Fiscal Plan, "Safety system", p. 11.

backbone, be in good health, be motivated to keep doing their work, and keep the labor productivity stable.

94. This is very much the case of PREPA. Economists José I. Alameda Lozada and Alfredo González Martínez were commissioned to prepare an analysis on the salaries and benefits the UTIER members receive, the "Salaries and Benefits Report".[45] Among other things, this report analyzes PREPA´s productivity. As presented on the graphs, the productivity report is composed of capital productivity, overall employment productivity, and UTIER members labor productivity. The charts reflect that PREPA has suffered a significant and drastic loss of capital productivity from 2008 through 2017.[46]

95. Nonetheless, despite the loss of capital productivity, it has been able to continue providing electric power service. The latter is due to a significant increase in labor productivity, with the UTIER members leading the productivity growth.[47] Labor has supplied the deficiency that the loss of capital product has caused.

96. A separate report, "The PREPA Workforce Labor Productivity"[48], (the "LP report"), also authored by economists José I. Alameda Lozada and Alfredo González Martínez, specifies that labor productivity is composed of UTIER members, management, and the rest of the employees.[49] From the year 2000 to 2017, UTIER labor production has grown in a 45.2% versus all other employees which have only grown as a whole by

---

[45] José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*", (2017).
[46] Alameda & González, *Id*., 34.
[47] Alameda & González, *Id*., 34,38.
[48] José I. Alameda & Alfredo González Martínez, "*La Productividad de la Fuerza Laboral de la AEE*", (2017).
[49] Alameda & Gonález, *Id*., p.16.

32.5%.[50]  Currently the labor production of an UTIER member grows an average of 2.31% annually, while management only grows by a 1.57% and the rest grow at a 0.60%.[51]

97. In terms of money, the adjusted hourly contribution of an UTIER member to PREPA equals $379.00 per hour, per employee, yet this same employee earns an average of $26.15 per hour (including fringe benefits); thus it can be concluded that an average UTIER worker contributes 15x more to PREPA than what he earns hourly.[52]

98. It can be stated that essentially it is the UTIER members and their labor what has allowed PREPA to continue rendering its services. Impairing the CBA is the equivalent to landing a significant blow to those who currently are the pillars of the PREPA corporation. If labor were to be affected, PREPA would run a serious risk of having to cease operations, totally or partially.

99. Currently, for every 2.3% of capital production lost, UTIER members´ labor production has to grow by a 1% so it can compensate for the loss of capital.[53]  For these employees to continue supplying and growing their labor production, they must be presented with optimal work conditions. Taking away their benefits and hard earned money will not set the pace for a growth of labor productivity.

100. Impairing or altering their CBA, which both PREPA's and the Commonwealth's Fiscal Plans do, submerges these employees in a trustless, illegal, economically unstable, and unsafe environment that only serves to create the ideal conditions for loss of labor productivity.

---

[50] Alameda & González, *Id.*, p.16.
[51] Alameda & González, *Id*., Graphic I, p.17.
[52] Alameda & González, *Id*., Table H, p.18-19.
[53] Alameda & González, *Id*., p.19.

101. Not only does it cause an unstable environment, but it is actually causing the loss of many employees.

102. UTIER members render a vital day to day service for PREPA and the people of the Commonwealth. They are one of the main reasons why the electric power service is, despite the economic fiasco, still working and providing an essential service. Protecting their rights and hard earned benefits is the equivalent of assuring PREPA´s stability.

### C. **THE CBA AND ITS IMPAIRED CLAUSES**.

103. As stated before, the CBA is a binding contract between PREPA and UTIER members that dictates the labor relations between both parties. Despite the existing legal obligation of upholding such contract and abstaining from impairing it, PREPA and the Commonwealth have continually tried to undermine it. The Government of the Commonwealth has passed four specific laws that impair and alter the CBA. Many of them as a response to the fiscal measures required of the Commonwealth by the OB. The damage is furthered by the approval and adoption of the OB of these laws, through the PREPA and Commonwealth Fiscal Plans and Budgets. This approval is the equivalent of the adoption of such illegal and unconstitutional Acts. Thus, it is crucial to examine the CBA, its clauses, and explain how the abovementioned Acts impair it.

104. The major aspects of the CBA being altered are, vacation license, illness license, employee mobility or transfer within or out of the corporation, the rights and protection of the appropriate unit, bonuses, and job classifications. Nonetheless, to be specific, these laws have a negative impact on exactly 37 CBA articles of an agreement that is composed in its totality of 50 articles. The following is a list of all the impaired CBA articles:

a. Art. I – Union Recognition
b. Art. II – Union Shop
c. Art. III - Appropriate Unit
d. Art. IV- Subcontracting
e. Arts. VI - Classifications
f. Art. VII –Training
g. Art. VIII – Job Reclassification Procedure
h. Art. IX – Vacant and Newly Created Positions
i. Art. X - Job Stabilization
j. Art. XI – Work Day, Work Period, Work Week, Regular Work Hours
k. Art. XII – Vacations for Regular Employees
l. Art. XIII – Vacations for Temporary Employees
m. Art. XIV – Licenses for Union Officials and Representatives
n. Art. XV – Illness License for Regular Employees
o. Art. XVI – Illness License for Temporary Employees
p. Art. XIX – License for Work Related Accidents
q. Art. XX – License for Family Funerals
r. Art. XXI – License for Early Morning Emergency Jobs for Regular and Temporary Employees
s. Art. XXII –License for Twenty-Four Hours Consecutive Work in Rotating Shifts

t. Art. XXIII – Holidays Granted Off with Pay to Regular and Temporary Employees
u. Art. XXIV – Holidays Granted Off with Pay to Emergency Workers
v. Art. XXV – Paid Days Off Granted by PREPA in Light of Administrative Provisions of the Governor of Puerto Rico
w. Art. XXVI – Health Insurance
x. Art. XXVII – Benefits due to Inability, Retirement, or Death
y. Art. XXIX - Salaries
z. Art. XXX – Extraordinary Compensation
aa. Art. XXXIII – Christmas Bonus
bb. Art. XXXIV – Annual Special Compensation Due to Risk
cc. Art. XXXVI – Payment Due to Transfer Expenses
dd. Art. XXXVII – Transfers Due to PREPA's Exclusive Interest
ee. Art. XXXVIII – Pension System
ff. Art. XXXIX – Dispute Resolution Procedure
gg. Art. XLI – Disciplinary Procedure
hh. Art. XLIV – Occupational Security and Health
ii. Art. XLV – General Dispositions
jj. Art. XLVI – Performance and Assistance Bonus
kk. Art. XLVII – Collective Bargaining Agreement Compliance

105. The CBA establishes the vacation and illness licenses and pay. It specifies how these licenses will be accrued, used, paid, or monetarily compensated for when unused. Their payment varies depending on the reason why the license is being liquidated: separation from job, death, or retirement.

a. In regards to the illness license, the CBA stated that regular employees would accumulate 1.58 sick days per month of service, for a total of 19 sick days a year. <u>These would be accumulated without limits</u>.[54]

b. In case of death or retirement, the pending sickness balance would not be lost but rather liquidated in money.[55]

c. Regarding vacations, the CBA established that employees would accumulate 2.5 vacation days per month of service, for a total of 30 days a year.[56]

d. When an employee does not wish to use his vacation days during the year, those unused days will be enjoyed during the next calendar year. Any vacation days that remain unused due to a job necessity will be paid by PREPA by the end of the next calendar year.[57]

e. The CBA also establishes that PREPA will pay any and all annual vacation balance accumulated when an employee ceased to work with the company.[58]

106. As to the mobility or transfer aspect of employees and job classifications, the collective bargaining agreement establishes certain key aspects. The CBA covers, among other things, the following procedures:

a. Employee solicitation of a vacant or new position,[59]

b. Employee classifications,[60]

c. Job reclassification,[61]

---

[54] CBA, Art. XV, sec. 1, p.66.
[55] *Id.*, sec. 8, p.68.
[56] CBA, Art. XII, sec. 1, p.61.
[57] *Id.*, sec. 2, p.61.
[58] *Id.*, sec. 8, p.62.
[59] CBA, Art. IX, p.47.
[60] CBA, Art. VI, p.23.
[61] CBA, Art. VIII, p. 45.

    d.   Job outsourcing,[62]

    e.   Transfer of employees,[63] and

    f.   Job stabilization, (relocation of employees when certain areas have closed or are temporarily suspended).[64]

107. After the enactment of the following laws, the CBA has been impaired, with 37 of its 50 dispositions rendered useless. The damage caused by such actions will be discussed in detail in section G of this Complaint.

### D. ACT NUMBER 66-2014, ACT NUMBER 3-2017, ACT NUMBER 8-2017 AND ACT NUMBER 26-2017

108. In 2014, the Government of the Commonwealth passed the "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act", Act Num. 66 of June 17, 2014. ("Act. Num. 66"). [65] This Act had a negative impact and impaired, among others, the following CBA areas: employee transfer, vacation license and pay, illness license and pay, the monetary compensation for the lack of use of vacation and illness licenses, and all other non-economic clauses that might have an economic impact on the corporation´s budget.

    a.   Regarding employee transfer, "…the transfer and administrative detail of regular and transitory employees between positions, job classifications and levels, group of employees, appropriate units, **union units and nonunion units and vice versa**, among Entities of the Executive Branch[,] shall be allowed;…[a]**ny provision of law, regulation, covenant, agreement, or precept that is**

---

[62] CBA, Art. IV, p.18.
[63] CBA, Art. XXXVI – Art. XXXVII, pp.106-107.
[64] CBA, Art. X, pp. 55-57.
[65] "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", ley número 66 de 17 de junio de 2014.

**contrary to the provisions of this Chapter shall be suspended during the effective term thereof**; provided that there shall be full flexibility to make transfers and administrative details".[66] [Emphasis Supplied].

b. Among other things, this act established as an extraordinary monetary compensation, the following:[67]

-"Cash liquidations of vacation leave accrued in excess in the case of final liquidations upon the employee's separation from public service. Provided, that during the effectiveness of this Act, the maximum of days subject to liquidation upon separation from service shall be sixty (60) days. Likewise, during the effectiveness of this Act, any public employee who accrues more than sixty (60) days at the end of each calendar year shall use such excess within the nearest date on or before the next six (6) months of the following calendar year. Provided further that every Entity of the Executive Branch shall pay, on or before August 31st of each year, any excess accrued as of the effective date of this Act and during the effectiveness thereof, when the employee has been unable to use such leave within the term provided herein due to special service circumstances beyond his/her control. All that pertains to vacation leave, in the case of public corporations, shall be addressed as provided in Section 17 of this Act."[68]

- "Cash liquidations for sick leave accrued in excess in the case of liquidations upon the employee's separation from public service. Provided, that during the

---

[66] Act Num. 66, sec. 10, p.71.
[67] Act Num. 66, sec. 11(c), p.72.
[68] Id., sec. 11(c)(i), p.72.

effectiveness of this Act, the maximum of days subject to liquidation upon separation from service shall be ninety (90) days. The employee shall keep the balance accrued as of the effective date of this Act, but accrual over such maximum balance shall be eliminated during the effective term of this Act. Provided further that, during the effectiveness of this Act, any excess annual accrual not used on or before December 31st of the corresponding year shall be forfeited. All that pertains to sick leave, in the case of public corporations, shall be addressed as provided in Section 17 of this Act."[69]

c.  Lastly Art. 17 provided the following specifically to public corporations:

-"…all public corporations shall suspend the financial terms negotiated under collective bargaining agreements in effect having a direct or indirect economic impact on the operations of the public corporation that aggravate the budget situation thereof or whose suspension is warranted to improve its budget situation."

-"…public corporations shall recognize to both union and nonunion employees their vacation leaves accrued as of the effective date of this Act; however, the excess thereof accrued before and during the effective term of this Act shall not be liquidated in cash. Public corporations shall establish a plan whereby both union and nonunion employees shall exhaust the leaves accrued in excess so that no excess is carried over after the effective term of this Act."

-"... sick leaves accrued in excess by union or nonunion employees of the public corporations before the effective date of this Act shall be frozen at the

---

[69] Id., sec. 11(c)(ii), p.73.

32

pay rate in effect as of June 30th, 2014, and the liquidation thereof in cash shall only be made in the event of separation from public service. Any sick leaves accrued in excess after the effective date of this Act, as well as that accrued as of December 31st of each year, shall be used on or before June 30th of the year following the year in which it was accrued; after said date such balance shall be forfeited."

d.  The lifespan of this Act was until the 1st of July of 2017.

109. At the beginning of this year the Government enacted the "Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico", Act Number 3 of January 23, 2017.[70] ("Act Num. 3"). This act, like Act Num. 66, impaired the vacation and illness pay and liquidation and all non-economic clauses that are thought to have an adverse impact on the corporation's budget. The following are changes implemented by this law that have an adverse effect on the CBA:

a.  Any and all collective bargaining agreement articles, ruling, law, or administrative disposition or clause therein that is contrary to or interferes with what is here established, is understood to be suspended during the lifespan of this law.[71]

b.  There will be no increase in economic benefits nor will any extraordinary monetary compensation be given.[72]

c.  Every agency must develop and implement immediately a plan to reduce the accumulation of vacation days in excess of 60 days. The

---

[70] "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria par Garantizar el Funcionamiento del Gobierno de Puerto Rico", ley número 3 de 23 de enero de 2017.
[71] Act Num. 3, art. 6, p.10-11.
[72] *Id.*, art. 7, p.11.

public service employee, who accumulates more than 60 days at the end of the natural year, must enjoy the excess days at the nearest date during or before the following six months of the next natural year. [73]

d.  During the lifespan of this law, all public corporations must suspend all non-economic clauses that have any economic impact, whether it be direct or indirect, on the operations of the corporation, and which serve to worsen the budget of such corporation or that its suspension is necessary to alleviate the budget situation.

The public corporations will recognize employees' vacation balances but will not be allowed to liquidate in cash the excess balance. The corporations must establish a plan for employees to exhaust their vacations pay so that by the end of the lifespan of this law no excess balances are available.

In regard to illness days, the excess days will be frozen in accordance with the existing salary on June 30, 2014. Excess days will only be liquidated in cash if the employee is no longer in the public service. The excess sick days that are accumulated after this law comes into effect, as well as the excess that is accumulated by the 31st of each year, must be enjoyed by June 30 of the next year, each year. After this date, the excess days are lost.[74]

---

[73] *Id.*, art. 12, p.13.
[74] *Id.*, art. 14, p.16.

110. Afterwards came the "Administration and Transformation of the Human Resources of the Government of Puerto Rico Act", Act Number 8 of February 4, 2017.[75] ("Act Num. 8"). According to the Preamble of this law, the fact that the Government has allowed its agencies to be their own individual administrators has led through the years to an excessive amount of growth of the governmental apparatus. This growth has led to excess bureaucracy, different pay grades for employees that allegedly carry out the same duties, and duplicity in the services the agencies provide, among other things. The Government has become decentralized, with each agency having its own structure. This in turn has led to excess money being spent. This law, according to its Preamble, is a response to such problems. Its purpose is to make the Government the sole employer of all public employees, this way it can consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies, and facilitate the transfer or movement of employees between agencies. The following  are ways in which it alters the actual CBA:

    a.  According to Act Num. 8, any collective bargaining agreement that was created before this law and that is still in place, will be respected. [76] Yet for the Government to be able to freely move employees around between agencies and public corporations and to establish a unified merit system, certain changes have to be made that will alter the existing CBA.

---

[75] "Ley para la Administración y Transformación de los Recursos Humanos  en el Gobierno de Puerto Rico", ley número 8 de 4 de febrero de 2017.
[76] Act Num. 8,art. 5, sec. 5.2, p.14.

b.  This law demands that a unified system of job classifications be established, without regard to what agency an employee works for, as a way to make it easier for the Government to move employees around between agencies and public corporations. [77] PREPA offers a very specific and unique service that is not performed by other agencies. There is no other agency with whom to compare the jobs at hand. The Government´s unification of job classifications or the creation of new job classifications would interfere with those that have been agreed upon by PREPA and UTIER, who, it should be noted, are the most qualified to establish a classification of a job due to the nature of the tasks performed by these employees.

c.  Act Num. 8 allows the Government to freely move or transfer employees between agencies and public corporations and vice versa. [78] This will affect the collective bargaining unit since each one has specific duties assigned to them that distinguish them from one other and restrain them from representing other units. For example the UTIER unit only represents members from the operations and conservation area.

d.  Every agency and public corporation will have to follow a specific merit system that will be the base for any promotion, demotion, employment, training, transfer, or retention of an employee. [79] A

---

[77] *Id*., art.2, sec. 2.1(4), p.6 & art. 6, sec. 6.2, p.14-15.
[78] *Id*., art.2, sec. 2.1(13), p.7; art.5, sec. 5.2, p.14; art. 6, sec. 6.4(2),(4), p.20-21; art.6, sec. 6.6(10)(2), p.27-28.
[79] *Id*., art.2, sec. 2.2(3), p.7; art.2, sec.2.2(5), p.7; art.5, sec. 5.2, p.15; art.6, sec. 6.1, p.14.

standard unified system without regard to the agreements and negotiations of the employee's collective bargaining agreement.

111. Lastly, later this year, the "Fiscal Plan Compliance Act", Act Number 26 of April 29, 2017 ("Act Num. 26"),[80] came into effect and significantly altered the CBA, further stripping the PREPA employees of their contractual rights. These are some of the most significant changes:

   a. It eliminates the monetary compensation for excess vacation and illness days.[81]

   b. "…all public employees shall be entitled to accumulate vacation leave, at a rate of one and one-fourth (1 1/4) days for every month of service."[82]

   c. "Vacation leave may accumulate up to a maximum of sixty (60) workdays."[83]

   d. "…As a general standard, [vacations] must be enjoyed during the natural year in which it was accumulated…[t]he lack of use of the vacation license has to be due to a job necessity that comes as a request of the company and it must be in writing.[84]

   e. "Employees that are unable to enjoy their vacation leave during the determined natural year due to service needs, evidenced in writing and at the request of the agency or public instrumentality, are exempted from the provisions of subsection (e) of this Article. In this case, the

---

[80] "Ley de Cumplimiento con el Plan Fiscal", ley número 26 de 29 de abril de 2017.
[81] Act Num. 26, Introduction, p.17.
[82] *Id*., Art. 2.04(1)(a), p.33.
[83] *Id*., Art. 2.04(1)(c), p.33.
[84] *Id*., Art. 2.04(1)(d), p.33.

agency or public instrumentality is obligated to make the necessary adjustments for the employee to enjoy at least the excess of accumulated leave over the limit of sixty (60) days, on the nearest possible date, within the term of the first three (3) months of the following natural year."[85]

f.   "The agency or public instrumentality is obligated to provide for the enjoyment of the accumulated vacation leave, prior to the processing of any severance that constitutes a total and absolute disassociation from service and the processing of a transfer to provide services in another agency or public instrumentality."[86]

g.   "All employees who have been hired by the Government of Puerto Rico prior to Law 8-2017… entered into effect shall be entitled to accumulating sick leave at the rate of one and a half (1.5) days for every month of service."[87]

h.   "Sick leave may be accumulated up to a maximum of ninety (90) workdays at the end of any natural year…"[88]

i.   Any excess accumulated beyond the 60 vacation days and the 90 sick days will be lost by the end of the natural year. Denying the employee, the use of these excess days or a monetary compensation.

112. The Government of Puerto Rico and PREPA have, through the approval and adoption of the abovementioned laws, and in an attempt to comply with the OB, retroactively

---

[85] *Id.*, Art. 2.04(1)(g), p.34.
[86] *Id.*, Art. 2.04(1)(h), p.34.
[87] *Id.*, Art. 2.04(2)(a), p.36.
[88] *Id.*, Art. 2.04(2)(f), p.38.

destroyed and impaired the CBA. The adverse effect is such, that they render the CBA almost useless. With their actions, they have blatantly violated the Constitution of the United States, the Constitution of the Commonwealth of Puerto Rico, and PROMESA.

**E. CBA, CONTRACT CLAUSE, AND IMPAIRMENT OF CONTRACTUAL OBLIGATIONS.**

113. All four of the abovementioned acts have been approved as countermeasures to the economic crisis. The most recent ones being an attempt of the Government to comply with the OB's requirements.

114. As consistently stated, the CBA is a legal, binding contract between the UTIER members and PREPA, in which the Government of the Commonwealth, through PREPA, willfully entered into.

115. The Contract Clause of the United States of America Constitution establishes in its Art. I, section 10, cl. 1 that, "No State shall…pass any…Law impairing the Obligation of Contracts…". This Contract Clause has its equal in the Constitution of the Commonwealth of Puerto Rico in its Art. II, § 7.

116. The Contract Clause prohibits a State from passing laws that will impair contractual obligations entered upon between parties. Nonetheless, this prohibition is not absolute. A state may alter contractual obligations under certain circumstances, in light of its police power.

117. When a State passes laws hindering a contract, the Courts are called upon, to determine if such a violation is allowed by the Constitution. For this, the legislation enforced must pass a two-prong test. First, if there is in fact a substantial impairment of a contract, and

39

second, if such impairment is reasonable and necessary to serve an important government purpose.[89]

118. In regard to the first part of the test, whether there is a substantial impairment of a contract, the case at hand satisfies such a requirement. The previous paragraphs enumerate not only the different laws that affect the CBA but also, specific clauses that have a particular negative effect on the agreement. They all have a drastic impact on areas such as vacation and illness accrual and payment, monetary compensation of vacation and illness days not used, the loss of excess days the employees had accumulated, mobility and transfer of employees, and job classifications. These can all be qualified as substantial impairments.

119. The second part of the test asks if the impairment is reasonable and necessary to serve an important governmental purpose. If this second part is not answered affirmatively, the impairment should be found in violation of the Contract Clause and cannot be allowed by the Courts.

120. In the case at hand, the Government alleges it has passed these laws as a response to the economic crisis that the Commonwealth is currently going through. This in turn, allows it to impair a contract in its favor. Normally, when a government passes a law impairing a contract, complete deference is given to the legislative assessment and intent. Nonetheless, when the State's self-interest is at stake, less deference is given to such assessment because, "…If a State could reduce its financial obligations whenever it

---

[89] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 41 (2011); *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977).

wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all". [90]

121. Even though there is an actual fiscal crisis at hand, the impairments brought on by these laws must be cautiously examined. For example, Act Num. 26 establishes in its Preamble that one of its main purposes is to make all public employees´ benefits the same. Thus making central government employees and public corporations employees equal.[91]  Making all employees equal is not an important governmental purpose that should entail drastically impairing and altering public corporation employees, previously negotiated and contracted rights. If equality were the real motive, every single employee serving the Government should have their benefits and salaries adjusted, not just public corporation employees. Such a measure raises the alarming question of whether or not the purpose of this law is nothing more than allowing the Government of the Commonwealth to default on their legally binding obligations; escaping their obligation, for example, to pay the excess days accumulated by employees, or granting them the opportunity to enjoy such days, without the risk of losing them. "Thus, a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors."[92]

122. Even if the impairment of the contract served an actual important public purpose, such a measure cannot prove to be a reasonable and necessary impairment. For it to satisfy this requirement, it would have to be the only way in which the government can actually

---

[90] <u>United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño</u>, 633 F.3d 37, 41-43 (2011); <u>U.S. Trust Co. of New York v. New Jersey</u>, 431 U.S. 25-26 (1977).
[91] Act Num. 26, "Equity in Fringe Benefits for all Public Employees", Preamble, p.11.
[92] <u>U.S. Trust Co. of New York v. New Jersey</u>, 431 U.S. 1, 29 (1977).

save money and have a significant impact in restoring and helping the fiscal crisis the Commonwealth is going through.

123. There are many other ways in which the Government can obtain funds in the midst of this fiscal crisis, which do not have to impair the contractual rights of PREPA employees. The employees and the UTIER must be granted the opportunity to demonstrate the fact that there are other ways in which to help out the fiscal crisis at hand.

> "Consequently, a plaintiff with reason to believe that a state action was unreasonable or unnecessary can, in the complaint, list the state's articulated motive(s), and then plead facts that undermine the credibility of the those stated motives or plead facts that question the reasonableness or necessity of the action in advancing the stated goals. For example, if a state purports to impair a contract to address a budgetary crisis, a plaintiff could allege facts showing that the impairment did not save the state much money, the budget issues were not as severe as alleged by the state, or that other cost-cutting or revenue-increasing measures were reasonable alternatives to the contractual impairment at issue."[93]

Yet, for the UTIER members to be able to effectively argue and protect their rights against the Government of the Commonwealth, they must have the opportunity to bring this issue before the Court. This is vital, since the Courts have established that, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well".[94]

124. The following are some possible options the Government has that do not include taking away legal contractual rights of PREPA employees:

---

[93] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 44 (2011);
[94] *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 30-31 (1977)

a. Of PREPA's 1.5 million clients, approximately 484,227 receive a subsidy on their electric power bill. [95] These should be reexamined and there should be a determination on whether or not such subsidies are needed and if the amount being subsidized should be lowered.

b. The accounts receivable surpasses $1,000 million.[96] This is income that is not being received. PREPA should first target these accounts before targeting the employees´ benefits.

c. PREPA has, during past years, acquired petroleum at an inflated price. Costing it millions of dollars.[97] An evaluation of the petroleum costs should be done in an effort to acquire a less expensive product.

d. Contracts that are handed out without a proper auction being held, should be regulated and better scrutinized in an effort to evaluate how beneficial and cost efficient they are for PREPA.

e. Theft of electric service can be targeted, allowing for the capture of lost revenue.

125. The previous alternatives lead to the conclusion that there are less drastic measures that do not require interfering with the PREPA employees existing CBA. There are other alternatives that can and must be first explored by the Government, before considering reaching in the pockets of the employees as a reasonable and necessary measure.

126. As a result, it can be determined from the previous analysis that the abovementioned laws do not serve an important public purpose and they do not qualify as a necessary and reasonable impairment. The Government of the Commonwealth has various options that

---

[95] José I. Alameda & Jorge Luis Torres, "*Estudio para determinar la pertinencia de la  Ley 4 del 16 de febrero de 2016 como instrumento de  revitalización de la Autoridad de Energía Eléctrica*", page 13.
[96] Alameda & Torres, *Id*., 14.
[97] Alameda & Torres, *Id*., 8-9.

do not require the impairing of the CBA. Thus, its actions cannot withstand the Contract Clause two-prong test, making its actions unconstitutional and illegal. Leading to the conclusion that any budget or fiscal plan that adopts these measures or laws, is illegal and unconstitutional by association.

### F. CBA AND THE TAKING CLAUSE.

127. As seen, the CBA allowed the UTIER members to accrue a certain amount of vacation and illness days. Regarding illness days, employees could accrue these without a set limit, and PREPA would compensate monetarily the accumulated days, when they retire or upon death.[98] In reference to vacation days, employees could accrue a year's worth of vacation and use it the following year; PREPA would also compensate in money any and all vacation accrued when the employee ceased to work with PREPA.[99]

128. Since the negotiated CBA endowed employees with this flexibility, many would accumulate vacation and sick days for long periods. The agreement between PREPA and UTIER instilled in these employees a sense of trust, that rightfully led them to believe this accumulated time would be there for them to use whenever they needed to. In many cases these days represented an extra income for their retirement. In other cases, as seen in their Financial Statement, PREPA allowed employees to exchange sick days accrued for supplemental pension benefits; "The Authority's employees with over 20 years of service are entitled to exchange accrued sick leave for supplemental pension benefits just to complete merit annuity (30 years of service) and/or be paid in cash the value of such

[98] CBA, Art. XV, sec. 1, p.66 & sec. 8, p.68.
[99] CBA, Art. XII, sec. 2, p.61 & sec. 8, p.62.

44

sick leave upon separation of employment". [100] For many, these days were the equivalent of a monetary fund.

129. Notwithstanding the reason for which they were accrued, these days were earned by the employees through their months of service and as such belong to them. They were not handed over as part of the CBA, but rather the CBA established the guidelines by which these could be earned and used. Seeing as though they are the product of the UTIER members rendered services, they are entitled to accrue, use, and dispose of them as agreed in the CBA.

130. The use of the days accrued is not something unexpected for which PREPA could not be prepared. On the contrary, as seen in its Financial Statement, the corporation established as an item on the budget, a predetermined amount for the payment of accrued vacation, sick leave, and payroll benefits. [101]

> "The Authority records as a liability and as an expense **the vested accumulated vacation and sick leave as benefits accrue to employees**. The cost of vacation and sick leave expected to be paid in the next twelve months is classified as current and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities." [102] [Emphasis Supplied].

131. The use of these days, or the money compensation in exchange, is something that was expected to occur. As evidenced here, the fund was tailored to the amount of benefits accrued to the employees. To be specific, the accrued sick leave and payroll benefits – exclusive of benefits to be liquidated after one year, were of approximately $114.5 million for the year 2014 and $122.4 million for 2013. [103] This can only lead to the

---

[100] Financial Statements, Required Supplementary Information and Supplemental Schedules 2014, sec. 12, p.77.
[101] *Id.*, sec. 9, p.59.
[102] *Id.*, sec. 2, p.41.
[103] *Id.*, sec. 9, p.59.

conclusion that PREPA has the capability to pay for these accumulated vacation and sick days and that this fund's exclusive purpose was to pay for these accruals.

132. The United States Constitution states in its Fifth Amendment that, "…private property [shall not] be taken for public use, without just compensation." The Takings Clause has its equivalent in the Art. II, sec. 9 of the Constitution of Commonwealth of Puerto Rico and is applied to the States and the Commonwealth through the XIV Amendment of the United States Constitution.

133. This clause is divided into two aspects, first, if an actual taking of private property occurred, and second, if the person received a just compensation in exchange for the property taken. The lack of just compensation makes the action unconstitutional.

134. In the case at hand, the accrued balances of excess vacation and illness days are private property belonging to the employees. These accumulations are earned by the employees in exchange for their monthly service rendered. As such, once they are accumulated they belong to no one but the employee, who, according to the CBA, could either use them, or accumulate them and receive a monetary compensation for them when they no longer rendered services for PREPA. These can be better seen in PREPA's Financial Statement as funds that the employees have earned and are set aside for when they decide to use them. As such these are private property belonging to each PREPA employee.

135. The abovementioned laws not only limit the accrual amount, but also establish a deadline by which these days need to be used, rendering any unused excess as lost and not entitled to a monetary compensation. They have arbitrarily determined, that the hard earned vacation and illness excess accumulation would be disposed of, if not used by when the Government unilaterally decided they should be used.

46

136. The Government is obligating the employees to use the accumulated days and eliminating not only the possibility of getting compensated for the excess not used, but also denying employees the opportunity of using the excess balance through an extended period of time. According to Act Num. 26, the days not used by the end of the natural year will be lost.[104] Many employees have years of accumulated accruals that could not, and should not, be used in such a short period of time, making them by default, lost. Days that were not necessarily accumulated for the purpose of being used but rather cashed for whatever purpose they legally, contractually, and rightfully could.

137. As a result, by forcing the employees to either use the days like the Government now demands or be subject to losing them without receiving any monetary compensation in exchange, the Government is stripping these employees of private property without a just compensation.

138. Thus, it can be established that the Government's actions of enacting the abovementioned laws violate the Taking Clause of the United States Constitution and the Constitution of the Commonwealth of Puerto Rico. They deprive, take away, and force employees to dispose of the vacation and sick days they have worked to accrue without offering a just compensation in exchange. This in turn makes any fiscal plan or budget that adopts these laws unconstitutional by default or association.

### G. NEGATIVE OUTCOME OF ACT NUM. 66-2014, ACT NUM. 3-2017, ACT NUM 8-2017, ACT NUM. 26-2017, AND THE IMPAIRMENT OF THE CBA.

139. The impairment of the CBA holds severe and negative consequences for the UTIER members, PREPA, and the Commonwealth.

---

[104] Act Num. 26, Art. 2.04(1)(d-e), p.33-34.

47

140. By eliminating major benefits and impairing 37 of the 50 clauses in the CBA, the Government has thrown the employees in a trustless, illegal, unsafe, and economically unstable environment.

141. As previously explained, the UTIER employees work a high risk demanding job which, as stated in the PREPA Fiscal Plan, in the Commonwealth is 5 times more dangerous than the industry average. For an employee to carry out such a dangerous task, it is necessary for him to count on, among other things, the necessary licenses and benefits that assure he will be taken care of in case of a fateful event.

142. These governmental actions serve a harsh blow to the workforce that can only result in the diminishment of labor productivity. Unfortunately, affecting the main thing that is currently sustaining PREPA's productivity and its capability of continuing to provide the Commonwealth with electric power service.

143. If labor productivity diminishes, particularly UTIER member's labor, PREPA's productivity as a whole would suffer a negative impact with the only possible outcome of PREPA having to totally or partially cease its production and distribution of electric power.

144. As previously stated, PREPA is the main provider and sole distributor of electric power on the Island, if it were to cease operations be it completely or partially, this would be disastrous for the Commonwealth and its economy. Without it, vital operations of the Island would have to cease functioning. The Commonwealth, the Government, its hospitals, businesses, schools, agencies, and others would not be able to operate at full capacity, if at no capacity at all. The same would be true for private citizen's businesses. All of the above would cause everyone to lose business and have to incur in major

expenses to keep what little they could of their business working. As such there would be less money in people's pockets, less purchases being made, and more debt being accrued.

145. In regard to the employees, without PREPA working or working only partially, many would lose their jobs. This means less income for already struggling members of society and their families. These would have less money, there would be less spending on their part, and more debt would be accrued. The strain on these employees would be felt by their families and by the local economy that would see a descent in the client's purchases.

146. Due to the lack of labor, PREPA would not only see a decrease in production and a partial or total shutdown, but a severe reduction in its revenues. Customers would not pay for a service they are lacking and even if they would, the lack of workers would impede or make harder the collection of payment.

147. Targeting employees and hurting what little income safety they have, has a domino effect on the economy. The repercussions of the abovementioned Acts are felt by employees, which in turn hurts PREPA, the Commonwealth, its citizens and the Government. It has the devastating effect of stumping any much needed fiscal stability or economic growth that all fiscal plans and budgets require. In addition, the lack of economic growth and stability impedes the approval of a plan of adjustment, since the repayment capability of the Commonwealth has nowhere to stem from or at least does not provide assurance that it will be stable enough to make the necessary payments to its creditors.

148. It is also important to emphasize that these violations of the CBA could entail a massive exodus of employees using their excess vacation and sick days, for fear of losing them. Some employees have enough excess days to take months off their work. Leaving PREPA under staffed, and having to incur not only in the payment of the days being used, but also having to pay for substitute employees. This is another way in which PREPA's well-functioning could suffer a negative impact.

**H. PROMESA, PREPA'S FISCAL PLAN, THE COMMONWEALTH'S FISCAL PLAN, AND THE 2017-2018 COMMONWEALTH's FISCAL BUDGET AND PREPA FISCAL BUDGET.**

149. On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes".[105]

150. Among other things, PROMESA: (i) establishes a process for the Oversight Board to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the Oversight Board to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

---

[105] H.R. 5278, 114th Cong. (2016) (Preamble).

50

151. Pursuant to PROMESA, "A Fiscal plan developed under this section shall, with respect to a territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets…".[106]

152. Congress included 14 different "requirements" that any fiscal plan must satisfy.[107] It authorized the Oversight Board to certify a fiscal plan only if the fiscal plan "satisfies such requirements."[108]

153. If a fiscal plan "does not satisfy such requirements," then the "Board shall provide to the Governor a notice of violation."[109]

154. Once a fiscal plan is certified by the OB, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan.[110]

155. PREPA's Fiscal Plan was certified on April 28, 2017. This plan adopts and implements both Act Num. 66 and Act Num. 3 as part of the measures that will be taken to transform the corporation. As previously stated, both legislations are in violation of the CBA, the Contract Clause, and the Taking Clause. By adopting them, the PREPA Fiscal Plan has itself violated both the CBA and the Constitution. The OB has, as a result of approving and certifying this plan, incurred in illegal and unconstitutional acts itself, thus violating the Constitution.

156. The above is also true for the Commonwealth's Fiscal Plan. This Plan embraces and makes part of its reform measures, the unconstitutional laws previously mentioned in this Complaint. It specifically adopts the employee mobilization policy, uniform fringe benefits, and the elimination of vacation and sick days liquidations. All of

---

[106] 48 U.S.C. §§ 2141 (b)(1),(2).
[107] 48 U.S.C. §§ 2141 (b).
[108] 48 U.S.C. §§ 2141 (c)(3)(A).
[109] 48 U.S.C. §§ 2141 (c)(3)(B).
[110] 48 U.S.C. §§ 2142.

these, as previously explained, violate the CBA, the Contract Clause, and the Taking Clause. According to the introduction of this Fiscal Plan, PREPA is not a major entity covered by the Commonwealth Fiscal Plan.[111] Nonetheless, this Fiscal Plan includes laws that do have an effect on PREPA and that actually impair its CBA. As such, by including this legislation in its reform measures, the Commonwealth has acted in violation of the Constitution. By certifying this plan, the OB's acts and its approval are in violation of the CBA and the Contract and Taking Clauses of the United States Constitution.

157. On Friday, June 30, 2017, the Oversight Board approved the Commonwealth of Puerto Rico's 2017-2018 Fiscal Year Budget and the PREPA Fiscal Year Budget. These Budgets are aligned, with the Commonwealth and PREPA Fiscal Plans, without correcting the incongruences, legal deficiencies, and constitutional violations of these Plans. Resulting in the Budgets also being unconstitutional.

158. Moreover, the 2017-2018 Budgets, the Commonwealth Fiscal Plan, and PREPA Fiscal Plan, all violate section 201(b)(A)(B)(G)(N) of PROMESA.

159. PROMESA specifically requires in its Section 201(b)(1)(A),(B),(G),(N)[112] that any fiscal plan must:

(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—

  (i)    applicable laws; or
  (ii)   specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

(B) ensure the funding of all essential public services;
[…]

---

[111] Commonwealth Fiscal Plan, "Major Entities Not Covered by the Fiscal Plan", p.6.
[112] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(N).

(G) enable the achievement of fiscal targets;

[…]

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the
constitution, other laws, or agreements of a covered territory or covered territorial
instrumentality in effect prior to the date of enactment of this Act.

160. First in its Section 201(b)(1)(A)[113] PROMESA specifically requires that any fiscal
plan must: "(A) provide for estimates of revenues and expenditures in conformance
with agreed accounting standards and be based on: (i) applicable laws; or (ii) specific
bills that require enactment in order to reasonably achieve the projections of the
Fiscal Plan;". The Commonwealth and PREPA Fiscal Plans, and the 2017-2018
Budgets, are not based on any applicable law or specific bill needed to reasonably
achieve the financial stabilization intended through the Fiscal Plans, but rather have
based their foundation on several legislations that violate the CBA and the
Constitution, and that cut and undermine employees' benefits and rights, causing
economic loss and employment instability. Rather than achieving their goals of
financial stabilization, these Fiscal Plans and Budgets embrace unconstitutional laws
that only serve to create a bigger economic chaos.

161. In Section 201(b)(1)(B)[114] of PROMESA, it specifically requires that any fiscal plan
must: "(B) ensure the funding of essential public services". As mentioned here,
PREPA is the sole distributor of electric power for the Commonwealth, thus making it
an essential public service. If PREPA were unable to continue operating, the whole
island would be left without electric power. The loss of capital productivity has left

---

[113] 48 U.S.C. §§ 2141(b)(1)(A).
[114] 48 U.S.C. §§ 2141(b)(1)(B).

PREPA essentially depending on the UTIER employees' labor production in order to be able to continue rendering such an essential service. Taking away from these UTIER members their rightfully earned and negotiated benefits, would only lead to a loss of labor that would devastate PREPA's stability and well-functioning. In order to secure funds for this service, it is necessary that the corporation continue providing and distributing electric power. The only way this distribution and productivity will continue, is if the labor productivity remains steady or grows. Yet neither will happen if the employees are not well remunerated and their rights protected. These Fiscal Plans and Budgets, by adopting the legislation enacted by the Commonwealth without any change in its unlawful and unconstitutional nature, violate PROMESA, because by taking away employee benefits they do not achieve their obligation of securing funds for the essential public service that PREPA renders.

162. PROMESA in Section 201(b)(1)(G) [115] specifically requires that any fiscal plan must: "(G) enable the achievement of fiscal targets". Both Fiscal Plans' goals include economic growth and stability. The 2017-2018 Budgets are supposed to aid those goals. Yet, how will they achieve economic growth and stability if the foundation for these plans is built on legislation that violates the Contract and Taking Clauses of the Constitution; when the Fiscal Plans are built on illegal and unconstitutional laws that take money, job benefits, financial certainty, and stability from its employees, resorting to taking legally earned benefits and monetary compensation, from those who are the backbone of the main provider and sole distributor of electric power of the Commonwealth. This strategy will result in the weakening of the corporation. The

---

[115] 48 U.S.C. §§ 2141(b)(1)(G).

economic loss that these employees will suffer, will have a ripple effect on PREPA and on the Commonwealth's economy that will make economic growth and stability uncertain and unattainable.

163. Lastly, PROMESA in Section 201(b)(1)(N)[116] specifically requires that any fiscal plan must: "(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act". Regarding this point, the CBA that was negotiated between PREPA and UTIER, was subscribed in 2008 and as such, is prior to the date of enactment of PROMESA, which demands that the agreement be respected. Nonetheless, both Fiscal Plans and Budgets violate this mandate. The CBA is impaired through the enactment and adoption of the abovementioned legislation, and by adopting and incorporating these laws into their reform measures, the Fiscal Plans and Budgets in turn violate the CBA and PROMESA. Through approval and certification of these measures the OB became complicit in the impairment of the CBA and in the violation of the Contract and Taking Clauses of the Constitution of the United States.

164. Based on the previous analysis it can be stated that the Fiscal Plans and Budgets, completely disregard the abovementioned PROMESA requirements, constituting a gross violation of the clear statutory mandates of PROMESA and the U.S. Constitution.

165. The certifications of the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, by the OB are arbitrary, lacking a rational basis, and in clear and open violation of the

---

[116] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G), (N).

requirements of Section 201 of PROMESA as here stated, and in blatant violation of the Constitution of the United States.

166. For all the above stated reasons, allowing these Fiscal Plans and Budgets to continue without making the necessary and constitutional corrections, would equal a gross violation not only of PROMESA but also of the contractual rights of these employees and the Constitutions of the U.S. and of the Commonwealth of Puerto Rico. Furthermore, it seriously encumbers the possibility of reversing the country's continuing economic contraction since taking from the UTIER members their legally acquired benefits would have a negative effect on employees, and a devastating outcome on the labor productivity that PREPA so desperately relies on. It will in turn, make economic recovery an even more tortuous and tough climb for these members, their families, PREPA, and the Commonwealth.

167. The latter impair the goals of PROMESA of generating an economy capable of repaying the debt of the Commonwealth, creating financial stability, and sustaining economic growth. In short, allowing the Fiscal Plans to continue as they are, would create a serious risk of completely destabilizing the PREPA corporation, event from which it cannot be assured it can recover from.

### I. PROMESA AND THE PLAN OF ADJUSTMENT OF DEBT

168. Section 302 of PROMESA[117] defines who may be eligible to file a case under Title III. In the particular case of the Commonwealth and of PREPA among other requirements, to be eligible for filing a Title III case, they must adopt a Fiscal Plan certified by the OB.

---

[117] 48 U.S.C. §§ 2162

169. Moreover, according to sections 104 (j) and 312 of PROMESA[118], as part of the Title III case, the OB, may file a plan of adjustment of the debts in a Title III. However, the OB may file the plan of adjustment of debts only after the issuing of a certification that it is consistent with the applicable certified Fiscal Plan.

170. Once filed, the court shall confirm the plan of adjustment of the debts, only if it satisfies a series of requirements. In section 314(b)(6)-(7), PROMESA specifically states that the plan of adjustment of debts must be feasible and in the best interests of creditors, and consistent with the applicable Fiscal Plan certified by the Oversight Board.[119]

171. Therefore, the certification of a **valid fiscal plan** by the OB is an essential requirement for the Commonwealth and PREPA in order to be eligible for filing a confirmable plan of adjustment of debt under Title III of PROMESA. As long as the Plan is at odds with Constitutional mandates, it will not be valid and should not be allowed to be eligible to file a confirmable plan of adjustment of debt under Title III of PROMESA.

172. Both, the PREPA and the Commonwealth Fiscal Plans, as they are currently, cannot be certified as valid fiscal plans. They adopt as part of their reform measures, unconstitutional legislation that violates and impairs an existing agreement between the UTIER members and PREPA. No valid legal plan can be based on laws that completely disregard Constitutional Clauses.

173. In addition, the Budgets and the Fiscal Plans do not achieve the fiscal targets for which they were drafted. The legislation on which they are based will not help

---

[118] 48 U.S.C. §§ 2124(j) and 2172.
[119] 48 U.S.C. §§ 2174(b)(6)-(7).

achieve the economic stability and growth that they pursue. They attack the very backbone and foundation on which PREPA relies on for productivity, leaving it weak and in serious danger of losing its main source of productivity. The Plans as they are, create economic chaos.

174. These Fiscal Plans are in violation of PROMESA and the Constitution of the United States and of the Commonwealth of Puerto Rico. Unless they are recast to no longer contain illegal and unconstitutional measures and as to comply with the requirements herein stated, they cannot be treated as valid fiscal plans. Since a valid fiscal plan is an essential requirement for the confirmation of a plan of adjustment of debts, the lack of compliance with the previously stated requirements makes it impossible to confirm a plan of adjustments of debts according to Section 314 of PROMESA.[120]

## V.    FIRST PRAYER FOR RELIEF

175. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 174 hereof as if fully set forth herein.

176. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims, and a declaratory judgment is necessary to resolve such controversy.

177. Plaintiff is entitled to an order declaring that PREPA is a protected essential public service.

## VI.    SECOND PRAYER FOR RELIEF

178. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 177 hereof as if fully set forth herein.

---

[120] 48 U.S.C. §§ 2174.

179. Plaintiff is entitled to an order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, violate the Contract Clause of the Constitution.

## VII.    THIRD PRAYER FOR RELIEF

180. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 179 hereof as if fully set forth herein.

181. Plaintiff is entitled to an order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, violate the Taking Clause of the Constitution.

## VIII.    FOURTH PRAYER FOR RELIEF

182. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 181 hereof, as if fully set forth herein.

183. Plaintiff is entitled to an order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, impair the CBA and violate the Contract Clause of the Constitution.

## IX.    FIFTH PRAYER FOR RELIEF

184. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 183 hereof, as if fully set forth herein.

185. Plaintiff is entitled to an order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, take accrued benefits belonging to the employees without affording them a just compensation in exchange and violate the Taking Clause of the Constitution.

## X.   SIXTH PRAYER FOR RELIEF

186. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 185 hereof, as if fully set forth herein.

187. Plaintiff is entitled to an order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 violate the Contract Clause of the Constitution.

## XI.   SEVENTH PRAYER FOR RELIEF

188. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 187 hereof, as if fully set forth herein.

189. Plaintiff is entitled to an order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget (2017-2018 Budgets), as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 violate the Taking Clause of the Constitution.

## XII.   EIGHTH PRAYER FOR RELIEF

190. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 189 hereof, as if fully set forth herein.

191. Plaintiff is entitled to an order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Contract Clause enshrined in the Constitution of the United States of America.

### XIII.    NINTH PRAYER FOR RELEIF

192. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 191 hereof, as if fully set forth herein.

193. Plaintiff is entitled to an order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Taking Clause enshrined in the Constitution of the United States of America.

### XIV.    TENTH PRAYER FOR RELIEF

194. Plaintiff repeats and alleges once again, the allegations contained in paragraphs 1 through 193 hereof, as if fully set forth herein.

195. Plaintiff is entitled to an order declaring that the PREPA Fiscal Plan, the Commonwealth Fiscal Plan and the 2017-2018 Budgets should be totally recast to ensure compliance with the requirements established in section 201(b) of PROMESA. They are to be reformulated as to comply with relative lawful priorities or agreements in effect prior to the date of enactment of PROMESA, comply with the U.S. Constitution, enable the achievement of fiscal targets, ensure funding for essential public services, and provide for estimates of revenues and expenditures based on applicable laws or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plans.

### XV.    ELEVENTH PRAYER FOR RELIEF

196. Plaintiff repeats and alleges once again, that the allegations contained in paragraphs 1 through 195 hereof, as if fully set forth herein.

197. Defendants should be enjoined and stayed from presenting any plan of adjustment of debt on the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, until they are recast to comply with PROMESA and the United States Constitution.

## XV. RELIEF DEMANDED

WHEREFORE, in view of the foregoing, Plaintiff respectfully requests from this Honorable Court to enter a judgment against defendants as follows:

a. An order declaring that PREPA is a protected essential public service.

b. An order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, violate the Contract Clause of the Constitution.

c. An order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, violate the Taking Clause of the Constitution.

d. An order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, impair the CBA and violate the Contract Clause of the Constitution.

e. An order declaring that Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, take accrued benefits belonging to the employees without affording them a just compensation in exchange and violate the Taking Clause of the Constitution.

f. An order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 violate the Contract Clause of the Constitution.

g. An order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 violate the Taking Clause of the Constitution.

h. An order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Contract Clause enshrined in the Constitution of the United States of America.

i. An order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Taking Clause enshrined in the Constitution of the United States of America.

j. An order declaring that the PREPA Fiscal Plan, the Commonwealth Fiscal Plan and the 2017-2018 Budgets should be totally recast to ensure compliance with the requirements established in section 201(b) of PROMESA. They are to be reformulated as to comply with relative lawful priorities or agreements in effect prior to the date of enactment of PROMESA, comply with the U.S. Constitution, enable the achievement of fiscal targets, ensure funding for essential public services, and provide for estimates of revenues and expenditures based on applicable laws or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plans.

63

k.  Defendants should be enjoined and stayed from presenting any plan of adjustment of debt on the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, until they are recast to comply with PROMESA and the United States Constitution.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this day 6 of August 2017.



Urb. Constancia
2803 Calle San Francisco
Ponce, Puerto Rico 00717
Tel: (787) 848-0666
Fax: (787) 841-1435

/s/Rolando Emmanuelli Jiménez
Rolando Emmanuelli Jiménez
USDC: 214105

/s/Yasmín Colón Colón
USDC: 230814

Emails: rolando@bufete-emmanuelli.com
yasmin@bufete-emmanuelli.com
 notificaciones@bufete-emmanuelli.com